UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| DAIKIN AMERICA, INC., | ) | |
| | ) | |
| | ) | PUBLIC VERSION |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 22-122 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GUJART FLUOROCHEMICALS | ) | |
| LIMITED, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |

_____

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, Plaintiff Daikin

America Inc. ("Plaintiff") hereby moves for judgment on the agency

record with respect to its complaint challenging the final determination

of the antidumping investigation issued by the U.S. Department of

Commerce ("Commerce") in *Granular Polytetrafluoroethylene Resin*

*from India: Final Determination of Sales at Less Than Fair Value and*

1

*Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 3,772 (Dep't Commerce Jan. 25, 2022) ("*Final Determination*").

For the reasons explained in the accompanying memorandum in support of its motion for judgment on the agency record, Plaintiff respectfully move for the Court to hold that the contested portions of the *Final Determination* are not supported by substantial evidence or otherwise not in accordance with law. Plaintiff further moves for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

*/s/ Luke A. Meisner*
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin America, Inc.*

Dated: September 19, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

DAIKIN AMERICA, INC.,

     *Plaintiff,*

v.

UNITED STATES,

     *Defendant,*

and

GUJART FLUOROCHEMICALS
LIMITED,

     *Defendant-Intervenor.*

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

PUBLIC VERSION

Case No. 22-122

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin
America, Inc.*

Dated: September 19, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY OF TERMS ...................................................................... vi

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................... 1

I.   Administrative Determination Under Review .................................... 1

II.  Issues Presented for Review.............................................................. 2

STANDARD OF REVIEW...................................................................... 2

STATEMENT OF FACTS ...................................................................... 4

SUMMARY OF ARGUMENT ............................................................... 12

ARGUMENT ........................................................................................ 15

I.   Commerce's Failure to Apply Adverse Facts Available to GFCL's
     U.S. Movement Expenses Was Not Supported by Substantial
     Evidence and Was Not in Accordance with the Law ........................ 15

  A. Legal Standard............................................................................ 15

  B. Record Evidence Demonstrates GFCL Was Able to Report
     Transaction-Specific U.S. Movement Expenses, But Did Not ...... 17

    i.  GFCL Could Identify Merchandise Sold in the U.S. with
        Merchandise Shipped from India Using Batch Numbers.......... 18

    ii. GFCL Could Link Batch Numbers to Specific Shipments,
        Permitting Calculation of U.S. Movement Expenses for Each
        Transaction ........................................................................... 21

  C. Commerce's Reasons for Accepting GFCL's U.S. Movement
     Expenses Were Not Grounded in Substantial Evidence .............. 24

    i.   Commerce Ignored Record Evidence that GFCL Batch
         Numbers Were Associated with Specific Shipments ............... 25

    ii.  Commerce Ignored Record Evidence that GFCL's Packing,
         Shipping, and Warehousing [                              ]............ 28

    iii. Commerce Ignored Record Evidence that GFCL's Allocation
         Method was Distortive.......................................................... 30

    iv.  GFCL's Timely Submission of Records Maintained in the
         Ordinary Course Does Not Excuse Commerce's Erroneous
         Findings................................................................................ 36

II. Alternatively, Commerce's Decision Not to Recalculate GFCL's Reported Movement Expenses on an Overall Average Basis Should Be Remanded as Unsupported by Record Evidence ........................ 39

III. Commerce's Decision to Grant GFCL a CEP Offset Was Not Supported by Substantial Evidence and Was Not in Accordance with the Law ...................................................................................... 43

A. Legal Standard .................................................................... 43

B. Commerce's Deviation from its Consistent Practice to Require Quantitative Support for LOT Claims Was Arbitrary ................. 46

D. GFCL Was Not Entitled to Protection Under § 1677m(d) because It Knowingly Provided Incomplete Information ............................... 55

IV. CONCLUSION ..................................................................... 57

CERTIFICATE OF COMPLIANCE

PUBLIC VERSION

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. United States*, 273 F.Supp.3d 1200 (Ct. Int'l Trade 2017)..43

*Ad Hoc Shrimp Trade Action Committee v. U.S.*, 675 F.Supp.2d 1287 (Ct. Int'l Trade 2009) ............................................................... 17

*AK Steel Corp. v. U.S.*, 346 F.Supp.2d 1348 (Ct. Int'l Trade 2004)........ 17

*Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ................................................................ 4, 27, 34

*Andaman Seafood Co., Ltd. v. U.S.*, 768 F.Supp.2d 1315 (Ct. Int'l Trade 2011) ....................................................................... 44

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ..45, 49

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) .......................... 3

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ........................................................................... 34

*Dongguan Sunrise Furniture Co., Ltd. v. U.S.*, 865 F.Supp.2d 1216 (Ct. Int'l Trade 2012) ................................................................. 6

*Dupont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir. 2005) ............................................................................... 3

*Essar Steel Ltd. v. U.S.*, 678 F.3d 1268 (Fed. Cir. 2012) ....................... 28

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)........ 3

*Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 2022 WL 1565618 (Ct. Int'l Trade 2022) ................................................ 27

*Hyundai Steel Co. v. United States*, 319 F.Supp.3d 1327 (Ct. Int'l Trade 2018)....................................................................... 51

*Hyundai Steel Co. v. United States*, 365 F. Supp.3d 1294, 1300 (Ct. Int'l Trade 2019) ............................................................... 43

*Hyundai Steel Co. v. United States*, 518 F.Supp.3d 1309, 1327 (Ct. Int'l Trade 2021) ............................................................... 55

*LG Chem, Ltd. v. United States*, 534 F.Supp.3d 1386 (Ct. Int'l Trade 2021)....................................................................... 38

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001)........ 9

*Navigator Company, S.A. v. United States*, 415 F.Supp.3d 1278 (Ct. Int'l Trade 2019) ............................................................... 30, 34

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ... 16, 24, 37

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ..... 3, 37, 42

*NSK Ltd. v. U.S.*, 481 F.3d 1355 (Fed. Cir. 2007) ....................... 36, 39, 51

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) ................................................................................. 55

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ........... 27

*RZBC Group Shareholding Co. Ltd. v. U.S.*, 100 F.Supp.3d 1288 (Ct. Int'l Trade 2015) ................................................................... 51

*SKF USA Inc. v. United States*, 35 C.I.T. 1365 (2011) ......................... 41

*SKF USA Inc. v. United States*, 800 F.Supp.2d 1316 (Ct. Int'l Trade 2011) ............................................................................................. 32

*Sucocitrico Cutrale Ltda. v. United States*, Slip-Op. 12-71, 2012 WL 2317764 (C.I.T. June 1, 2012) ................................................... 43

*Ta Chen Stainless Steel Pipe v. U.S.*, 23 C.I.T. 804 (1999) .................... 55

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................... 3

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................... 3

19 U.S.C. § 1677a(c)(2)(A) ............................................................. 6

19 U.S.C. § 1677b(7)(B) ................................................................. 9

19 U.S.C. § 1677b(a)(6)(B)(ii) ....................................................... 6

19 U.S.C. § 1677e(a)(2) ............................................................. 15, 17

19 U.S.C. § 1677e(b)(1) ............................................................. 15, 17

19 U.S.C. § 1677m(d) ......................................................... passim

## Other Authorities

*Certain Oil Country Tubular Goods from the Republic of Korea,* 87 Fed. Reg. 20,817 (Dep't Commerce April 8, 2022) ....................................... 46

*Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (Dep't Commerce June 29, 2020) ................................................. 46, 47

*Granular Polytetrafluorethylene Resin from India and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 10,926 (Dep't Commerce Feb. 23, 2021) ....................................... 4

*Granular Polytetrafluorethylene Resin from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 49,299 (Dep't Commerce Sept. 2, 2021) ........................................ 4

*Polyethylene Terephthalate Sheet from the Republic of Korea*, 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020) .................... 44, 46, 48, 49

*Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Dep't Commerce Feb. 14, 2020) ................................................................... 46

## Regulations

19 C.F.R. § 351.401(b) ..................................................................... 43

19 C.F.R. § 351.401(g) .............................................................. passim

19 C.F.R. § 351.412(f) ....................................................................... 9

PUBLIC VERSION

# GLOSSARY OF TERMS

| | |
|---|---|
| **AD** | Antidumping |
| **AFA** | Adverse Facts Available |
| **CEP** | Constructed Export Price |
| **Commerce** | U.S. Department of Commerce |
| **Daikin** | Daikin America, Inc. |
| **GFCL** | Gujarat Fluorochemicals Limited |
| **IDM** | Issues and Decision Memorandum |
| **GFCL Br.** | GFCL Rebuttal Brief (Nov. 19, 2021) |
| **LOT** | Level of Trade |
| **Pet. Br.** | Petitioner's Case Brief (Nov. 9, 2021) |
| **PTFE** | Polytetrafluoroethylene |
| **SAA** | Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994). |

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| ———————————————— | |
| DAIKIN AMERICA, INC., ) | |
| ) | PUBLIC VERSION |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 22-122 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| GUJART FLUOROCHEMICALS ) | |
| LIMITED, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| ————————————————) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Daikin hereby submits the following memorandum in support of

its motion for judgement on the agency record in the above-captioned

action.

**STATEMENT PURSUANT TO RULE 56.2(c)(1)**

## I.   Administrative Determination Under Review

Daikin seeks judicial review of Commerce's final determination in

the less-than-fair-value investigation of granular PTFE resin from

1

PUBLIC VERSION

India, in which Commerce (1) declined to apply facts otherwise available to respondent GFCL's reported U.S. movement expenses and (2) granted GFCL a CEP offset. The challenged determination, findings, and conclusions are set out in Commerce's January 18, 2022 IDM for the *Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Granular Polytetrafluoroethylene Resin from India* (Jan. 18, 2022) ("*Final IDM*"), Appx01055-Appx01075.

## II.   Issues Presented for Review

(1) Was Commerce's determination to accept GFCL's reported U.S. movement costs on an allocated basis supported by substantial evidence and in accordance with the law?

(2) Whether, alternatively, the Court should uphold Commerce's decision not to revise GFCL's movement expenses to remove certain distortions and inaccuracies that resulted from the way GFCL reported these expenses?

(3) Whether Commerce's determination to grant GFCL a CEP offset, despite the fact that GFCL failed to support its claim for such an offset with quantitative evidence, supported by substantial evidence and in accordance with the law?

## <u>STANDARD OF REVIEW</u>

This Court must hold unlawful any determination by Commerce in an antidumping proceeding that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence requires more than the mere assertion of "evidence which in and of itself justified {the determination} without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Ultimately, the substantial evidence standard asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Moreover, "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v.*

3

PUBLIC VERSION

*United States*, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000)

(collecting cases).

## STATEMENT OF FACTS

The AD proceeding at issue began on January 27, 2021, when

Daikin submitted an AD petition concerning unfairly traded imports of

granular PTFE resin from India. *Granular Polytetrafluorethylene Resin*

*from India and the Russian Federation: Initiation of Less-Than-Fair-*

*Value Investigations*, 86 Fed. Reg. 10,926 (Dep't Commerce Feb. 23,

2021), Appx01026. Commerce initiated the AD investigation on

February 23, 2021, and chose GFCL as the sole mandatory respondent.

On September 2, 2021, Commerce published its preliminary affirmative

determination in the AD investigation. *Granular Polytetrafluorethylene*

*Resin from India: Preliminary Affirmative Determination of Sales at*

*Less Than Fair Value*, 86 Fed. Reg. 49,299 (Dep't Commerce Sept. 2,

2021) ("Preliminary Determination"), Appx01050. The parties

subsequently submitted case briefs requesting changes be made to

certain aspects of the Preliminary Determination. On January 25, 2022,

Commerce published its final affirmative determination, accompanied

by an Issues and Decision Memorandum describing the determinations

PUBLIC VERSION

it reached regarding the requested changes briefed by the parties. *See Final IDM,* Appx01055.

The first issue challenged on appeal is Commerce's decision to accept GFCL's reported U.S. movement expenses for domestic inland freight (DINLFTPU), international freight (INTNFRU), and domestic inland insurance (INSUREU) on an allocated basis rather than a transaction-specific basis. In its initial AD questionnaire, Commerce instructed GFCL to report its U.S. movement expenses on the basis of "the specific freight charges incurred on each transaction." *Commerce AD Questionnaire* (Mar. 26, 2021) at Field 23.0, Appx09239. Commerce sought this information because, under the agency's regulations, parties are required to report such expenses on a "transaction-specific" basis and calculate them "on as specific a basis as is feasible," and may deviate from this method only where (1) transaction-specific reporting is not feasible *and* (2) the alternative method does not cause inaccuracies and distortions. 19 C.F.R. § 351.401(g). The purpose of this regulatory preference for transaction-specific movement expenses is that Commerce must deduct from GFCL's U.S. sales prices the cost of transporting goods to the United States to ensure a fair comparison to

GFCL's sales prices for sales in India, which do not incur such costs. *See* 19 U.S.C. § 1677b(a)(6)(B)(ii); 19 U.S.C. § 1677a(c)(2)(A), *see also Dongguan Sunrise Furniture Co., Ltd. v. U.S.*, 865 F.Supp.2d 1216, n. 44 (Ct. Int'l Trade 2012). Any departure from reporting transaction-specific U.S. movement expenses creates distortions that may artificially raise the value of GFCL's U.S. sales and mask dumping.

GFCL did not report its U.S. movement expenses on a transaction-specific basis. Rather, GFCL's questionnaire response stated that it

> …*aggregated* the gradewise[1] actual freight costs for its sales to {U.S. affiliate} GFL Americas during the POI by product and divided the actual freight costs by the weight of gradewise sales to GFL Americas. The per kg grade wise cost so arrived was then used to *allocate* freight among various line item reported in the sales database {sic}.

*GFCL. C Resp.* (May 17, 2021) at C-27, C-30, Appx03539, Appx03542 (emphasis added). In a supplemental questionnaire, Commerce asked GFCL to explain why it departed from the transaction-specific method. It noted that "Commerce's preference is for companies to report freight expenses on the most transaction-specific basis possible to prevent distortions and inaccuracies in the data reported." *GFCL Supp. C Resp.*

---

[1] "Grade" refers to the product type of PTFE. *See GFCL Sec. C Supp. Resp.* (Jul. 12, 2021) at Exhibit SC-5, Appx05106.

PUBLIC VERSION

(Jul. 12, 2021) at 7, Appx05087. Commerce then instructed GFCL to report its movement expenses on a transaction-specific basis or, alternatively, "explain why it is not feasible to do so, and why your reported allocation based on product type is appropriate." *Id.*

In its supplemental response, GFCL stated that it could not "establish a one-to-one correlation" between sales by GFCL to its U.S. affiliate, GFL America, and GFL America's sales to the unaffiliated U.S. customer, because such sales may involve multiple purchases from GFCL that are stored in a U.S. warehouse prior to sale. *Id.* at 7-8, Appx05087-05088. GFCL's response did not address the question of the appropriateness of its allocation method nor the risk of distortions or inaccuracies. GFCL merely reported that "it is not possible to report movement expenses on an actual basis and that's why reported on an allocation basis" {sic}. *Id.* at 8, Appx05088.

Based on GFCL's refusal to provide the information Commerce required, Daikin submitted a case brief that requested the application of partial AFA to calculate GFCL's U.S. movement expenses. *See Pet. Br.* at 3, Appx08605. Daikin pointed to specific record evidence showing that GFCL could have reported transaction-specific movement expenses

PUBLIC VERSION

because it was able to match its sales to GFL America with GFL America's sales to unaffiliated U.S. customers by tracking the batch numbers of the merchandise. *See id.* at 4-5, Appx08606-08607. Daikin also described numerous distortions and inaccuracies caused by GFCL's decision to allocate expenses by product type. *See id.* at 5-9, Appx08607-08611. Daikin further argued that if Commerce did not apply adverse facts available to GFCL, it should at least apply neutral facts available by recalculating the movement expenses in a manner that removes the distortions from GFCL's allocation methodology by using the period-wide weighted-average movement expenses for all product types. *Id.* at 10-11, Appx08612-08613.

In its Final Determination, Commerce declined to apply AFA or neutral facts available and instead accepted GFCL's allocation method as "reasonable." *Final IDM* at 6, Appx01060. Commerce's discussion of evidence raised by Daikin that contradicted these findings was limited to cursory single-sentence references or, in the case of evidence demonstrating that GFCL's allocation method was distortive, entirely absent. *See id.*

8

PUBLIC VERSION

The next issue challenged on appeal is Commerce's granting of GFCL's claim for a CEP offset. *See id.* at 9-10, Appx01063-01064. A CEP offset is an adjustment to normal value that Commerce may grant when a respondent's home market sales occur at a more advanced LOT than the respondent's U.S. sales, and therefore involve higher selling expenses.[2] Consistent with its established practice, Commerce instructed GFCL in its initial antidumping questionnaire to "{p}rovide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different levels of trade impact price comparability." *GFCL A Resp.* (Apr. 26, 2021) at A-24, Appx01910. Commerce required this information because it will only grant a CEP offset where: (1) the respondent establishes that the home market LOT is at a more advanced stage of distribution than the LOT of the constructed export price; and (2) Commerce lacks enough data to determine whether the difference affects price comparability. *See* 19 U.S.C. § 1677b(7)(B); 19 C.F.R. § 351.412(f).

---

[2] The U.S. Court of Appeals for the Federal Circuit has interpreted LOT or "level of trade" to refer to the "marketing stage" at which sales are made – for instance, sales to wholesale distributors as compared to sales to end users. *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001).

PUBLIC VERSION

Rather than provide Commerce with the data it requested, GFCL merely asserted that "{t}here is significant variation in the level of trade between U.S. sales and Home Market sales, which can be quantified when comparing the expenses assigned to sales associated with each level of trade." *GFCL A Resp.* (Apr. 26, 2021) at A-24, Appx01910. While paying lip service to the need for a quantitative analysis, GFCL did not provide any actual quantification of the variation in LOTs, and instead referred Commerce to a selling functions chart purporting to show different, self-selected intensities of selling functions in the home market and the U.S. market. *Id.* at Exhibit A-11, Appx02101. In a supplemental questionnaire, Commerce found that the selling functions chart did not constitute the quantitative analysis that was required and thus instructed GFCL to "{p}rovide documentation supporting GFCL's methodology (*i.e.*, the quantitative analysis) used to report the levels of intensity…provided by GFCL." *GFCL A Supp. Resp.* (May 24, 2021) at 1, Appx03880. GFCL replied:

> As GFCL stated in its initial Section A questionnaire response, GFCL used the "0-10 scale," as provided by the Department, with "5" representing a sale with average associated selling expenses to report the levels of intensity for each selling activity/function. If GFCL never performs a selling activity, this was marked with a "0." If GFCL always

> performs selling activity, this activity was marked with "10."
> Actions frequently or sometimes performed were marked
> with levels of intensity of "8" or "3," respectively.

*Id.* at 2, Appx03881. This response again failed to provide an actual

quantitative analysis that could explain GFCL's assignment of different

values to different selling activities and prove, as GFCL asserted, that

"{t}here is significant variation in the level of trade between U.S. sales

and Home Market sales, which can be quantified{.}" *GFCL A Resp.* (Apr.

26, 2021) at A-24, Appx01910.

Daikin's case brief established that GFCL failed to provide a

quantitative analysis supporting its LOT claims and argued that

Commerce should therefore deny GFCL's claim for a CEP offset. *See*

*Pet. Br.* at 12, Appx08614. Nevertheless, in its Final Determination,

Commerce granted GFCL a CEP offset. *See Final IDM* at 9-10,

Appx01063-01064. This was not because GFCL's responses were

adequate. In fact, Commerce agreed with Daikin that they were not, but

it stated:

> {W}e agree that the quantitative analysis provided by GFCL
> was inadequate in response to Commerce's initial
> questionnaire, which requires that the respondent provide a
> quantitative analysis showing how the expenses assigned to
> the POI sales made at different claimed levels of trade
> impact price comparability, as well as how the quantitative

11

> analysis supports the claimed levels of intensity for the
> selling activities reported in the selling functions chart.

*Id.* at 9, Appx01063. Commerce's theory in granting GFCL a CEP offset

was that Commerce itself had failed to "inform GFCL that it required

more information," because its supplemental questionnaire "only

requested generally that GFCL provide supporting documentation for

its reported levels of intensity, which GFCL did for certain claimed

selling activities." *Id.* at 10, Appx01064. Commerce explained that

although it would accept GFCL's information as sufficient "for purposes

of this segment of the proceeding," it noted that "a more detailed and

robust quantitative analysis of its selling functions will be required for

us to evaluate whether a CEP offset is warranted in any future

administrative reviews{.}" *Id.*

## SUMMARY OF ARGUMENT

Commerce's failure to apply AFA to GFCL's U.S. movement

expenses was not supported by substantial evidence and was not in

accordance with the law for two distinct reasons. *First*, GFCL's own

sales documentation clearly demonstrated that it could have reported

transaction-specific U.S. movement expenses. In particular, GFCL could

(i) track merchandise by batch number [

]; (ii) link these batch numbers to specific shipments; and (iii) calculate the cost to ship [

]. Because 19 C.F.R. § 351.401(g) requires that respondents submit transaction-specific movement expenses, if feasible, Commerce cannot willy-nilly excuse GFCL from that requirement. *Second*, Commerce's rationale for accepting GFCL's product-specific allocation of movement expenses was contradicted by record evidence and failed to address Daikin's arguments. In particular, Commerce failed to require that GFCL affirmatively prove that its allocation method did not cause distortions, despite a legal requirement to do so, and Commerce's determination unlawfully ignored specific evidence of these distortions raised by Daikin.

Even assuming, *arguendo*, that Commerce lawfully declined to calculate GFCL's movement expenses using AFA, it should have recalculated these expenses on an overall-average basis, rather than the product-specific basis that GFCL proposed. Doing so would have removed the distortions inherent in GFCL's product-specific allocation, which produced [     ] variations in movement costs by product type despite GFCL's practice of [

13

]. Because Commerce was legally required to ensure that GFCL's allocation was free of distortions, it should have, at a minimum, assigned the weighted average movement expenses of all product types to GFCL's U.S. sales.

Turning to the next issue challenged on appeal, Commerce's decision to grant GFCL a CEP offset was not supported by substantial evidence and was not in accordance with the law, for three distinct reasons. *First*, Commerce arbitrarily departed from its consistent practice to require a quantitative analysis to support a respondent's claim that different sales activities are performed at allegedly different LOTs. *Second*, contrary to Commerce's assertion that GFCL had not been provided with sufficient notice under 19 U.S.C. § 1677m(d) that its responses were deficient, Commerce's requests and GFCL's responses demonstrated that GFCL was aware that it needed to support its LOT claims with quantitative analysis. *Third*, because GFCL had notice of what Commerce required and that its initial response was deficient, GFCL's failure to provide a quantitative analysis was intentional, and § 1677m(d) could not operate to protect such intentionally deficient responses. Because it is the respondent's burden to demonstrate

PUBLIC VERSION

entitlement to a favorable adjustment, and because GFCL failed to

prove the existence of different LOTs, Commerce's decision to grant a

CEP offset was arbitrary and capricious and should be overturned.

## ARGUMENT

I. **Commerce's Failure to Apply Adverse Facts Available to GFCL's U.S. Movement Expenses Was Not Supported by Substantial Evidence and Was Not in Accordance with the Law**

### A. Legal Standard

Commerce is required by statute to reach its determinations using

facts otherwise available when a respondent: (i) withholds information

that has been requested by Commerce; (ii) fails to provide information

within the deadlines established or in the form and manner requested;

(iii) significantly impedes a proceeding; or (iv) provides information that

cannot be verified. *See* 19 U.S.C. § 1677e(a)(2). In selecting from the

facts otherwise available to fill gaps in the record created by the

respondent, Commerce may do so using an inference that is adverse to

the respondent if "an interested party has failed to cooperate by not

acting to the best of its ability to comply with a request for information"

from Commerce. 19 U.S.C. § 1677e(b)(1). The Court of Appeals for the

Federal Circuit has interpreted "{t}o the best of its ability" to mean

"one's maximum effort," and has specified that it is not enough for a
respondent to simply submit whatever information requires the least
effort to Commerce; rather the information provided must represent the
"maximum it is able to do" and must be "complete and accurate."
*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.
2003).

This standard requires that a respondent "conduct prompt,
careful, and comprehensive investigations of all relevant records that
refer or relate to the imports in question to the full extent of the
importers' ability to do so." *Id.* The court in *Nippon Steel* required two
showings to apply an adverse inference: (1) an objective showing that a
reasonable and responsible party would have known that the requested
information was required to be kept; and (2) a subjective showing that
the respondent failed to produce the information and this lack of
cooperation was due either to (i) failure to keep all required records or
(ii) failing to put forth its maximum efforts to investigate and obtain the
requested information from its records. *See id.* at 1382-83. The court
concluded that "{t}he statutory trigger for Commerce's consideration of

PUBLIC VERSION

an adverse inference is simply a failure to cooperate to the best of

respondent's ability, regardless of motivation or intent." *Id.*

While Commerce has some discretion in determining whether a

respondent cooperated to the best of its ability, that discretion is "not

unlimited." *Ad Hoc Shrimp Trade Action Committee v. U.S.*, 675

F.Supp.2d 1287, 1304 (Ct. Int'l Trade 2009). Rather, in order to be

upheld by a reviewing court, Commerce's determination not to apply

AFA must itself be "reasonable, not an abuse of discretion, and

supported by substantial evidence." *See AK Steel Corp. v. U.S.*, 346

F.Supp.2d 1348, 1356 (Ct. Int'l Trade 2004).

### B. Record Evidence Demonstrates GFCL Was Able to Report Transaction-Specific U.S. Movement Expenses, But Did Not

During the AD investigation, GFCL knew that it was obligated to

report transaction-specific movement costs, as Commerce's initial

requests for that information reflected the requirements of 19 C.F.R. §

351.401(g). Further, GFCL's own sales records showed it was feasible to

report its U.S. movement expenses on a transaction-specific basis.

Despite this ability, GFCL failed to expend the effort necessary to

provide Commerce with the requested information, thereby triggering

PUBLIC VERSION

Commerce's duty to use facts otherwise available under 19 U.S.C. §
1677e(a)(2) with an adverse inference under 19 U.S.C. § 1677e(b)(1).

> *i. GFCL Could Identify Merchandise Sold in the U.S.
> with Merchandise Shipped from India Using Batch
> Numbers*

GFCL's principal justification for declining to report transaction-
specific movement expenses was its purported inability to "establish a
one-to-one correlation" between GFL America's purchases from GFCL
in India and GFL America's sales to unaffiliated U.S. customers. *GFCL
Supp. C Resp.* (Jul. 12, 2021) at 7-8, Appx05087-05088. GFCL excused
its failure based on the claim that many of its U.S. sales involved
"multiple purchases from {GFCL}, which are then stored in the U.S.
warehouse." *Id.* GFCL's theory was that because U.S. sales to
unaffiliated customers were filled from this warehouse and could
involve inventory derived from multiple shipments from India,
matching these shipments to U.S. sales was not "feasible." *Id.* In its
rebuttal brief, GFCL reiterated to Commerce that "the transaction-
specific shipment information on which the movement expenses at issue
were based cannot be tracked or identified after the goods are stored in
the U.S. warehouses and entered into GFL Americas LLC's inventory."

PUBLIC VERSION

*GFCL Br.* at 3, Appx08685. When Commerce explained its decision not to apply AFA to GFCL's movement expenses, it repeated GFCL's explanation almost verbatim in its Final Determination:

> GFCL reported that its U.S. affiliate, GFL Americas, stored the inventory for U.S. sales in a warehouse and then sold it to its U.S. customers based on the pending orders and availability of the stock in the warehouse. Specifically, GFCL reported that its sales of subject merchandise involved 'multiple purchases from {GFCL},' and, therefore, it was not feasible to 'establish a one-to-one correlation between purchases and sales.' As GFCL also noted, the merchandise shipped from GFCL's U.S. warehouses can be from various lots of different sizes, product types, and over different time periods.

*Final IDM* at 6, Appx01060.

GFCL's professed inability to link merchandise shipped from India to its U.S. warehouse with merchandise sold to the U.S. customers was directly and clearly contradicted by record evidence. In its supplemental questionnaire response, GFCL included an "Export Customer Complaint Register" that recorded complaints from [

       ] customers about the merchandise they received, and

[

                    ]. *See GFCL Supp. A. Resp.* (May 24, 2021) at

PUBLIC VERSION

Exhibit SA-3(a), Appx03913.[3] This document showed that GFCL

routinely tracks merchandise batch numbers [

]. *See id.* For example, [

].” *Id.* GFCL

determined that “[

].” *Id.* In another example, GFCL recorded that [

].” *Id.* Finally, GFCL recorded that the customer for

[                                  ] complained that [

]. GFCL was able to trace [

] and determined that [

---

[3]   GFCL provided the Export Customer Complaint Register in connection with an issue unrelated to movement expenses, in which Commerce asked GFCL to provide documents supporting its claimed selling functions performed in the U.S. *See GFCL Sec. A Supp. Resp.* (May 24, 2021) at 1-2.

]. *Id.*

Daikin's case brief raised this issue before Commerce, but Commerce's final determination did not bother to address the existence of the Export Customer Complaint Register and whether it proved the "feasibility" of reporting movement expenses on a transaction-specific basis. This record evidence established that GFCL had detailed knowledge of which merchandise from India had been packed, shipped, and sold to its customers abroad, [                    ], undermining GFCL's professed inability to "establish a one-to-one correlation" between its purchases from India and its sales in the U.S. *GFCL Supp. C Resp.* (Jul. 12, 2021) at 8, Appx05088.

### ii. *GFCL Could Link Batch Numbers to Specific Shipments, Permitting Calculation of U.S. Movement Expenses for Each Transaction*

In addition to its ability to link individual U.S. sales to specific batches of merchandise from India, GFCL also could trace each batch to specific shipments. Indeed, GFCL placed information on the record showing it had all of the variables necessary to calculate transaction-

21

PUBLIC VERSION

specific movement costs for each U.S. sale: the [

] contained in the U.S. sale.

GFCL's commercial invoices establish the cost of its shipments

from India to the U.S. For example, [

] *GFCL Supp. A Resp.* (May 24, 2021) at Exhibit SA-4,

Appx03932. [

]. *Id.*, Appx03935. [

]. *Id.* Because GFCL knew the [

],

GFCL could calculate the cost to ship each batch – *i.e.* [

].

With that information, GFCL could arrive at the transaction-

specific cost for international freight for a given sale's merchandise to

the U.S. by making the effort to determine which batches were included

22

PUBLIC VERSION

in each U.S. sale. GFCL possessed that ability, because [



]. *Id.*, Appx03925.[4] For example, GFCL recorded that the same

[



]. *Id.* This record evidence clearly established

that GFCL could link merchandise in U.S. sales to specific shipments. It

further showed that even if batches were split up between sales, GFCL

could still make the calculation because its information [

]. *Id.* Indeed, GFCL must have

possessed the ability to understand [

], because that is

exactly what the Export Customer Complaint Register reflects.

While it may have been time-consuming or onerous to trace the

batch numbers that went into each U.S. sale, the law requires that

---

[4]  These same documents also recorded the cost of inland freight for the U.S. sale,
     as they [                                                                    ].
     Compare [

                                                                ]. *GFCL Supp. A Resp.*
     (May 24, 2021) at Exhibit SA-4, Appx03920

PUBLIC VERSION

GFCL employ its "maximum effort" if it wished to avoid the application of AFA. *Nippon Steel Corp.*, 337 F.3d at 1382 (Fed. Cir. 2003). However, as Daikin's case brief pointed out to Commerce, GFCL simply refused to expend the same efforts for Commerce that it routinely expends for its own customers when they [

] for purposes of receiving technical support. *Pet. Br.* at 5, Appx08607. Because Commerce's request for transaction-specific movement costs was embodied in the law at 19 C.F.R. § 351.401(g), and because GFCL manifestly "fail{ed} to put forth its maximum efforts to investigate and obtain the requested information from its records," GFCL's conduct satisfied the elements to trigger Commerce's application of AFA. *Nippon Steel Corp.*, 337 F.3d at 1382-3.

### C. Commerce's Reasons for Accepting GFCL's U.S. Movement Expenses Were Not Grounded in Substantial Evidence

Despite GFCL's failure to meet the statutory standard, Commerce declined to apply AFA and instead accepted GFCL's proposed method for calculating movement expenses on an allocated basis as "reasonable." *Final IDM* at 6, Appx01060. Commerce's determination that GFCL was exempt from the requirement to provide transaction-

24

PUBLIC VERSION

specific data was grounded in several erroneous findings. These findings included: (1) the record did not indicate how batch numbers from U.S. sales were associated with batch numbers from specific shipments; (2) the merchandise shipped from GFCL's U.S. warehouses can be from various lots of different sizes, product types, and over different time periods; (3) there was no evidence that GFCL's allocation methodology caused inaccuracies or was distortive; (4) GFCL timely responded to all of Commerce's requests for information regarding movement expenses; and (5) GFCL's allocation methodology was based on its records maintained in the ordinary course of business. *Final IDM* at 6-7, Appx01060-01061. These findings were flatly contradicted by record evidence, and none of them constituted substantial evidence that GFCL's reported data reflected its maximum efforts.

> ### i. *Commerce Ignored Record Evidence that GFCL Batch Numbers Were Associated with Specific Shipments*

Commerce found that "{a}lthough certain documents on the record referenced by the petitioner, such as quality assurances, contain batch numbers, the record does not indicate how those batch numbers are associated with specific shipments." *Id.* at 7. Commerce stated it was therefore unable to conclude that "allocating movement expenses by

batch number would result in a more transaction-specific cost than

allocating freight expenses by the grade of the product sold." *Id.* In fact,

the record did indicate how batch numbers were associated with specific

shipments. As described in the preceding section, GFCL placed

[

].

*See GFCL Supp. A Resp.* (May 24, 2021) at Exhibit SA-4, Appx03925.

[

]. For example, the [

]. *Id.* The [

]. *Id.*,

Appx03935.

Since GFCL knew [

] were necessarily "associated with specific

shipments" on the record. Commerce's finding to the contrary was

unsupported, unexplained, and failed to consider the evidence raised by

Daikin in its case brief regarding the links between [

]. *See Pet. Br.* at

3-4, Appx08605-08606 (explaining GFCL's "ability to link the {U.S.} sale

to…the [

].""). By "fail{ing} to consider or discuss record evidence

which, on its face, provides significant support for an alternative

conclusion," Commerce's conclusion was unsupported by substantial

evidence. *See Allegheny*, 112 F.Supp.2d at 1165.

To the extent Commerce needed more information regarding the

exact methodology GFCL employed to track the batch numbers in its

U.S. sales and in its India-U.S. shipments, GFCL should not be able to

benefit from the incompleteness of a record that it alone had a duty to

create. Antidumping respondents carry "the burden to build the record

of the proceeding." *Hyundai Electric & Energy Systems Co., Ltd. v.*

*United States*, 2022 WL 1565618, at *8 (Ct. Int'l Trade 2022) (citing

*QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).

Despite this burden, Commerce excused GFCL from reporting

PUBLIC VERSION

transaction-specific data because of the lack of evidence that GFCL

alone possessed and was obligated to provide under the "maximum

efforts" standard. This effectively inverts the intent of the antidumping

laws by rewarding GFCL for *not* providing information. *Essar Steel Ltd.

v. U.S.*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (finding that the purpose

of the AFA statute is to incentivize respondents to provide information

to Commerce).

> ii.  *Commerce Ignored Record Evidence that GFCL's
>       Packing, Shipping, and Warehousing [
>                  ]*

Commerce accepted GFCL's argument that it could not establish a

one-to-one correlation between merchandise shipped from India and

sold in the U.S. because "the merchandise shipped from GFCL's U.S.

warehouses can be from various lots of different sizes, product types,

and over different time periods." *Final IDM* at 6, Appx01060. However,

the fact that Indian shipments and U.S. sales may have been dissimilar

in size, product type, or time period did not prevent GFCL from making

transaction-specific calculation based on the information it *did* have.

Firstly, the existence of "lots of different sizes" posed no obstacle

given that GFCL could calculate movement costs at the level of

[                    ]. As shown above, GFCL's own sales documents show

that it knew [

                              ]. *See supra*. Secondly, differences in

product type could not have mattered because [


   ]. While PTFE is sold in different "grades," PTFE of any grade

retains the same basic physical properties, and so the method of

packing, shipping, and warehousing PTFE does not change by grade.

Indeed, GFCL's questionnaire responses reported only two methods for

packing subject merchandise: cardboard boxes and plastic drums, with

no differentiation by grade. *See GFCL A Resp.* (Apr. 26, 2021) at A-21,

Appx01907. Indeed, all of GFCL's sales documentation shows that it

[


   ]. For instance, [



                    ]. *See GFCL Supp. A Resp.* (May 24, 2021) at

Exhibit SA-4, Appx03953. Furthermore, there is no record evidence that

PUBLIC VERSION

PTFE grades required different warehousing methods. Lastly, the fact that U.S. sales consisted of merchandise shipped from the warehouse at different times meant only that GFCL would need to trace the batches that made up each sale. All of the relevant movement expenses were incurred for each batch *prior* to shipment from the warehouse to the U.S. customer.

Reporting these movement expenses on a transaction-specific basis may have required GFCL to expend additional time and energy, but that is precisely what the "maximum efforts" standard contemplates.

### iii.  Commerce Ignored Record Evidence that GFCL's Allocation Method was Distortive

"{T}he regulations expressly require {the respondent}, when reporting an expense on an allocated basis, to demonstrate that the allocation does not cause inaccuracies or distortions." *Navigator Company, S.A. v. United States*, 415 F.Supp.3d 1278, 1291 (Ct. Int'l Trade 2019). GFCL's method for allocating movement costs was to average such costs by product type, or "grade." *GFCL. C Resp.* (May 17, 2021) at C-27, C-30, Appx03539, Appx03542. Because [

], GFCL's allocation

PUBLIC VERSION

method was profoundly distortive. In its case brief, Daikin carefully

explained these distortions to Commerce. *See Pet. Br.* at 5-10,

Appx08607-08612. Yet Commerce concluded, summarily and without

addressing Daikin's arguments, that "there is no evidence that {GFCL's}

allocation methodology causes inaccuracies or is distortive." *Final IDM*

at 6, Appx01060.

In fact, such evidence was overwhelming. Firstly, GFCL's reported

movement expenses showed [        ] variation between different product

types [                                              ]. For example,

GFCL reported that [


   ]. *See Pet. Br.* at 6, Appx08608. Because GFCL's sales

documentation shows that [


                                    ] clearly distort the movement

expenses that were actually incurred and, as a result, the net U.S. price

used to calculate GFCL's dumping margin. *Compare GFCL Supp. A*

*Resp.* (May 24, 2021) at Exhibit SA-4, Appx03953 (showing that

[

]) *with*

*GFCL C Resp.* (May 18, 2021) at Exhibit C-14, Appx03619 (showing

that GFCL reported a per-unit freight cost of [          ] for [

  ] and a per-unit freight cost of [        ] for [                  ]). It

defies common sense that Commerce could accept a movement expense

allocation method that resulted in [      ] divergences across product

types despite no [

    ].

Because PTFE product types do not differ in shipment method but

do differ as to price, an allocation that averages movement expenses by

product type is akin to allocating such expenses by product value. This

is the only apparent explanation for the [      ] variation in movement

expenses for product types with identical physical properties. This

Court has refused to accept such allocations where the products are

physically similar and involve uniform shipping methods. For instance,

in *SKF USA Inc. v. United States*, 800 F.Supp.2d 1316 (Ct. Int'l Trade

2011), the Court approved of Commerce's rejection of a respondent's

allocation of movement expenses based on product value, because under

that methodology "two different sales of the same bearing, packed in the same manner, could have different reported packing expenses solely because of differences in price." *Id.* at 1375. The Court upheld Commerce's determination that "allocation based on weight avoided the distortion that it identified as occurring when value-based allocation was applied." *Id.*

Secondly, GFCL's movement expenses included both [

] for reasons that were never explained. *See Pet. Br.* at 7, Appx08609. Even more concerningly, the movement expenses that GFCL allocated to [

]. Indeed, the weighted-average expense for international freight for all products,

[        ], is [

] *See id.* Lastly, GFCL's allocation method resulted in numerous anomalies, including [         ] U.S. sales with [     ] movement expenses and [

]. *See id.* at 5-6, Appx08607-08608. The failure of a

PUBLIC VERSION

respondent to explain inclusion of [




].

Commerce's summary refusal to consider the evidence of

distortions and inaccuracies that Daikin raised in its case brief falls

short of the agency's obligation under the substantial evidence

standard, which requires Commerce to "take into account whatever in

the record fairly detracts from its weight." *CS Wind Vietnam Co. v.*

*United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Indeed,

"Commerce's total failure to consider or discuss record evidence which,

on its face, provides significant support for an alternative conclusion

renders the Department's determination unsupported by substantial

evidence." *Allegheny*, 112 F.Supp.2d at 1165 (Ct. Int'l Trade 2000)

(collecting cases). Commerce's single-sentence disposition of the issue,

without any consideration or discussion of the evidence that Daikin

PUBLIC VERSION

raised, is sufficient on its own to render Commerce's determination unsupported by substantial evidence.

In addition, Commerce's conclusory determination that there was "no evidence that {GFCL's} allocation methodology causes inaccuracies or is distortive" wrongly shifted the burden to Daikin to provide evidence that GFCL's allocation was distortive. *See Final IDM* at 6, Appx01060. In fact, the antidumping laws place the burden with the respondent to affirmatively demonstrate that its allocation is *not* distortive. 19 U.S.C. § 351.401(g) provides that "{a}ny party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions." *Id.* In the underlying investigation, when specifically asked by Commerce to do so, GFCL failed to explain why its allocation methodology did not cause distortions. *GFCL Supp. C Resp.* (Jul. 12, 2021) at 7-8, Appx05087-Appx05088. GFCL's rebuttal brief similarly ignored the specific evidence of distortions that Daikin's own brief had raised, only offering inapposite assertions that tracing moving expenses

by batch would "introduce a distorted batch-number specific allocation" and that previous attempts to report on a transaction-specific basis yielded "an extremely complicated and inaccurate calculation." *GFCL Br.* at 7, 9, Appx08689, Appx08691. Asserting purported drawbacks of the transaction-specific method was not enough – GFCL was required to affirmatively demonstrate that its proposed allocation methodology did not produce distortions. *See* 19 C.F.R. § 351.401(g); *see also NSK Ltd. v. U.S.*, 481 F.3d 1355 (Fed. Cir. 2007) (upholding Commerce's rejection of respondent's proposed allocation because "{i}nstead of setting forth a full explanation of why {the allocation} is non-distortive, NTN relied on a brief conclusory assertion to that effect"). Because the evidence of distortions that Daikin presented was never addressed, Commerce's determination is unsupported by substantial evidence.

> iv. *GFCL's Timely Submission of Records Maintained in the Ordinary Course Does Not Excuse Commerce's Erroneous Findings*

In its *Final IDM*, Commerce further justified its decision to accept GFCL's movement expenses by noting that "GFCL timely responded to all of Commerce's requests for information regarding its movement expenses" and that "GFCL's allocation methodology is based on its

records maintained in the ordinary course of business." *Final IDM* at 6, Appx01060. However, the submission of distortive or incorrect information, even if timely and maintained in the ordinary course, does not satisfy a respondent's duty under the AD laws. Under 19 C.F.R. § 351.401(g), a respondent must submit transaction-specific expenses unless (1) transaction-specific reporting is not feasible and (2) the alternative method does not cause inaccuracies and distortions. As demonstrated above, GFCL was able to report transaction-specific expenses and its alternative method was distortive. Thus, Commerce was not free to excuse GFCL from its obligation to report transaction-specific expenses on the basis that GFCL reported distortive expenses on an allocated basis within the deadlines set by Commerce.

Regarding GFCL's timeliness, in addition to being "prompt," respondents must also conduct "careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." *Nippon Steel*, 337 F.3d, at 1382. A respondent's data that is submitted promptly, but does not reflect a careful and comprehensive investigation to the full extent of its ability, is therefore deficient.

PUBLIC VERSION

Regarding records maintained in the ordinary course, 19 C.F.R. § 351.401(g) provides that Commerce, when determining the feasibility of transaction-specific reporting, "will take into account the records maintained by the party in question in the ordinary course of its business," among other factors. *See* 19 C.F.R. § 351.401(g)(3). However, the fact that an allocation method may be based on records maintained in the ordinary course is not a sufficient condition for Commerce to ignore its preference and accept an allocation. For example, in *LG Chem, Ltd. v. United States*, 534 F.Supp.3d 1386, 1402 (Ct. Int'l Trade 2021), this Court upheld Commerce's choice to reject a respondent's division-specific method of allocating expenses as less accurate than a company-wide method, even though the respondent tracked the expenses by division in the ordinary course of its business.

GFCL has argued that because transaction-specific expenses were not tracked in the ordinary course, Commerce was not permitted to require them. *GFCL Br.* at 7, Appx08689. That is not the standard. The key inquiry is whether the respondent records the *information* necessary to calculate transaction-specific expenses in the ordinary course, not whether it was already performing that calculation prior to

38

Commerce's requests. *See NSK Ltd. v. U.S.*, 346 F.Supp.2d 1312, 1342 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (rejecting respondent's argument that "its records do not allocate expenses based on weight" because respondent's "product brochure lists weight for all of its {products}."). Like the respondent in *NSK*, GFCL kept records in the ordinary course of business that permitted it to calculate transaction-specific expenses, such as [


]. *See supra.* Commerce's finding that GFCL's preferred allocation methodology "is based on its records maintained in the ordinary course of business" misses the point – if it was feasible to calculate transaction-specific expenses based on GFCL's records, then Commerce was obligated to reject expenses on an allocated basis –the regulations require the most transaction-specific calculation that is feasible. *See* 19 C.F.R. §351.401(g).

## II.    Alternatively, Commerce's Decision Not to Recalculate GFCL's Reported Movement Expenses on an Overall Average Basis Should Be Remanded as Unsupported by Record Evidence

Even if Commerce was warranted in determining not to apply partial AFA to GFCL based on the respondent's failure to report its

movement expenses on a transaction-specific basis, Commerce should have, at a minimum, recalculated GFCL's reported movement expenses to remove distortions and inaccuracies. As discussed above, the record evidence showed that, for individual transactions, different types of PTFE sold by GFCL were [

]. As a result, it makes no sense for these movement expenses to be allocated by product type in a manner that results in [     ] divergences in the reported movement expenses for different product types. Furthermore, as discussed above, when asked by Commerce why it was appropriate to allocate movement expenses by product type, GFCL completely and utterly failed to provide any response to this question. Accordingly, even if Commerce were actually correct in finding that it was not feasible for GFCL to report its movement expenses on a more specific basis, Commerce should have recalculated GFCL's movement expenses on an overall average basis rather than a product-specific average basis.

Significantly, in prior proceedings, where a respondent's allocation of sales expenses has led to inaccuracies or distortions, Commerce has not hesitated to recalculate the expenses in question. For example, in

an administrative review of the AD orders on ball bearings, the respondent allocated its packing expenses by value based on the gross unit price of the bearings. *SKF USA Inc. v. United States*, 35 C.I.T. 1365, 1373 (2011). In the final results of the review, Commerce reallocated the packing costs to convert them to a weight basis as opposed to the value basis used by the respondent. *Id.* Commerce found that under the respondent's allocation methodology, "two different sales of the same bearing, packed in the same manner, could have different reported packing expenses solely because of differences in price." *Id.* at 1375 (citation omitted). Commerce concluded that allocating by weight was a "better method for allocating packing expenses than price because it avoids the problem described above." *Id.* On appeal to the CIT, Commerce's decision to reallocate the packing expenses was affirmed. The Court found that "Commerce reasonably determined that allocation based on weight avoided the distortion that it identified as occurring when value-based allocation was applied." *Id.*

Commerce could have easily removed the distortions in GFCL's allocation of movement expenses by product type by assigning to all U.S. sales the weighted-average movement expenses of all product

PUBLIC VERSION

types during the period of investigation. For example, for international freight, the total expenses are [       ] and the total weight is [     ], yielding a per-unit INTNFRU of [    ]. *GFCL C Resp.* (May 18, 2021) at Exhibit C-14, Appx03618. Similar calculations could have been performed for domestic inland freight and insurance. *See Pet. Br.* at 11, Appx08613.

Commerce may depart from past practices for good reason, but must provide a reasoned explanation for its departure. *See Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007). Here, Commerce has not provided an adequate explanation based on appropriate considerations for such a departure from its practice of reallocating a respondent's allocation of sales expenses when they lead to inaccuracies or distortions. Instead, as discussed above, Commerce refused to grapple with the extensive record evidence showing the existence of distortions. Accordingly, the Court should remand Commerce's final determination with instructions to recalculate GFCL's movement expenses in a manner that removes the distortions resulting from GFCL's allocation methodology.

42

### III.   Commerce's Decision to Grant GFCL a CEP Offset Was Not Supported by Substantial Evidence and Was Not in Accordance with the Law

#### A. Legal Standard

The party seeking a CEP offset bears the burden of establishing that the differences in selling activities performed in the home and U.S. markets are "substantial." *Hyundai Steel Co. v. United States*, 365 F.Supp.3d 1294, 1300 (Ct. Int'l Trade 2019) (quoting *Sucocitrico Cutrale Ltda. v. United States*, Slip-Op. 12-71, 2012 WL 2317764, at *5 (C.I.T. June 1, 2012)); *see also* 19 C.F.R. § 351.412(c)(2). This reflects a fundamental principle of the antidumping laws: the burden of establishing entitlement to a price adjustment always rests with the party in possession of the relevant information. *See* 19 C.F.R. § 351.401(b), *see also ABB Inc. v. United States*, 273 F.Supp.3d 1200, 1209 (Ct. Int'l Trade 2017) ("It is well established that a respondent bears the burden of establishing its entitlement to any favorable adjustment") (collecting cases); SAA at 829 ("{I}f a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment.").

43

PUBLIC VERSION

If that burden has not been met, Commerce is not free to grant the adjustment. *Andaman Seafood Co., Ltd. v. U.S.*, 768 F.Supp.2d 1315, 1320 (Ct. Int'l Trade 2011) ("In order to receive a CEP offset, the foreign producer or exporter must supply evidence that … 'different selling activities are actually performed at the allegedly different levels of trade.'") (citing the SAA). To effectively administer the statutory requirement that respondents prove the existence of "substantial" differences in selling activities between the home and U.S. markets, Commerce has required respondents to provide both a qualitative and *quantitative* analysis of such differences to establish the existence of two different LOTs. *See Polyethylene Terephthalate Sheet from the Republic of Korea*, 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020) ("*PET Sheet from Korea*") and accompanying IDM at Comment 4. Commerce has explained in prior proceedings the critical importance of the quantitative analysis in supporting the claimed differences in selling functions and determining whether such differences are substantial in warranting a finding of sales being made at different LOTs:

> Commerce's requirement that respondents support LOT claims with quantitative evidence in all proceedings was

implemented in 2018 to enhance Commerce's ability to determine whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different LOTs. For instance, in *Corrosion Resistant Steel from Korea*, Commerce considered, *inter alia*, the following quantitative information in its LOT and CEP offset analysis: (1) how expenses assigned to POR sales made at different claimed LOTs impact price comparability functions; (2) a demonstration of how indirect selling expenses vary by the different LOT claimed; and (3) an explanation of how the quantitative analysis provided by the respondent supported its claimed levels of intensity for the reported selling activities. In *Corrosion Resistant Steel from Korea*, Commerce found that the quantitative analysis submitted by the respondent corroborated its reported level of intensity information. Additionally, in *Warmwater Shrimp from Thailand*, in conducting its LOT/CEP offset analysis, Commerce considered a respondent's selling expenses in combination with the analysis of selling functions in order to determine if the level of selling expenses substantiated the narrative explanation of selling functions. Furthermore, in *ESB Rubber from Brazil*, Commerce declined to find the existence of different LOTs or grant a CEP offset when the record lacked sufficient quantitative evidence corroborating a respondent's LOT claims.

*Id.*

Commerce's determination must be overturned as arbitrary where it is shown that the agency "consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). Commerce has consistently found that claimed

differences in reported levels of intensity in selling functions between claimed LOTs are unsubstantiated where respondent does not support its claims with quantitative information. *See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea,* 87 Fed. Reg. 20,817 (April 8, 2022) and accompanying IDM at Comment 16; *Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (June 29, 2020) and accompanying IDM Comment 1; *PET Sheet from Korea*, IDM Comment 4; *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Feb. 14, 2020), IDM at 15-16, *unchanged in final*, 85 Fed. Reg. 40,239 (July 6, 2020).

### B. Commerce's Deviation from its Consistent Practice to Require Quantitative Support for LOT Claims Was Arbitrary

Commerce's recent denials of CEP offsets under similar circumstances support a denial of GFCL's CEP offset in this investigation. In *PET Sheet from Korea*, for example, Commerce denied a CEP offset when the respondent "did not provide the requested quantitative analysis requested by Commerce in the initial questionnaire," and only submitted the type of support that GFCL provided here, *i.e.*, a selling functions chart and documentation. *PET*

PUBLIC VERSION

*Sheet from Korea*, IDM at 17-18. Commerce explained that although the respondent "argues that the selling functions chart it provided is the quantitative analysis supporting its eligibility for a CEP offset…, {the respondent} does not provide the calculations it made to support its assigned '1' to '10' level rankings, and as such, these assigned values, which supposedly reflect the frequency and intensity of the selling activities performed, cannot be considered 'quantitative' analysis." *Id.* at 19. Likewise, GFCL identified no calculations to support the underlying numbers assigned to specific activities listed on its selling activities charts. *GFCL Sec. A Supp. Resp.* (May 24, 2021) at 1, Appx03880.

In *Rubber from Brazil*, as here, the respondent "reported that it undertook significantly more selling functions in connection with sales to Brazilian end users than to Brazilian distributors and to its U.S. affiliate." *Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (June 29, 2020) (AD AR Final), IDM at 8. Nevertheless, Commerce declined to grant a CEP offset. The respondent's "indirect selling expense information…{did} not provide the required quantitative support for {respondent}'s claimed home-market LOTs," nor did

47

respondent's "documents provide direct quantitative support for claims made by its employees about the hours worked on home-market sales to end users and distributors." *Id.* at 9. The respondent's lack of a quantitative analysis meant that it failed to rule out the possibility "that differences in prices between these two customer categories is attributable to…other reasons, such as discretionary pricing decisions or differences in sales volumes." *Id.* These same deficiencies pertain to GFCL's claim for a CEP offset in this case.

In both *Rubber from Brazil* and *PET Sheet from Korea*, Commerce explained the important policy reasons for requiring a quantitative analysis, namely, to avoid the potential for manipulation and to ground a CEP offset on objective data:

> {R}eliance on purely qualitative information may create the potential for manipulation (or inaccurate reporting) by permitting respondents to create a narrative that is not linked in any way to its verifiable financial data. Requiring quantitative evidence enhances our LOT analysis because such information allows us to determine whether differences in prices among various customer categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to some other unrelated factor such as relative sales volumes. Quantitative information, such as the selling expense information requested by Commerce in this investigation, permits Commerce to examine whether a respondent's narrative explanations and qualitative evidence are supported by its

books and records maintained in the ordinary course of business. Additionally, the requirement that respondents provide quantitative support for their claimed LOTs reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that results from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations.

*Id.* at 10; *PET Sheet from Korea*, IDM at 20 (same).

The bottom line is that Commerce has consistently found since 2018 that it is only appropriate to grant a CEP offset where the respondent establishes through a quantitative analysis that there are two different LOTS in the U.S. market and home market. Because Commerce thus "consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice," its decision to grant GFCL a CEP offset without such quantitative analysis was arbitrary and must be overturned. *Consol. Bearings*, 348 F.3d at 1007.

### C.  Commerce Gave GFCL an Opportunity to Provide a Quantitative Analysis

Whether GFCL met its burden to establish the existence of two different LOTs is not in dispute – Commerce itself found that it did not. *See Final IDM* at 9, Appx01063 (concluding that "the quantitative analysis provided by GFCL was inadequate{.}"). What is in dispute is

49

PUBLIC VERSION

whether Commerce was free to depart from its established practice by granting GFCL's claim for a CEP offset, on the theory that Commerce's supplemental request for the quantitative analysis "used to report the levels of intensity…provided by GFCL" was not specific enough to "inform GFCL that {Commerce} required more information." *See GFCL A Resp.* (Apr. 26, 2021) at A-24, Appx01910; *GFCL A Supp. Resp.* (May 24, 2021) at 1, Appx03880; *Final IDM.* at 10, Appx01064. In particular, Commerce claimed that its supplemental questionnaire failed to give GFCL an opportunity to correct the deficient quantitative analysis under 19 U.S.C. § 1677m(d), which provides, "If {Commerce} determines that a response to a request for information under this title does not comply with the request, {Commerce} shall promptly inform {respondent} of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency{.}" Commerce stated that it "only requested generally that GFCL provide supporting documentation for its reported levels of intensity." *Final IDM* at 10, Appx01064. Thus, according to Commerce, GFCL "did not have an opportunity…to remedy any deficiency in its quantitative analysis{.}" *Id.*

50

Commerce's supplemental questionnaire did, in fact, provide GFCL with an opportunity to remedy its inadequate quantitative analysis. Specifically, it instructed GFCL to "{p}rovide documentation supporting GFCL's methodology (*i.e.*, the quantitative analysis) used to report the levels of intensity…provided by GFCL." This instruction placed GFCL on notice that Commerce lacked sufficient quantitative evidence in support of GFCL's LOT claims. Courts have interpreted § 1677m(d) to require that Commerce's communications put respondents on reasonable notice of the issue. *See, e.g., RZBC Group Shareholding Co. Ltd. v. U.S.*, 100 F.Supp.3d 1288, 1298 (Ct. Int'l Trade 2015) (finding "respondents had notice under § 1677m(d)," because even though "Commerce never expressly stated, 'This information is useless,'" the agency's communications "left the clear impression that {respondent's} data fell short"); *NSK*, 481 F.3d at 1360, n.1 (holding that "Commerce…satisfied its obligations under § 1677m(d) when it issued a supplemental questionnaire specifically pointing out and requesting clarification of {the} deficient responses"); *Hyundai Steel Co. v. United States*, 319 F.Supp.3d 1327, 1346 (Ct. Int'l Trade 2018) ("Commerce's supplemental questionnaire notified Plaintiff that its initial

submissions were insufficient to demonstrate the arm's length nature of

the transactions and identified the information it needed to make that

showing.").

Commerce's supplemental questionnaire met this notice standard

because it identified a particular issue: GFCL needed to support its

claim that home market and U.S. sales were made at two different

LOTs with additional documents supporting the quantitative analysis.

The way that Commerce worded its request changed between the initial

questionnaire and the supplemental questionnaire: Commerce initially

sought a quantitative analysis showing how selling expenses at GFCL's

claimed LOTs impacted price comparability, while its supplemental

request asked for a quantitative analysis supporting GFCL's reported

levels of intensity for selling functions in the claimed LOTs, which

GFCL had provided in response to the initial request. *See GFCL A Resp.*

(Apr. 26, 2021) at A-24, Appx01910; *GFCL Sec. A Supp. Resp.* (May 24,

2021) at 1, Appx03880. But these differences in phrasing did not relieve

GFCL of its burden to provide information because, "{r}ead in context,"

Commerce's questions provided respondent "with an opportunity to

explain further the basis for reporting {an} allocated expense{.}"

*Navigator Co.*, 415 F.Supp.3d, at 1291 (rejecting respondent's claim of insufficient notice under § 1677m(d)).

Here, both of Commerce's requests sought the same thing: quantitative proof that GFCL was performing different intensities of selling activities in the home and U.S. markets. Commerce's final determination misleadingly describes its supplemental inquiry as "request{ing} generally" mere "supporting documentation." In fact, Commerce specifically sought "documentation supporting GFCL's methodology (*i.e., the quantitative analysis*){.}"[5] *Final IDM* at 10, Appx01064; *GFCL Sec. A Supp. Resp.* (May 24, 2021) at 1, Appx03880 (emphasis added). GFCL therefore was fully on notice regarding the "nature of the deficiency" and had "an opportunity to explain further the basis for reporting" its selling expenses. 19 U.S.C. § 1677m(d); *Navigator Co.*, 415 F.Supp.3d at 1291.

---

[5]  Commerce's Issues and Decision Memo states that GFCL did comply with Commerce's supplemental request, because GFCL provided "supporting documentation for its reported levels of intensity…for certain claimed selling activities." *Issues and Decision Memo* at 10, Appx01064. This rationale elides Commerce's specific request for "quantitative analysis," which GFCL did not provide.

PUBLIC VERSION

The party in the best position to claim that it lacked notice was GFCL, which could have argued in its rebuttal brief to Commerce that it "did not have an opportunity…to remedy any deficiency in its quantitative analysis." *Final IDM* at 10, Appx01064. Yet GFCL never thought to make such a claim. Instead, its rebuttal brief focused almost solely on the argument that the quantitative analysis was not a legally necessary element of that burden. *See GFCL Br.* at 10-11, Appx08692-08693. Further, GFCL's initial answer to Commerce, which stated that the difference in LOTs "can be quantified when comparing the expenses assigned to sales associated with each level of trade," demonstrated that GFCL perfectly understood what it was required to do. *GFCL A Resp.* (Apr. 26, 2021) at A-24, Appx01910. Notice was not the issue. Indeed, the purported lack of notice was raised for the first time not by GFCL but instead by Commerce in its *Final IDM*. Rather than adjudicate claims made by the parties on the record, Commerce presented a novel theory to bail out a respondent that had not proven its entitlement to a favorable adjustment.

### D. GFCL Was Not Entitled to Protection Under § 1677m(d) because It Knowingly Provided Incomplete Information

The Federal Circuit and this Court have found that respondents who understand what information Commerce is seeking but fail to comply with its requests are not entitled to protection under § 1677m(d). The purpose of that provision of the statute is to prevent Commerce from internally identifying a deficiency and then using it to trap an unaware respondent. *See, e.g.*, *Hyundai Steel Co. v. United States*, 518 F.Supp.3d 1309, 1327 (Ct. Int'l Trade 2021) (finding Commerce failed to give notice under § 1677m(d) where it had "effectively retreated into its bureaucratic shell, poised to penalize respondent for deficiencies not specified in the letter that Commerce would only disclose after it was too late") (citing *Ta Chen Stainless Steel Pipe v. U.S.*, 23 C.I.T. 804, 820 (1999)).

But when a respondent is aware of what Commerce is seeking and knowingly fails to comply, this rationale drops away, and § 1677m(d) cannot protect such a respondent. *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (finding that "nothing in {§ 1677m(d)} compels Commerce to treat intentionally

incomplete data as a 'deficiency' and then to give a party that has intentionally submitted incomplete data an opportunity to 'remedy' as well as to 'explain.'"). Otherwise, a respondent would be incentivized to submit incomplete data knowing that at worst, it would have an opportunity to remedy the defect and at best, Commerce would not notice the deficiency. *See id.* ("The consequence of such a reading would be to permit respondents to submit fraudulent data with the knowledge that, should their misconduct come to light, they can demand an opportunity to remedy their intentionally deficient data{.}").

The heart of the § 1677m(d) inquiry is therefore not what Commerce said, but what the respondent knew. Because GFCL was told twice that its claimed selling activities in the home and U.S. markets needed to be supported by the quantitative analysis, because its responses demonstrated an awareness of Commerce's need for such quantitative support, and because GFCL did not even think to claim that it lacked notice of this requirement when it submitted its rebuttal brief to Commerce, the agency could not invoke § 1677m(d) to justify its decision to grant GFCL a CEP offset to which it was otherwise not legally entitled. GFCL's acknowledged failure to supply the required

PUBLIC VERSION

quantitative analysis meant that it did not meet its burden to prove the existence of substantial differences in selling activities between the home and U.S. markets. Thus, Commerce's decision to grant GFCL a CEP offset was unsupported by substantial evidence and not in accordance with the law.

## IV.   CONCLUSION

For the foregoing reasons, Daikin requests that this Court: (i) hold that Commerce's decisions to accept GFCL's reported U.S. movement expenses and to grant GFCL's request for a CEP offset are unsupported by substantial evidence and otherwise not in accordance with the law; and (ii) and remand Commerce's *Final Determination* with instructions to issue new determinations consistent with the Court's decision.

Respectfully submitted,

*/s/ Luke A. Meisner*
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin America, Inc.*

Dated: September 19, 2022

57

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response brief contains 10,811 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.

Dated: September 19, 2022              <u>/s/ Luke A. Meisner</u>
                                       Luke A. Meisner