# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| DAIKIN AMERICA, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | )    Court No. 22-00122 |
| | ) |
| and | ) |
| | ) |
| GUJARAT FLUOROCHEMICALS | ) |
| LIMITED, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

LESLIE M. LEWIS
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

DANIEL ROLAND
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice

Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202)

December 9, 2022                    *Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

GLOSSARY OF TERMS..................................................................viii

STATEMENT PURSUANT TO RULE 56.2...........................................2

    I.    Administrative Determination Under Review.....................2

    II.   Issues Presented For Review...................................................3

STATEMENT OF FACTS..................................................................3

    I.    Initiation Of Investigation....................................................3

    II.   Preliminary Determination..................................................11

    III.  Final Determination.............................................................12

SUMMARY OF THE ARGUMENT....................................................13

ARGUMENT...................................................................................14

    I.    Standard Of Review.............................................................14

    II.   Commerce Reasonably Relied On GFCL's Movement
          Expenses As Reported On An Allocated Basis...................16

          A.   Legal Framework.........................................................17

          B.   Record Evidence Supports Commerce's Determination
               To Rely On GFCL's Movement Expenses Reported On
               An Allocated Basis.......................................................20

          C.   Commerce Reasonably Declined To Apply Facts
               Available With An Adverse Inference..........................35

i

III.   Commerce's Decision To Not Recalculate GFCL's Product-
       Specific Allocated Movement Expenses On An Average Basis
       Is Supported By Substantial Evidence And In Accordance
       With Law.................................................................................. 40

IV.    Commerce Lawfully Granted A CEP Offset To Adjust
       Normal Value Accounting For GFCL's Home Market Sales
       At A More Advanced LOT Than GFCL's U.S. Sales ........... 42

       A.   Legal Framework.......................................................... 43

       B.   Record Evidence Supports Commerce's Determination
            That The LOT For GFCL's Home Market Was More
            Advanced Than For Its U.S. Market .......................... 45

       C.   Commerce's Determination To Grant GFCL A CEP
            Offset Was Not Arbitrary............................................. 52

       D.   Commerce's Determination To Continue To Grant
            GFCL The CEP Offset Is In Accordance With Law.... 57

CONCLUSION........................................................................................ 62

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) ............................................................. 29

*Ad Hoc Shrimp Trade Action Committee v. United States*,
  675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) ...................................... 36

*AK Steel Corp. v. United States*,
  346 F. Supp. 2d 1348 (Ct. Int'l Trade 2004) ...................................... 36

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ............................................................ 15

*BlueScope Steel Ltd. v. United States*,
  548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ...................................... 38

*Canadian Solar, Inc. v. United States*,
  23 F.4th 1372 (Fed. Cir. 2022) ............................................................ 18

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ...................................................... 15, 41

*Consol. Bearings Co. v. United States*,
  348 F.3d 997 (Fed. Cir. 2003) ............................................................. 53

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................. 14

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ....................................................................... 15, 29

*Deosen Biochemical Ltd. v. United States*,
  301 F. Supp. 3d 1372 (Ct. Int'l Trade 2018) ...................................... 38

*Downhole Pipe & Equip., L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ............................................................. 41

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ............................................................... 14

*Hyundai Steel Co. v. United States*,
   518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ................................... 58, 60

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ............................................................. 16

*LG Chem, Ltd. v United States*,
   534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021) ................................... 34, 35

*Micron Tech., Inc. v. United States*,
   243 F.3d 1301 (Fed. Cir. 2001) ............................................................. 44

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) ................................................. 19, 36, 38

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................. 15

*NSK Ltd. v. United States*,
   346 F. Supp. 2d 1312 (Ct. Int'l Trade 2004) ....................................... 35

*Papierfabrik August Koehler SE v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016) ............................................................. 61

*RHP Bearings Ltd. v. United States*,
   288 F.3d 1334 (Fed. Cir. 2002) ................................................... 52, 53

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
   No. 2021-2281, 2022 WL 2155965 (Fed. Cir. June 15, 2022) ............. 61

*SKF USA Inc. v. United States*
   35 C.I.T. 1365 (2011) ............................................................................. 41

*SNR Roulements v. United States,*
  341 F. Supp. 2d 1334 (Ct. Int'l Trade 2004) ......................29, 30, 37, 39

*Tianjin Magnesium Int'l Co. v. United States,*
  844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...................................... 20

*Torrington Co. v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995) ............................................................ 43

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) ........................................................... 18

## UNITED STATE CODE

19 U.S.C. § 1516a(b)(1)(B) ................................................................... 14

19 U.S.C. § 1677a ................................................................................. 17

19 U.S.C § 1677a(a) .............................................................................. 43

19 U.S.C. § 1677a(b) ............................................................................. 17

19 U.S.C. § 1677a(c)(2)(A) .................................................................... 17

19 U.S.C. § 1677b(a) ............................................................................. 42

19 U.S.C. § 1677b(a)1)(B)(i) ................................................................. 43

19 U.S.C. § 1677b(a)(7)(A) .................................................................... 44

19 U.S.C. § 1677b(a)(7)(B) ..........................................................44, 46, 51

19 U.S.C. § 1677e(a) ............................................................................. 37

19 U.S.C. § 1677e(a)(1) ......................................................................18, 36

19 U.S.C. §1677e(a)(2) .......................................................................18, 39

19 U.S.C. §1677e(a)(2)(A)-(D) ................................................................. 18

19 U.S.C. § 1677e(b) ...........................................................................18, 36, 37

19 U.S.C. § 1677e(b)(1) ................................................................................. 37

19 U.S.C. § 1677e(b)(2)(A)-(D) ................................................................. 36,

19 U.S.C. § 1677m(d) ....................................................................18, 57, 59, 60

19 U.S.C. § 1677(35)(A) .............................................................................. 17

## RULE

Rule 56.2 ...........................................................................................................1, 2

## REGULATIONS

19 C.F.R. § 351.401(a) .................................................................................. 17

19 C.F.R. § 351.401(b)(1) ............................................................................ 46

19 C.F.R. § 351.401(g)(1) ............................................................................ 21

19 C.F.R. § 351.401(g)(3) .......................................................................21, 29

19 C.F.R. § 351.402(g)(2) ............................................................................ 21

19 C.F.R. § 351.402(g)(3) ............................................................................ 39

19 C.F.R. § 351.412(c)(2) ............................................................................ 44

19 C.F.R. § 351.412(f) .............................................................................46, 51

## FEDERAL REGISTER NOTICES

*Antidumping Duties; Countervailing Duties*,
62 Fed. Reg. 27,296 (May 19, 1997) ................................................... 46

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*; 2018-2019,
  86 Fed. Reg. 15,912 (Dep't Commerce March 25, 2021).....................55

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*; 2018–2019,
  86 Fed. Reg. 53,631 (Dep't Commerce Sept. 28, 2021) ......................56

*Emulsion Styrene-Butadiene Rubber from Brazil*,
  85 Fed. Reg. 38,847 (June 29, 2020)...........................................53–56

*Granular Polytetrafluoroethylene Resin From India*,
  86 Fed. Reg. 49,299 (Dep't Commerce September 2, 2021)...............10

*Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Antidumping Duty Orders*,
  87 Fed. Reg. 14,514 (Dep't Commerce March 15, 2022).......................2

*Granular Polytetrafluoroethylene Resin From India and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*,
  86 Fed. Reg. 10,926 (Dep't Commerce Feb. 23, 2021) .........................3

*Granular Polytetrafluoroethylene Resin from India: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*,
  87 Fed. Reg. 3,772 (Dep't Commerce January 25, 2022)..................2, 12

*Polytetrafluoroethylene Resin From India*,
  83 Fed. Reg. 48,594 (Dep't Commerce September 26, 2018...............10

*Polyethylene Terephthalate Sheet from the Republic of Korea*,
  85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020) .................passim

## GLOSSARY OF TERMS

| | |
|---|---|
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| CEP | Constructed Export Price |
| C.R. | Confidential Record |
| Commerce | Department of Commerce |
| Daikin | Daikin America, Inc. |
| Daikin Br. | Daikin's Motion for Judgment on the Agency Record (ECF No. 22) |
| DINLFTPU | Inland Freight – Plant/Warehouse To Port Of Exportation |
| GFL Americas | Gujarat Fluorochemicals Americas LLC |
| GFCL | Gujarat Fluorochemicals Limited |
| IDM | Issues and Decision Memorandum |
| LOT | Level of Trade |
| IAQR | Initial Section A Questionnaire Response |
| ICQR | Initial Section C Questionnaire Response |
| IQ | Initial Questionnaire |
| INTNFRU | International Freight |
| INSUREU | Country Of Manufacture Inland Insurance |
| PDM | Preliminary Decision Memorandum |
| POI | Period of Investigation |
| PTFE | Polytetrafluorethylene |
| P.R. | Public Record |
| SAA | Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 |

(1994).

| | |
|---|---|
| SAQ | Supplemental Section A Questionnaire |
| SAQR | Supplemental Section A Questionnaire Response |
| SCQ | Supplemental Section C Questionnaire |
| SCQR | Supplemental Section C Questionnaire Response |
| SSCQR | Second Supplemental Section C Questionnaire Response |
| VQR | Verification Questionnaire Response |

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DAIKIN AMERICA, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | )　　Court No. 22-00122 |
| | ) |
| and | ) |
| | ) |
| GUJART FLUOROCHEMICALS | ) |
| LIMITED, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE <u>AGENCY RECORD</u>

Defendant, the United States, respectfully submits this response

to the motion for judgment on the agency record filed by plaintiff,

Daikin America, Inc., (Daikin or plaintiff), challenging the Department

of Commerce's final determination in the antidumping duty (AD)

investigation of granular polytetrafluoroethylene (PTFE) resin from

India. As demonstrated below, Commerce's affirmative determination

is supported by substantial evidence and is otherwise in accordance

with law.  Accordingly, the United States respectfully requests that the Court sustain Commerce's determination, deny Daikin's motion, and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

## I.   Administrative Determination Under Review

Daikin challenges various aspects of Commerce's final determination in the AD investigation of granular PTFE resin from India.  *See Granular Polytetrafluoroethylene Resin from India: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 3,772 (Dep't Commerce January 25, 2022) (final determination) (P.R. 139) (Appx01076–78), and accompanying Issues and Decision Memorandum (IDM) (P.R. 136) (Appx01055–75).  Following an affirmative injury determination by the U.S. International Trade Commission, Commerce published an AD order on March 15, 2022.  *See Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Antidumping Duty Orders*, 87 Fed. Reg. 14,514 (Dep't Commerce March 15, 2022) (P.R. 145) (Appx01079–81).  The investigation covers entries of granular PFTE resin from India for the period of January 1, 2020, through December 31, 2020.

## II.   Issues Presented For Review

1.      Whether Commerce's reliance on Gujarat Fluorochemicals Limited's (GFCL) U. S. movement expenses reported on an allocated basis is supported by substantial evidence and in accordance with law.

2.      Whether Commerce's decision to not recalculate GFCL's movement expenses on an overall average basis is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's determination to continue to grant GFCL a constructed export price (CEP) offset is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

## I.   Initiation Of Investigation

On January 27, 2021, the Department of Commerce (Commerce) received an AD petition from domestic producer Daikin regarding imports of granular PTFE resin from India.  *See* Antidumping and Countervailing Duty Petitions, dated Jan. 27, 2021 (P.R. 1; P.R. 2 – P.R. 6), (C.R. 1; C.R. 2 – C.R. 5) (Appx01082–01833).  On February 23, 2021, Commerce initiated this AD investigation.  *See Granular Polytetrafluoroethylene Resin From India and the Russian Federation:*

*Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 10,926 (Dep't Commerce Feb. 23, 2021) (*Initiation Notice*) (P.R. 25) (Appx01026–30).

Following Commerce's selection of GFCL as the sole mandatory respondent, Commerce issued its initial questionnaire to GFCL.  *See Respondent Selection Memorandum* at 4–5 (Dep't Commerce March 12, 2021) (P.R. 33) (C.R. 14) (Appx01875–80) (selecting the mandatory respondent); and Initial Questionnaire (IQ) (Dep't Commerce March 26, 2021) (P.R. 38) (Appx09159–09312).

In the initial questionnaire, Commerce explained that if GFCL makes sales to unaffiliated U.S. customers through an affiliated U.S. reseller, the sales are classified as CEP sales.  *See* IQ at G-11 (Appx09175).  To derive a CEP, Commerce deducts movement expenses from the U.S. selling price.  *Id.*  As such, Commerce requested that GFCL report its movement expenses and that it do so on a transaction-specific basis.  *See id.* at C-17 (Appx09237) (requesting that GFCL report "direct costs incurred" to bring the merchandise from original place of shipment to the customer).  Additionally, Commerce explained that it calculates normal value based on sales made in the foreign

market at the same level of trade (LOT) as the CEP (U.S.) sales or adjusts for differences. *Id*. at A-6–A-8 ¶ 3 (Appx09181–83). To evaluate LOT differences, Commerce requested that GFCL provide information about its marketing process for each market, *i.e.*, its distribution systems, including categories of customers, selling activities, and levels of selling expenses. *Id*. at A-7 (Appx09182). Commerce also asked GFCL to provide, among other things, "a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability" for each selling activity and to "{e}xplain how the quantitative analysis support{s} the claimed levels of intensity for the selling activities." *Id*. at A-7–A8 (Appx09182–83).

In its timely response, GFCL confirmed that, except for a limited number of sales, its U.S. sales were made through GFCL's affiliated U.S. reseller and importer, Gujarat Fluorochemicals Americas LLC (GFL Americas), and, therefore, it had reported U.S. sales on a CEP basis. *See* Initial Section A Questionnaire Response, dated Apr. 26, 2021 (IAQR) (P.R. 44 – P.R. 52) (C.R. 15 – C.R. 30) at A-2 (Appx01887); Initial Section C Questionnaire Response, dated May 17, 2021 (ICQR) (P.R. 57) (C.R. 42) at C-1 (Appx03513). For U.S. sales, GFCL reported

movement expenses—specifically, inland freight (DINLFTPU), inland insurance (INSUREU), and international freight (INTNFRU)[1]—on an allocated, rather than transaction-specific, basis. *See* ICQR (P.R. 57) (C.R. 42) at C-27–C-30, Exhibit C-14 (Appx03539–42, 03616). GFCL also timely provided information regarding the marketing stages involved in its home market and U.S. sales and, based on "significant variation in the {LOT} between U.S. sales and Home Market sales," GFCL claimed a LOT adjustment. *See* IAQR (P.R. 44) (C.R. 15) at A-16–A-25 (Appx01902–11); IAQR (P.R. 44) (C.R. 17) at Exhibit A-11 (Appx02101) (reporting channels of distribution and selling functions with levels of intensity).

   In a supplemental questionnaire, Commerce requested that GFCL "{p}rovide documentation supporting {the} methodology (*i.e.*, the quantitative analysis)" it used to assign levels of intensity to its selling activities to support its LOT adjustment. *See* Supplemental Section A

---

[1] For movement expenses, "DINLFTPU" represents the name assigned to "inland freight – plant/warehouse to port of exportation"; "INTNFRU" is the name assigned to "international freight"; and "INSUREU" is the name assigned to "country of manufacture inland insurance." These movement expenses, which are incurred for the U.S. sales, are deducted from the U.S. selling price to derive a constructed export price (CEP).

Questionnaire (Dep't Commerce May 13, 2021) (SAQ) (P.R. 55) (C.R. 31)
at ¶ 3 (Appx03301).  GFCL timely responded with additional
explanation, a customer complaint register, and copies of customer
correspondence, *i.e.*, the documentation GFCL "used as {a} basis to
determine and report the levels of intensity for technical assistance."
*See* Supplemental Section A Questionnaire Response, dated May 24,
2021 (SAQR) (P.R. 59) (C.R. 67) at 1–2 (Appx03880–81) & Exhibits SA-
3(a)–SA-3(c) (Appx03912–19); SAQR (C.R. 73) at SA-7 (Appx04040–43).
Although Daikin commented on certain aspects of GFCL's initial and
supplemental questionnaire responses prior to the preliminary
determination, Daikin did not comment on the information GFCL
submitted in support of claimed differences in LOT.

On June 2, 2021, Commerce issued another supplemental
questionnaire to GFCL stating that:

> Commerce's preference is for companies to report freight
> expenses on the most transaction specific basis possible to
> prevent distortions and inaccuracies . . . . Therefore, if
> possible, report DINLFTPU, INTNFRU, and INLFPWU
> using the actual expense incurred for each shipment . . . .
> *Alternatively, if you believe it is not feasible to report these*
> *movement expenses on a transaction-specific basis, explain*
> *why it is not feasible to do so, and why your reported*
> *allocation based on product type is appropriate.* Support your

> explanation with relevant accounting and sales
> documentation.

*See* Supplemental Section C Questionnaire (Dep't Commerce June 11, 2021) (SCQ) at ¶9 (emphasis added) (P.R. 70) (C.R. 76) (Appx04140); *see also* Daikin Comments on GFCL's Sections A-D Responses, dated June 2, 2021 at 8 (P.R. 61) (C.R. 74) (Appx04102) (stating that GFCL's movement expense reporting on an allocated basis was "grossly deficient").  Thus, Commerce requested that, if possible, GFCL report its movement costs on a transaction-specific basis or "explain why it is not feasible to do so, and why {its} reported allocation . . . is appropriate."  SCQ (P.R. 70) (C.R. 76) at ¶9 (Appx04140).

In its timely response, GFCL continued to report certain U.S. movement expenses on an allocated basis, explaining that, because U.S. sales from GFCL to GFL Americas involve multiple purchases stored in the affiliate's U.S. warehouse before GFL Americas sells to the unaffiliated U.S. customers, establishing a "one-to-one correlation" between GFCL's sales to GFL Americas and GFL Americas's sales to the U.S. customers was not feasible.  *See* Supplemental Section C Questionnaire Response, dated July 9, 2021 (SCQR) (P.R. 84) (C.R. 91) at 7–8 (Appx05087–88); *see also* Second Supplemental Section C

Questionnaire Response, dated Aug. 9, 2021 (SSCQR) (P.R. 99) (C.R.
176) at 2–3 (Appx06702–03) ("GFCL notes again that merchandise are
purchased by GFL Americas LLC from GFCL India, then stored in the
Warehouse based on the sales order billed, and delivered to customers
in the U.S.A. from inventory.  The procurement of goods and the sales of
goods are in different lots sizes, various time periods, and numerous
product types.").  Accordingly, GFCL explained that "it is not possible to
report movement expenses on an actual basis."  SCQR (P.R. 84) (C.R.
91) at 7–8 (Appx05087–88).

Despite GFCL's explanation, Daikin commented that "sales
documentation provided by GFCL appear to show that GFCL tracks the
batch number of the merchandise for each sale from GFCL to the U.S.
affiliate and for each sale from the U.S. affiliate to the U.S. customer."
*See* Daikin Comments on GFCL's Supplemental Section C Response,
dated Aug. 5, 2021 (P.R. 94) (C.R. 171) at 2–3 (Appx06671–72).  In pre-
preliminary comments, GFCL responded that it was unable to report
movement expenses on a transaction-specific basis by tracing the batch
number *"because* it only traces batches of merchandise" and sales
transported from GFL Americas's warehouse inventory could contain

9

numerous products with different lot sizes and be from various time periods. *See* GFCL Pre-Preliminary Comments, dated Aug. 12, 2021 (P.R. 100) (C.R. 182) at 15 (Appx06771) (emphasis in original). GFCL also noted that it had attempted to report expenses on a transaction-specific basis in the past but to no avail. *See id*. Specifically, GFCL explained that:

> The calculation derived by GFCL in the previous investigation of *PTFE Resin from India* was so complicated it could not be replicated, leading to larger issues for the Department and at verification.

*Id*. at 15 n.49 (Appx06771) (citing *Polytetrafluoroethylene Resin From India*, 83 Fed. Reg. 48,594 (Dep't Commerce September 26, 2018) (final less-than-fair value determination), and accompanying Issues and Decision Memorandum at Comment 2. As such, GFCL stated that, for this investigation, it reported its movement expenses the way in which they were incurred. *Id*. at 16–17 (Appx06772–73). Before the preliminary determination, Daikin did not rebut GFCL's position. *See generally,* Daikin Response to Pre-Preliminary Comments dated Aug. 16, 2021 (P.R. 101) (C.R. 183) (Appx06776–84).

10

## II.   __Preliminary Determination__

On September 2, 2021, Commerce published its preliminary determination.  *See Granular Polytetrafluoroethylene Resin From India*, 86 Fed. Reg. 49,299 (Dep't Commerce September 2, 2021) (Preliminary Determination), and accompanying Preliminary Decision Memorandum (Dep't Commerce Aug. 25, 2021) (PDM) (P.R. 104) (Appx01033–49).  In the preliminary determination, Commerce relied on GFCL's reported movement expenses.  *See* PDM at 7 (Appx01039).  Because Commerce preliminarily determined that GFCL's home market LOT is at a more advanced stage of distribution than that of the U.S. market and had no other information to calculate a LOT adjustment, Commerce granted GFCL a CEP offset.  *Id*. at 8–11 (Appx01040–43).

Despite GFCL's cooperation throughout the investigation, Daikin argued in its case brief that Commerce should apply partial adverse facts available (AFA) to calculate GFCL's reported movement expenses, or, alternatively, recalculate them on an overall average basis.  *See* Daikin Case Brief, dated Nov. 9, 2021 (C.R. 216) at 1–11 (Appx08603–13).  Daikin also argued that Commerce should reverse its preliminary decision to apply a CEP offset, claiming for the first time that GFCL

failed to meet its evidentiary burden for establishing entitlement to the adjustment. *Id.* at 12–17 (Appx08614–19). In its rebuttal case brief, GFCL contended that Commerce had properly accepted GFCL's reported movement expenses, making the application of partial AFA unwarranted and urged that Commerce should continue to apply the CEP offset. *See* GFCL Rebuttal Case Brief, dated Nov. 19, 2021 (P.R. 132) (C.R. 219) at 2–13 (Appx08684–95).

## III.   Final Determination

On January 25, 2022, Commerce published the final determination. *See* Final Determination (P.R. 139) (Appx01076–78), 87. Fed. Reg. 3,772, and IDM (P.R. 136) (Appx01055–75). In the final determination, Commerce declined to apply partial AFA to GFCL's movement expenses, instead continuing to rely on GFCL's reported movement expenses on an allocated basis. *See* IDM at 6 (Appx01060). Commerce also declined to reverse its preliminary decision to grant GFCL a CEP offset. *See* IDM at 9–10 (Appx01063–64).

Thereafter, Daikin filed a complaint with this Court to challenge certain aspects of Commerce's final determination. *See* Compl., ECF No. 9.

## SUMMARY OF THE ARGUMENT

Commerce's reliance on GFCL's movement expenses reported on an allocated basis is supported by substantial evidence and in accordance with law.  Because GFCL reported its movement expenses, albeit on an allocated (rather than transaction-specific) basis, there is nothing missing in the administrative record.  Further, the record shows that GFCL provided a reasonable explanation of why transaction-specific reporting was not feasible and demonstrated to Commerce's satisfaction that its allocation methodology did not cause distortions or inaccuracies.  The fact that Daikin holds a contrary view consistent with its preferred outcome is insufficient to show that Commerce should have applied partial AFA or altogether recalculated GFCL's reported movement expenses when the administrative record has no informational deficiency and shows that GFCL cooperated to the best of its ability.

Commerce's decision to continue to grant GFCL a CEP offset in the final determination also is supported by substantial evidence and in accordance with the law.  Although Daikin avers that Commerce arbitrarily departed from its practice to require a quantitative analysis,

Commerce reasonably explained its decision to rely on the detailed information GFCL provided to support the CEP offset, considering the concerns raised by Daikin before issuance of the final determination. Moreover, Commerce is required to provide GFCL with an opportunity to remedy any deficiency, and Commerce found that it had *not* given GFCL an opportunity to cure the deficiency identified in the final determination. Regardless, Commerce provided a reasonable explanation for its determination to grant the CEP offset and, therefore, Daikin's claim that Commerce acted unlawfully and arbitrarily lacks merit.

## ARGUMENT

## I.   **Standard Of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof

amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotation marks omitted).

Substantial evidence may be "less than the weight of the evidence," and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "{w}hen a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of

15

the statutory tests, Commerce may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and internal quotation marks omitted). This Court therefore affords Commerce considerable deference when exercising its technical expertise to select and apply methodologies to implement the trade laws.

## II.   Commerce Reasonably Relied On GFCL's Movement Expenses As Reported On An Allocated Basis

Commerce reasonably relied on GFCL's movement expenses reported on an allocated basis to calculate GFCL's margin. *See* IDM at 2–7 (Appx01056–61). As the record shows, GFCL explained to Commerce that transaction-specific reporting was not feasible because of its U.S. sales inventory and record-keeping systems. *See* ICQR (P.R. 57) (C.R. 42) at C-27–C-30, Exhibit C-14 (Appx03539–42, 03616). SCQR (P.R. 84) (C.R. 91) at 7–8 (Appx05087–88); SSCQR (P.R. 99) (C.R. 176) at 2–3 (Appx06702–03); GFCL Pre-Preliminary Comments (P.R. 100) (C.R. 182) at 15–17 (Appx06771–73). GFCL also demonstrated to Commerce's satisfaction that its allocation methodology did not cause inaccuracies or distortions. *See* IDM at 6–7 (Appx01060–61). Nevertheless, Daikin claims that "Commerce's failure to apply adverse

facts available to GFCL's U.S. movement expenses" is unsupported by substantial evidence and unlawful. *See* Daikin Br. at 15–39. Contrary to Daikin's claim, the application of facts available with an adverse inference requires a deficiency in the record and a finding of noncooperation, which are not present here. Accordingly, as explained below, the Court should reject Daikin's claim.

### A.   **Legal Framework**

Generally, Commerce determines a respondent's dumping margin by comparing the export price or CEP of subject merchandise in the United States with its normal value. *See* 19 U.S.C. § 1677(35)(A), § 1677a; 19 C.F.R. § 351.401(a). CEP refers to "the price at which the subject merchandise is first sold . . . by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b). In determining CEP, according to 19 U.S.C. § 1677a, Commerce adjusts for, among other expenses, "the amount . . .  attributable to any additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to . . . the United States." 19 U.S.C. § 1677a(c)(2)(A). To derive a CEP, Commerce

deducts movement expenses from the U.S. selling price. *Id*. Included in Commerce's adjustments for movement expenses are foreign and U.S. movement expenses of the merchandise. *See* PDM at 7 (Appx01039).

If "necessary information is not available on the record," Commerce uses "facts otherwise available" to remedy a deficiency in the record. *See* 19 U.S.C. § 1677e(a)(1). Commerce may also apply facts available if an interested party: (a) withholds information requested by Commerce; (b) fails to provide the information in the form or in the manner requested; (c) significantly impedes the proceedings; or (d) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2)(A)-(D). Before applying facts otherwise available, Commerce must inform a respondent of the deficiency and allow the respondent an opportunity to explain or remedy the deficiency. *See* 19 U.S.C. §§ 1677e(a)(2), 1677m(d). That is, Commerce can only use facts otherwise available when the record is "missing information or otherwise deficient." *See Canadian Solar, Inc. v. United States*, 23 F.4th 1372, 1379 (Fed. Cir. 2022) (citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1342 (Fed. Cir. 2011)).

If Commerce further finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with {its} request for information," it may apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b).  A respondent fails to act to the best of its ability when it does not exert "maximum effort" to provide Commerce with "full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  This standard requires that respondents "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the {respondent's} ability to do so." *Id*. Thus, the statutory trigger for an adverse inference requires "a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id*. at 1383 (emphasis added).  To determine whether an adverse inference is warranted, Commerce examines the "respondent's actions and assesses the extent of {the} respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id*. at 1382.

Finally, "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings." *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

## B. Record Evidence Supports Commerce's Determination to Rely On GFCL's Movement Expenses Reported On An Allocated Basis

During the investigation, GFCL timely reported to Commerce its movement expenses including those for inland freight (DINLFTPU), inland insurance (INSUREU), and international freight (INTNFRU).[2] *See* ICQR (P.R. 57) (C.R. 42) at C-27–C-30, Exhibit C-14 (Appx03539–42, 03616); SCQR (P.R. 84) (C.R. 91) at 7–8 (Appx05087–88); IDM at 6 (Appx01060). Daikin challenges Commerce's reliance on these expenses because GFCL reported on an allocated basis, rather than Commerce's preferred transaction-specific basis. *See* Daikin Br. at 17–24. According to Daikin, GFCL could have reported certain of its movement

---

[2] As stated above, "DINLFTPU" represents the name assigned to "inland freight – plant/warehouse to port of exportation"; "INTNFRU" is the name assigned to "international freight"; and "INSUREU" is the name assigned to "country of manufacture inland insurance." These are movement expenses to be deducted from the U.S. (CEP) sales price because they constitute costs incurred for the U.S. sale.

expenses on a transaction-specific basis by tracing batch numbers. *See id*. That GFCL did not, Daikin claims, indicates GFCL's noncooperation and requires that Commerce apply facts otherwise available with an adverse inference. *See id*. But Daikin overlooks that Commerce's preference for transaction-specific reporting is limited to feasibility and that Commerce is satisfied that the alternative reporting method employed here does not cause inaccuracies or distortions. GFCL explained that transaction-specific reporting was not feasible based on its U.S. sales inventory and record-keeping systems, and the record supports Commerce's determination that GFCL's allocation methodology did not cause inaccuracies or distortions.

*First*, GFCL was not necessarily "obligated to report transaction-specific movement costs," as Daikin suggests. Daikin Br. at 17. Although Commerce prefers that respondents report movement expenses on a transaction-specific basis, such reporting is not an absolute requirement in every instance. Indeed, Commerce's regulation specifies that, "{Commerce} may consider allocated expenses . . . when transaction-specific reporting is not feasible, provided {Commerce} is satisfied that the allocation method used does not cause inaccuracies or

distortions." 19 C.F.R. § 351.401(g)(1). Accordingly, the regulation permits allocations if the respondent seeking to report an expense on an allocated basis demonstrates "to {Commerce's} satisfaction that the allocation is calculated on as specific a basis as is feasible," and explains "why the allocation methodology used does not cause inaccuracies and distortions." 19 C.F.R. § 351.402(g)(2). Commerce also must take into account the records maintained by the party in question in the ordinary course of its business to determine feasibility of transaction-specific reporting. *See* 19 C.F.R. §351.401(g)(3) ("In determining the feasibility of transaction-specific reporting . . . the Secretary will take into account the records maintained by the party in question in the ordinary course of its business.").

Here, GFCL timely reported its movement expenses on an allocated basis. *See* ICQR (P.R. 57) (C.R. 42) at C-27–C-30 (Appx03539–42); *see also* IDM at 6–7 (Appx01060–61). Thereafter, consistent with the regulations, Commerce issued a supplemental questionnaire notifying GFCL that it could report on an allocated basis if the circumstances called for it:

> Commerce's preference is for companies to report freight
> expenses on the most transaction specific basis possible to

> prevent distortions and inaccuracies . . . . Therefore, if
> possible, report DINLFTPU, INTNFRU, and INLFPWU
> using the actual expense incurred for each shipment . . . .
> Alternatively, *if you believe it is not feasible* to report these
> movement expenses on a transaction-specific basis, explain
> why it is not feasible to do so, and why your reported
> allocation based on product type is appropriate. Support
> your explanation with relevant accounting and sales
> documentation.

SCQ (P.R. 70) (C.R. 76) at ¶9 (Appx04140) (emphasis added). So despite Daikin's assertion to the contrary, neither Commerce's regulations nor the agency's request *obligated* GFCL to report transaction-specific movement expenses if doing so was unfeasible.

The record also supports Commerce's finding that transaction-specific reporting was not feasible for GFCL. *See* IDM at 6–7 (Appx01060–61). As instructed by Commerce, GFCL confirmed that it was not feasible to report the movement expenses on a transaction-specific basis because the nature of its U.S. sales system and record-keeping practices rendered it unable to establish a one-to-one correlation between purchases by GFL Americas from GFCL and sales by GFL Americas to U.S. customers. *See* SCQR (P.R. 84) (C.R. 91) at 7–8 (Appx05087–88); *see also* IDM at 6–7 (Appx01060–61). Specifically, GFCL explained that its U.S. sales were made through its affiliated

U.S. reseller and importer, GFL Americas.  *See* IAQR (P.R. 44) (C.R. 15)

A-2 (Appx01887); ICQR (P.R. 57) (C.R. 42) at C-1 (Appx03513).

According to GFCL,

> GFL Americas LLC stored inventory for these sales in a U.S.
> warehouse and then sold it to their customer based on the
> pending orders and availability of the stock at warehouse.
> Therefore, in most of the cases, trading sales involve
> multiple purchases from GFL India, which are then stored in
> the U.S. warehouse. . . .   Because of this system, it is not
> feasible to establish a one-to-one correlation between
> purchases and sales.  Therefore, it is not possible to report
> movement expenses on an actual basis and that's why {it}
> reported on an allocation basis.

SCQR (P.R. 84) (C.R. 91) at 7–8 (Appx05087–88).  GFCL also

emphasized that the procurement of goods and the sales of goods are in

different lots and sizes, from various time periods, and from numerous

product types.  *Id.* at 3–4, 7–8 (Appx05083–84, 87–88); SSCQR (C.R.

176) at 2–3 (Appx06702–03); IDM at 6 (Appx01060).  As a result, GFCL

had allocated movement expenses by product grade based on grade

weight in kilograms.  *Id.*  More specifically, GFCL had aggregated the

actual gradewise freight costs for its sales to GFL Americas during the

investigation period by product and divided the actual freight costs by

the weight of gradewise sales to GFL Americas to calculate per-unit

movement expenses for each product sold to the United States.  *See*

24

ICQR at C-27, C-28, C-30, Exhibit C-14 (Appx03539–42, 03616); *see also*
SCQR at Exhibit SC-8 (P.R. 84) (C.R. 99) (Appx05124) (providing
worksheet for transfer cost from GFCL India to GFL Americas); IDM at
6–7 (Appx01060–61).  GFCL also placed on the record sample shipping
documents from its records maintained in the ordinary course of
business demonstrating that GFCL's ability to track the quantity and
costs of shipping subject merchandise to a single warehouse in the
United States on a per-grade basis.  *See* IAQR (P.R. 44) (C.R. 15) at A-
30 (Appx01916) & Exhibit A-13.3–A-13.4 (P.R. 15) (C.R. 19)
(Appx02156–2282) (exhibiting documents); *see also* Verification
Questionnaire Response, dated Sept. 22, 2021 (VQR) (P.R. 119) (C.R.
194) (Appx07182–84) at 3, Exhibits VSQ-1(c) (C.R. 195) (Appx07242–87)
(providing sales trace documents); IDM at 7 & 7 n.46 (Appx01061)
(referencing Exhibit VSQ-1(c)).

Based on GFCL's explanation and "its records maintained in the
ordinary course of business," Commerce found it "reasonable" that
"GFCL relied on the total expenses for shipping each grade of product
and the total quantity of each grade of product sold during the POI to
calculate its U.S. movement expenses."  *See* IDM at 6–7 (Appx01060–

61).   Commerce was also satisfied that GFCL's allocation methodology did not cause inaccuracies or distortions.   *See* IDM at 6–7 (Appx01060– 61); s*ee also* ICQR (P.R. 57) (C.R. 42) at C-27–C-30 (explaining allocation methodology) & Exhibit C-14 (Appx03539–42, 03616); *see also* SCQR (P.R. 84) (C.R. 99) at Exhibit SC-8 (Appx05124).   Consequently, Commerce rejected Daikin's argument—the same one Daikin now presents—that GFCL's "ability to link {} batch number{s}" equates to an ability to report on a batch-specific basis.   *See* IDM at 7 (Appx01061).

Nevertheless, Daikin reiterates its argument that GFCL could have reported its U.S. movement expenses on a transaction-specific basis because it purportedly could have tracked merchandise by batch number, *see* Daikin Br. at 17, and that record evidence contradicts GFCL's "professed inability to link merchandise shipped from India to its U.S. warehouse with merchandise sold to the U.S. customers," *id*. at 19.   Daikin therefore alleges that "Commerce's reasons for accepting GFCL's U.S. movement expenses were not grounded in substantial evidence."   Daikin Br. at 24, 25.   The record belies Daikin's claims.

For example, Daikin asserts that GFCL's "Export Customer Complaint Register" demonstrates that "GFCL routinely tracks

merchandise batch numbers." *See id.* at 20. Not so. The cited document merely shows that GFCL identified particular batch numbers for certain merchandise in response to post-sale complaints made by customers—not that GFCL "routinely" tracks merchandise batch numbers. *See* SAQR (P.R. 59) (C.R. 67) at 1–2 (Appx03880–81) & Exhibits SA-3(a)–SA-3(c) (Appx03912–19).

Daikin also avers that "GFCL could calculate the cost to ship each batch" because there are

[                                        ]. *See* Daikin Br. at 22. But Daikin's theory overlooks the dearth of record evidence that would enable Commerce to reasonably establish how batch numbers correlate to particular sales from GFCL to GFL Americas and from GFL Americas to U.S. customers. *See* IDM at 7 (Appx01061). Contrary to Daikin's claim that "Commerce ignored record evidence that GFCL batch numbers were associated with specific shipments," Daikin Br. at 25–28, Commerce explained that it had considered the record evidence —including documents cited by Daikin that "contain batch numbers"— and nonetheless concluded that "the record does not indicate *how* those batch numbers are associated with specific

27

shipments." IDM at 7 (Appx01061) (emphasis added). That Daikin

identifies a

[

], *see* Daikin's Br. at 26 (citing SAQR (P.R. 59) (C.R. 67) at Exhibit SA-4

(Appx03920–04008)), does not demonstrate that it is feasible for GFCL

to report its U.S. movement expenses on a transaction-specific basis.

Indeed, Daikin cites no record evidence indicating that the

[

.]

Moreover, as GFCL explained to Commerce, the procurement and

sales of merchandise do not always necessarily align, which prevents

GFCL from establishing a one-to-one correlation between purchases

and sales for movement expenses. *See* SSCQR (P.R. 99) (C.R. 176) at

2–3 (Appx06702–03); *see also* GFCL Reb. Br. (C.R. 219) at 5–7

(Appx08687–89). That Commerce considered the evidence and arrived

at a different conclusion than Daikin does not render Commerce's

determination unlawful. In other words, even if the record arguably

supported Daikin's view that a one-to-one correlation could be made using batch numbers, that would *not* mean that Commerce's contrary finding is unsupported by substantial evidence. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) ("An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.") (citing *Consolo*, 383 U.S. at 620).

At bottom, Daikin's argument that GFCL should have reported transaction-specific movement expenses is based on Daikin's speculation about the records that GFCL *could have* maintained. Daikin Br. at 17–24. The question, however, is not whether it would be *possible* for GFCL to report expenses on a transaction-specific basis from the records it *could have* maintained. Rather, the inquiry asks whether it is feasible for GFCL to report on a transaction-specific basis, taking into account GFCL's records maintained in the ordinary course of business. *See* 19 C.F.R. § 351.401(g)(3). The standard "refers to the feasibility of using existing documents to use transaction-specific reporting – *not* the feasibility of maintaining records that would allow such reporting." *SNR Roulements v. United States*, 341 F. Supp. 2d

1334, 1351 (Ct. Int'l Trade 2004) (emphasis in original).  Further,

"{n}othing suggests that companies are required to make wholesale

changes to their record-keeping practices to comply{.}"  *SNR*

*Roulements,* 341 F. Supp. 2d at 1351.  Like the challenging party in

*SNR Roulements*, Daikin "erroneously focuses on how {GFCL} *could*

*have* documented its shipments in a manner that would allow for more

specific reporting of its international freight expenses."  *See id.*

(emphasis in original).

Critical here, Daikin does not contend that the transaction-specific

expenses it demands are already calculated and can be found in existing

GFCL business records.  Instead, Daikin effectively criticizes GFCL for

not making *new* records by piecing together data from various sales and

shipping documents, which may not even include the necessary

information.  *See* Daikin Br. at 22–23, 30 (arguing GFCL "could arrive"

at the transaction-specific cost and acknowledging that doing so would

require GFCL to "expend additional time and energy").  Although the

record contains documents with batch numbers, it does not show that

GFCL maintains an existing record of batch numbers that are tracked

from shipment in India through the U.S. sale; nor does it indicate how

batch numbers for specific shipments are associated with specific U.S. sales or specific shipments.  Accordingly, because Daikin's batch-tracing theory is based on speculation about GFCL's records, Commerce reasonably declined to conclude that "allocating movement expenses by batch number would result in a more transaction-specific cost than allocating freight expenses by grade of the product sold."  IDM at 7 (Appx01061).

*Next*, Daikin claims that GFCL should have reported movement expenses on a transaction-specific basis because GFCL's packing, shipping, and warehousing [                    ]. *See* Daikin Br. at 28–30. However, that these [                ] does not by itself establish that reporting actual movement expenses for specific transactions based on GFCL's books and records maintained in the ordinary course of business is feasible.  Here, again, as discussed above, Daikin's argument depends on speculation and ignores the lack of record evidence supporting its batch-number theory.  In other words, [                    ] does not create the "one-to-one" correlation missing in the record.  Further, packing and shipping [                    ] across product type does not necessarily mean that movement or

shipping expenses must also be [        ] because other factors (*e.g.*,

pricing fluctuations from a shipper, *etc.*) can impact the actual

movement costs incurred for a particular shipment of a given product.

Notwithstanding its speculation to the contrary, Daikin simply has not

established that movement costs must be [        ].

  *Third*, Daikin argues that Commerce ignored record evidence that

GFCL's allocation method is distortive.  *See* Daikin Br. at 30–36.

Pointing mostly to arguments in its case brief and not record evidence,

Daikin contends that the inclusion of non-subject merchandise and the

[    ] variation of movement expenses between different product types

[                                        ] demonstrates

such distortion.  *See id*.  However, in the final determination, Commerce

explained its decision that GFCL's reporting of movement expenses on

an allocated basis was reasonable and that "there is no evidence that

{GFCL's} allocation methodology causes inaccuracies or is distortive."

*See* IDM at 6 (Appx01060).  Contrary to Daikin's claim that Commerce's

determination "wrongly shifted" the evidentiary burden to Daikin to

provide evidence that GFCL's allocation was distortive, Daikin Br. at 35,

Commerce's statement reflects the agency's consideration of the

record, including the arguments in Daikin's case brief, and its conclusion that the record does not support Daikin's claim.

As discussed above, GFCL demonstrated to Commerce's satisfaction that its allocation methodology is not distortive because it used GFCL's total shipping expenses and total quantity for each grade of product sold during the POI based on GFCL's records maintained in the ordinary course of business. *See* IDM at 6–7 (Appx01060–61); s*ee also* ICQR (P.R. 57) (C.R. 42) at C-27–C-30 (explaining allocation methodology) & Exhibit C-14 (Appx03539–42, 03616); *see also* SCQR (P.R. 84) (C.R. 99) at Exhibit SC-8 (Appx05124). Daikin's disagreement with Commerce's view of the evidence hinges on Daikin's view that [                            ] must mean that the actual movement expenses incurred for a given product are also [        ], which, as noted, is not necessarily the case. In other words, despite speculating that actual movement expenses must be [            ], Daikin does not actually *show* that is the case. Moreover, the record indicates that GFCL's allocation method is derived from actual POI gradewise freight costs by product and weight, not product value, as Daikin claims. *See* Daikin Br. at 32–33. Commerce acknowledged as much in the final

33

determination.  *See* IDM at 6–7 (Appx01060–61); ICQR at C-27, C-28, C-30, Exhibit C-14 (Appx03539–42, 03616); *see also* SCQR at Exhibit SC-8 (Appx05124).

*Finally*, based on its incorrect view that GFCL's reported movement expenses were distortive, Daikin argues that Commerce should not have accepted GFCL's timely submission of information from its records maintained in the ordinary course of business.  *See* Daikin Br. at 36–39.  However, as explained above, Commerce accepted GFCL's movement expenses because GFCL had explained that transaction-specific reporting was not feasible and demonstrated to Commerce's satisfaction that the allocation method did not cause inaccuracies or was distortive.  *See* IDM at 6–7 (Appx01060–61).  That GFCL submitted timely information undercuts Daikin's argument that GFCL was nonresponsive or failed to cooperate.

And neither case Daikin relies on should change the Court's calculus here.  *See* Daikin Br. at 38–39.  In *LG Chem, Ltd. v United States*, this Court upheld Commerce's decision to rely on expenses allocated on a company-wide rather than division-specific basis.  534 F. Supp. 3d 1386, 1402 (Ct. Int'l Trade 2021).  That the Court sustained

Commerce's decision, despite LG Chem's argument that division-specific expenses were kept in the ordinary course of business, neither shows that relying on an allocation method here was improper nor indicates that reporting on a transaction-specific basis was feasible for GFCL. *See id.* Likewise, in *NSK Ltd. v. United States*, Commerce merely rejected the respondent's argument that its records "do not allocate expenses based on weight" because there were "product brochure lists" showing otherwise. *See* 346 F. Supp. 2d 1312, 1342 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007). Neither case demonstrates that Commerce's decision to accept GFCL's argument here—on a completely different record—is unsupported by substantial evidence.

### C. Commerce Reasonably Declined To Apply Facts Available With An Adverse Inference

Because Commerce accepted GFCL's movement expenses on an allocated basis, there is no deficiency in the administrative record, and, therefore, Commerce reasonably declined to apply facts otherwise available with an adverse inference. *See* IDM at 6–7 (Appx01060–61). Nevertheless, Daikin argues that Commerce's failure to apply adverse facts available is unsupported by the record and unlawful. *See*

*generally* Daikin Br. at 15–39.  But because the application of adverse facts available requires a deficiency in the record and a finding of noncooperation, which are not present here, Daikin's argument lacks merit.

As noted, Commerce is afforded broad discretion in applying facts otherwise available and adverse inferences.  *See* 19 U.S.C. § 1677e(a)(1), and (b)(2)(A)-(D) (providing that, in certain circumstances, Commerce "shall use the facts otherwise available"); 19 U.S.C. §1677e(b) (providing that Commerce "may use an inference that is adverse").  This discretion is based on Commerce's "special expertise in administering the anti-dumping law {which} entitles its decisions to deference from the courts." *Ad Hoc Shrimp Trade Action Committee v. United States*, 675 F. Supp. 2d 1287, 1304 (Ct. Int'l Trade 2009) (quoting *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).  Accordingly, this Court upholds Commerce's decision not to apply AFA if it is "reasonable, not an abuse of discretion, and supported by substantial evidence." *AK Steel Corp. v. United States*, 346 F. Supp. 2d 1348, 1356 (Ct. Int'l Trade 2004).

Commerce reasonably declined to apply AFA because there is no deficiency in the record for movement expenses.  GFCL explained to Commerce why it was not feasible to report certain movement expenses on a transaction-specific basis and the administrative record fails to show that GFCL maintains an existing record of batch numbers for purchases from GFCL India through its affiliate's sales to U.S. customers or that batch numbers are uniquely tied with specific shipments.  Given that companies are not required "to make wholesale changes to their record-keeping practices to comply," Commerce reasonably accepted and relied on GFCL's movement expenses as reported on an allocated basis.  *SNR Roulements,* 341 F. Supp. 2d at 1351.  Accordingly, with regard to GFCL's movement expenses, there is no missing information in the administrative record that Commerce could lawfully fill using facts otherwise available pursuant to the requirements of 19 U.S.C. § 1677e(a).

Moreover, Commerce reasonably declined to apply AFA because Commerce did not find that GFCL failed to cooperate as required by 19 U.S.C. § 1677e(b).  As an initial matter, the question of GFCL's cooperation need not be reached by the Court if it agrees with the

Government that no record deficiencies exist. *See BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1357–58 (Ct. Int'l Trade 2021) (citing *Nippon Steel*, 337 F.3d at 1381) (describing the application of AFA as a "two-step process," the first of which involves Commerce determining if there is a deficiency of information in the administrative record); *Deosen Biochemical Ltd. v. United States*, 301 F. Supp. 3d 1372, 1377 (Ct. Int'l Trade 2018) ("{I}f the party withheld requested information *and* did not 'put forth its maximum effort' to comply with that request . . . the Department can apply AFA.") (emphasis in original).  But even if there were missing information or the record were otherwise deficient, Commerce explained that the application of facts available, (adverse or otherwise), was unwarranted because GFCL had timely responded to Commerce's requests for information regarding movement expenses; GFCL's allocation methodology is reasonable; and there is no evidence indicating that the methodology causes inaccuracies or distortions.  *See* IDM at 6 (Appx01060).  Commerce also explained that the underlying record is dissimilar to another case where it found that the respondent's allocation methodology was distortive, and that the respondent failed to cooperate to the best of its ability.  *See*

*id.* at 6, n.41.  Beyond Daikin's unsupported allegations, no record basis exists to conclude that GFCL failed to cooperate to the best of its ability within the meaning of the statute.

Daikin nonetheless challenges Commerce's failure to apply AFA, arguing that GFCL could have reported U.S. movement expenses on a transaction-specific basis but "failed to expend the effort necessary" to do so, "thereby triggering Commerce's duty to use facts otherwise available under 19 U.S.C. § 1677e(a)(2) with an adverse inference under 19 U.S.C. § 1677e(b)(1)."  Daikin Br. at 17–18; *id.* at 17–24.  Again, the application of AFA is subject to Commerce's broad discretion, and the question is not whether GFCL *could have* possibly reported on a transaction-specific basis from records it *could have* maintained; rather, the question is whether it is feasible for GFCL to have done so based on its existing records maintained in the ordinary course of business.  19 C.F.R. § 351.402(g)(3); *SNR Roulements,* 341 F. Supp. 2d at 1351.  As the record shows, GFCL provided timely and complete responses to each of Commerce's informational requests, and Commerce was satisfied with GFCL's submissions.  That GFCL did not undertake efforts to attempt to report its expenses in the manner proposed by

39

Daikin, based on information GFCL confirmed it does not maintain in the ordinary course of business, does not render GFCL uncooperative. Accordingly, Commerce reasonably declined to apply an adverse inference.

### III. Commerce's Decision To Not Recalculate GFCL's Product-Specific Allocated Movement Expenses On An Average Basis Is Supported By Substantial Evidence And In Accordance With Law

Daikin contends that Commerce's decision to not recalculate GFCL's movement expenses on an overall average basis should be remanded. *See* Daikin Br. at 39–42. Daikin's entire argument for recalculation, however, is based on its underlying claim that GFCL's allocation methodology is distortive, *see* Daikin Br. at 41, which, as discussed above, lacks merit. GFCL explained its allocation methodology and provided supporting evidence from its normal books and records, demonstrating to Commerce's satisfaction that its reporting method did *not* cause distortions:

> We disagree with the petitioners and find that GFCL's reporting of the U.S. movement expenses at issue . . . on an allocated basis is in this instance reasonable and that there is no evidence that its allocation methodology causes inaccuracies or is distortive.

IDM at 6 (Appx01060).  Daikin merely raises the same argument again and invites this Court to "reweigh this evidence," which the Court "may not do."  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015); *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted) ("{N}or is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record.") (citations omitted).

In addition, Daikin fails to demonstrate that recalculating movement expenses on an overall average basis would necessarily "remove {any alleged} distortions and inaccuracies."  Daikin Br. at 40.  Instead of attempting to make that showing, it merely states that such calculations "could have been performed."  *Id.* at 42.  Similarly, citing nothing in the record, Daikin urges that "it makes no sense" for GFCL's movement expenses to be allocated "by product type" based on what the "record evidence showed."  Daikin Br. at 40.  Yet Daikin does not explain how the alleged distortions that the record apparently "showed," *see* Daikin Br. at 33, would be eliminated through the recalculation method it seeks.

And contrary to Daikin's assertion, Daikin Br. at 41, *SKF USA Inc. v. United States* does not show Commerce's decision here is unsupported by substantial evidence.  35 C.I.T. 1365 (2011).  In that case, based on a different record, this Court affirmed Commerce's determination that allocating based on weight "avoided the distortion" that it had identified as occurring when value-based allocation was applied.  *See id.* at 1375.  Here, in contrast, Commerce found no distortions, and Daikin does not show how its proposed recalculation methodology "avoids" the alleged distortions it identifies.

**IV.   Commerce Lawfully Granted A CEP Offset To Adjust Normal Value Accounting For GFCL's Home Market Sales At A More Advanced LOT Than GFCL's U.S. Sales**

Commerce granted GFCL a CEP offset because GFCL demonstrated to Commerce's satisfaction that its home market level of trade (LOT) was more advanced than its U.S. (CEP) LOT.  *See* IDM at 9–10 (Appx01063–64).  In other words, although GFCL could have provided a more robust quantitative analysis, Commerce accepted the detailed information that GFCL provided as sufficient to show that there were differences between its home market and U.S. selling activities, such that an offset to achieve a fair comparison was

appropriate.  Commerce's determination is based on substantial record evidence and otherwise in accordance with law.

## A.   __Legal Framework__

The statute's mandate for a "fair comparison" between normal value and export price or CEP underlies Commerce's authority to make price adjustments.  19 U.S.C. § 1677b(a).  The SAA recognizes that "{t}o achieve such a fair comparison, section {1677b} provides for the selection and adjustment of normal value to avoid or adjust for differences between sales which affect price comparability."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 820 (1994), *reprinted in* 1994 U.S.C.C.A.N 4040, 4161.  It is well established that the statute generally "seek{s} to produce a fair 'apples-to-apples' comparison between foreign market value and United States price."  *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

To achieve that end, the statute, and Commerce's regulations, "call for adjustments to the base value of both foreign market value and United States price to permit comparison of the two prices at a similar point in the chain of commerce."  *Id.* (citation omitted).  Thus, both

sections 1677a and 1677b of the statute provide that, in determining

export price or normal value, Commerce will begin with the price at

which the subject merchandise or foreign-like product is first sold (the

"starting price"), while taking into account either various adjustments

or the ordinary course of trade.  *See* 19 U.S.C §§ 1677a(a),

1677b(a)(1)(B)(i).

Commerce grants a CEP offset to lower normal value when a

respondent's home market sales occur at a more advanced LOT than

the respondent's U.S. sales.  *See Micron Tech., Inc. v. United States*, 243

F.3d 1301, 1305 (Fed. Cir. 2001).  The regulation requires that

Commerce adjust normal value in the form of a CEP offset if the home

market LOT is at a more advanced stage than the CEP LOT, and there

is insufficient record information to determine the effect of this

difference on price comparability (*i.e.*, there is not an appropriate basis

to grant a LOT adjustment under 19 U.S.C. § 1677b(a)(7)(A)).  19 U.S.C.

§ 1677b(a)(7)(B); PDM at 9 (Appx01041).

Commerce's regulations also specify that:

The Secretary will determine that sales are made at
different levels of trade if they are made at different
marketing stages (or their equivalent).  Substantial
differences in selling activities are a necessary, but not

> sufficient, condition for determining that there is a
> difference in the stage of marketing.

19 C.F.R. § 351.412(c)(2).  To determine whether the comparison

foreign-market sales are at different stages in the marketing process

than the U.S. sales, Commerce examines the distribution system in

each market, *i.e.*, the chain of distribution, including selling functions

and class of customer, and the level of selling expenses for each type of

sale.

**B.    Record Evidence Supports Commerce's
       Determination That The LOT For GFCL's Home
       Market Was More Advanced Than For Its U.S. Market**

Record evidence supports Commerce's determination to continue

to grant GFCL a CEP offset in the final determination.  *See* IDM at 9

(Appx01063).  Daikin's arguments do not detract from the

reasonableness of Commerce's decision to accept GFCL's detailed

information as sufficient for the purposes of the less-than-fair-value

investigation, even though Commerce acknowledged in the final

determination that "a more detailed and robust quantitative analysis of

{GFCL's} selling functions will be required for {Commerce} to evaluate

whether a CEP offset is warranted in any future administrative

reviews."  IDM at 10 (Appx01064).

Daikin challenges Commerce's determination as unlawful, arguing that Commerce could not have granted a CEP offset after determining that GFCL did not submit a sufficient quantitative analysis.  *See* Daikin Br. at 44–46.  As an initial matter, neither the statute nor Commerce's regulations require that the respondent submit a quantitative analysis to demonstrate it is entitled to a CEP offset.  19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f).  Instead, Commerce's regulations specify that the party that is "in possession of the relevant information has the burden of establishing *to the satisfaction of {Commerce}* the amount and nature of a particular adjustment."  19 C.F.R. § 351.401(b)(1) (emphasis added); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,370 (May 19, 1997) ("{A}ll adjustments, including LOT adjustments, must be demonstrated to the satisfaction of the Secretary.").  Nevertheless, in prior investigations, Commerce has required respondents to provide both qualitative and quantitative analyses to enhance its ability to determine whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different LOTs.  *See Polyethylene Terephthalate Sheet from the Republic*

*of Korea*, 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020) (*PET Korea*), and accompanying IDM at Comment 4; *see also* Daikin Br. at 44; IDM at 9 (Appx01063).

In the initial questionnaire, Commerce requested that GFCL provide a quantitative analysis showing how expenses assigned to POI sales made at different claimed levels of trade impact price comparability, and how the quantitative analysis supports the claimed levels of intensity for the selling activities reported in the selling functions chart. *See* IQ (P.R. 38) at A-6–A-8 ¶ 3 (Appx09181–83); *see also* IDM at 9 (Appx01063). In response, GFCL provided information regarding the marketing stages involved in making the reported home market and U.S. sales and claimed a LOT adjustment, stating that there is "significant variation in the {LOT} between U.S. sales and Home Market sales, which can be quantified when comparing the expenses assigned to sales associated with each {LOT}." IAQR (C.R. 15 – C.R. 30) at Appx01910, Appx01903–10 & Ex. A-11 (Appx02101); *see also* PDM at 9 (Appx01041). GFCL supported its claim with a selling functions chart that listed selling functions and services provided for each channel of distribution in the home and the U.S. market, and the

degree to which each selling function is performed.  *See* IAQR at

Appx01903–10 and Exhibit A-11 (Appx02101).

In a supplemental questionnaire, Commerce requested that GFCL

"{p}rovide documentation supporting GFCL's methodology (*i.e.*, the

quantitative analysis) used to report the levels of intensity . . . for each

of the figures reported in {GFCL's selling functions chart}."  SAQ (P.R.

55) (C.R. 31) at ¶ 3 (Appx03301).  In response, GFCL detailed the

methodology it used to report the levels of intensity for the figures in

the selling functions chart and pointed Commerce to additional

documentation supporting the levels of intensity reported for technical

support and inventory maintenance.  *See* SAQR (P.R. 59) (C.R. 67) at 1–

2 (Appx03880–81) & Exhibits SA-3(a)–SA-3(c) (Appx03912–19)

(customer complaint register and correspondence) (demonstrating that

GFCL provides all technical support to U.S. customers, including after-

sales services and technical assistance); ICQR (P.R. 57) (C.R. 42) at C-

31–C-32, C-50 (Appx03543–44, 03562) & Exhibits C-30–C-36

(Appx03669–03737) (detailing GFCL's U.S. warehousing for further

distribution).

Based on this record evidence, including the detailed descriptions of the selling activities performed in each channel of distribution and documentation GFCL provided to support the levels of intensity it reported in its selling functions chart, Commerce preliminarily granted GFCL a CEP offset, finding that the normal value LOT was at a more advanced stage of distribution than the constructed export price LOT. *See* PDM at 9–11 (Appx01041–43).

In the preliminary determination, Commerce explained that GFCL made home market sales through *one* channel of distribution: direct sales to unaffiliated customers (Channel 1). *See* PDM at 9 (Appx01041); IAQR (P.R. 44) (C.R. 15) at A-16–A-18 (Appx01902–04). For CEP sales, however, GFCL reported that it made sales through *four* channels of distribution: shipment directly to unaffiliated U.S. customers with the U.S. affiliate acting as the importer of record (Channel 2); sales from the U.S. affiliates' warehouse to unaffiliated U.S. customers (Channel 3); consignment sales from the U.S. warehouse to unaffiliated U.S. customers (Channel 4); and sales made by consultants, who are paid fixed fees and are appointed by GFCL to promote sales to certain U.S. customers (Channel 6). *See* IAQR at A-18

(Appx01904); PDM at 9–10 (Appx01041–42). As such, Commerce found that there is one LOT for the home market because all home market sales were made through a single distribution channel and the selling activities (*i.e.*, sales support, training services, logistical services, and sales-related administrative activities) did not vary within the channel. *See* PDM at 9 (Appx01041); IAQR at A-20–A-22 (Appx01906–08) & Exhibit A-11 (Appx02101); *see also* SAQR at Exhibit SA-7 (Appx04040–43). Because Commerce found that the differences in selling functions and activities were not significant enough to indicate that the four CEP sales channels constitute different levels of trade, Commerce also determined that there is one LOT for CEP sales. *See* PDM at 10 (Appx01042).

In comparing U.S. (CEP) and home market LOTs, Commerce preliminarily found that:

> {I}n the home market the selling activities were generally performed at a high level within four selling function categories (i.e., sales support, training services, logistical services, and sales related administrative activities). However, *for the majority of the CEP sales channels, activities within these selling function categories were not performed at all.* Moreover, with respect to sales support and training services, activities were performed at a much higher intensity for home market sales.

*Id.* (emphasis added).  Accordingly, Commerce preliminarily determined that the home market LOT was at a more advanced stage of distribution than the LOT for the CEP.  *Id.*  However, as Commerce explained, "because there is only one LOT in the home market, we were unable to calculate a LOT adjustment based on GFCL's home market sales of the foreign like product, and we have no other information that provides an appropriate basis for determining a LOT adjustment." PDM at 10–11 (Appx01042–43).  Commerce thus granted GFCL a CEP offset pursuant to 19 U.S.C. § 1677b(a)(7)(B) and 19 C.F.R. § 351.412(f). *Id.* at 11 (Appx1043).

Then, for the first time, Daikin raised issues with the information GFCL provided to support the CEP offset in its case brief before Commerce issued its final determination.  *See* Pet. Case Brief at 12-17 (arguing that GFCL failed to meet its evidentiary burden for establishing entitlement to a CEP offset because it failed to provide a quantitative analysis).

In the final determination, "{u}pon further consideration of the information on the record of this investigation and based on parties' comments," Commerce acknowledged that the quantitative analysis

provided by GFCL in response to Commerce's initial questionnaire was "inadequate" because GFCL did not provide sufficient "quantitative analysis of the difference in levels of intensity." *See* IDM at 9–10 (Appx01063–64).  Commerce noted, however, that it "did not inform GFCL that it required more information" on this issue.  *See id.* at 10 (Appx01064).  Commerce also added that its supplemental questionnaire had "only requested generally that GFCL provide supporting documentation for its reported levels of intensity, which GFCL did for certain claimed selling activities." *Id.*  Given the detailed qualitative analysis provided by GFCL and the fact that "GFCL did not have an opportunity . . . to remedy any deficiency in its quantitative analysis," Commerce deemed that, "in this instance," GFCL's information was "sufficient" and granted a CEP offset.  *See id.*

## C. Commerce's Determination To Grant GFCL A CEP Offset Was Not Arbitrary

Daikin asserts that Commerce's decision to grant the CEP offset given the inadequate quantitative analysis is unlawful as an arbitrary deviation from agency practice.  *See* Daikin Br. at 46–49.  Daikin is incorrect.  An agency action is "arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP*

*Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (internal quotations and citations omitted); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (holding that a plaintiff "must show that Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice"). As detailed above (*see supra* III.B), Commerce provided a reasonable explanation for deeming GFCL's information "sufficient" to grant the CEP offset.

Although Daikin avers that Commerce's decision conflicts with Commerce's practice in "similar circumstances" and is therefore arbitrary, Daikin is wrong, as both cases it relies on (*PET Korea* and *Rubber from Brazil*) are meaningfully distinguishable. *See* Daikin Br. at 46–49 (citing *PET Korea*, 85 Fed. Reg. 44,276, and IDM at Comment 4; *Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (Dep't Commerce June 29, 2020), accompanying IDM at 8).

In *PET Korea*, Commerce preliminarily determined that "the record contains no basis" to find that the selling functions for the home market customers differed significantly from those performed for the U.S. sales channel and therefore concluded a CEP offset was not

warranted.  *See* 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020), and accompanying IDM at Comment 4.  And in the final determination, Commerce *continued* to deny the respondent a CEP offset, rejecting its argument that the quantitative analysis it had provided was sufficient. *See id.*

Likewise, in *Rubber from Brazil*, after requesting quantitative information related to the respondent's LOTs, Commerce preliminarily determined that the submitted information "{did} not provide the required quantitative support" for the respondent's claimed home-market LOTs.  *See Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (June 29, 2020) (*Rubber from Brazil*), and accompanying IDM at Comment 1.  In the final determination, after considering the respondent's arguments regarding its LOTs claim, Commerce found the quantitative analysis was still lacking; therefore, Commerce continued to deny the respondent the CEP offset.  *See Rubber from Brazil* IDM at Comment 1.

Notably, in both *PET Korea* and *Rubber from Brazil*, Commerce denied the offset *at the preliminary phase* of the investigation and *continued* to find in the final determination that the respondents had

failed to provide the required information.   Two key differences are present here: In contrast to those cases, (1) Commerce deemed GFCL had provided sufficient information at the preliminary phase and granted a CEP offset and (2) despite deciding in the final determination that GFCL should have provided a more robust quantitative analysis, Commerce concluded it had not "inform{ed} GFCL that it required more information." IDM at 10 (Appx01064).  Thus, contrary to Daikin's assertion, the situation here does not involve "similar circumstances." *See* Daikin Br. at 46–49.

In fact, Commerce's decision to grant GFCL the CEP offset here is consistent with its determination in another recent proceeding.  In *CWP Korea*, relying on *PET Korea* and *Rubber from Brazil*, Commerce initially denied the *CWP Korea* respondent a CEP offset in the preliminary results, explaining that the respondent had failed to provide a quantitative analysis supported by source documents to substantiate its reported selling functions and intensities.  *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*; 2018-2019, 86 Fed. Reg. 15,912 (Dep't Commerce March 25, 2021) (preliminary results), and accompanying PDM at 17–18, n.98.  In the final results,

however, Commerce reversed course and granted the respondent a CEP offset because—like with GFCL here—"Commerce never informed {the respondent} that it wished for more information" regarding the differences in levels of intensity for its selling functions in its chart.  *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*; 2018–2019, 86 Fed. Reg. 53,631 (Dep't Commerce Sept. 28, 2021) (final results), and accompanying IDM at Comment 3.  Moreover, just as it did here, Commerce accepted the *CWP Korea* respondent's information as sufficient for purposes of the particular segment of the proceeding, noting that "a more detailed and robust quantitative analysis of its selling functions will be required for {Commerce} to evaluate whether a CEP offset is warranted in any future administrative reviews."  *CWP Korea* IDM at Comment 3; *cf.* IDM at 10 (Appx01064) (noting the same to GFCL).

   In short, because Commerce provided a reasonable explanation for its decision—one that follows *CWP Korea* and is not inconsistent with *PET Korea* and *Rubber from Brazil*—the Court should reject Daikin's argument that Commerce acted arbitrarily in granting the CEP offset.

## D.    Commerce's Determination To Continue To Grant GFCL The CEP Offset Is In Accordance With Law

Despite Commerce's explanation for granting the CEP offset in this instance, Daikin argues that Commerce's supplemental questionnaire provided GFCL with an opportunity to "remedy its inadequate quantitative analysis" and "placed GFCL on notice that Commerce lacked sufficient quantitative evidence in support of GFCL's LOT claims."  Daikin Br. at 51.  Daikin's view of the supplemental questionnaire is mistaken and directly conflicts with that of Commerce—the party that issued it.

If Commerce finds that "a response to a request for information" is deficient, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews."  19 U.S.C. § 1677m(d).  Only after notifying the respondent of the nature of the deficiency and providing an opportunity to remedy or explain the deficiency can Commerce use adverse facts otherwise available.

This Court has recognized that "{b}roadly drawn initial or supplemental questionnaires may not sufficiently place a respondent on notice of the nature of the deficiency, and deprive it of the opportunity to remedy that deficiency." *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1322 (Ct. Int'l Trade 2021).   On the other hand, Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency when the supplemental questionnaire "specifically points out and requests clarification of the deficient responses, and identifies the information needed to make the required showing." *Id*. at 1322–23 (citations omitted) (cleaned up).

Here, contrary to Daikin's claim that Commerce raised the notice issue to "bail out a respondent that had not proven its entitlement to a favorable adjustment," Daikin Br. at 54, Commerce's final determination reasonably declined to penalize GFCL for a deficiency not "specifically pointed out" in Commerce's supplemental questionnaire.  As explained above, in the supplemental questionnaire, Commerce instructed GFCL to "{p}rovide documentation supporting GFCL's methodology (*i.e.*, the quantitative analysis) used to report the

levels of intensity . . . for each of the figures reported in {GFCL's selling functions chart}." SAQ at ¶ 3 (Appx03301).  In response, consistent with the broadly drawn request, GFCL detailed its methodology and pointed Commerce to additional documentation supporting the levels of intensity reported for technical support and inventory maintenance. *See* SAQR (P.R. 59) (C.R. 67) at 1–2 (Appx03880–81) & Exhibits SA-3(a)–SA-3(c) (Appx03912–19); ICQR at Exhibits C-30–C-36 (Appx03669–03737).  And in the final determination, Commerce acknowledged that it had "only requested generally" that GFCL provide supporting documentation for its reported levels of intensity, "which GFCL did for certain claimed selling activities."  IDM at 10 (Appx01064).  As a result, Commerce found that "GFCL did not have an opportunity, pursuant to {19 U.S.C. § 1677m(d)}, to remedy any deficiency in its quantitative analysis by providing additional information in a supplemental questionnaire response." *Id.*

That GFCL complied with Commerce's broad supplemental request for supporting "documentation," yet still failed to remedy the deficiency Commerce later identified in the final determination, does not establish that GFCL had notice of a *specific* deficiency or that

Commerce had identified the "information needed to make the required showing" for a sufficient quantitative analysis. *Hyundai Steel*, 518 F. Supp. 3d at 1322–23. Moreover, while Daikin accuses Commerce of presenting a "novel theory" to bail out GFCL, Daikin noticeably cites no case showing that this Court has rejected Commerce's own view that a broadly drawn questionnaire did not provide adequate notice to a respondent.

Finally, Daikin's related argument—that GFCL is not entitled to protection under the deficiency notice statute, § 1677m(d), because it knowingly provided incomplete information—should also be rejected for three reasons. First, Daikin's assertion hinges on the incorrect premise that GFCL was placed on notice of a specific deficiency and failed to comply. As noted, Commerce's supplemental request did *not* provide notice to GFCL regarding a specific deficiency, as Daikin suggests, and Commerce even said so. *See* IDM at 10 (Appx01064). Second, Daikin points to nothing in the record demonstrating GFCL "knowingly fail{ed} to comply" or intentionally provided incomplete data. *See* Daikin Br. at 55–57.

And third, Daikin cites no authority supporting its position that § 1677m(d) no longer applies where, like here, Commerce determined that the respondent did not have an opportunity to remedy the deficiency. The lone case it cites for this point (*Papierfabrik*) does not show otherwise. There, the Federal Circuit ruled that Commerce "did not abuse its discretion in denying Koehler a chance to correct data infected by intentional concealment of relevant information, when the concealment was discovered by another party to the proceeding." *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016). The situation here differs drastically, as it involves neither a refusal by Commerce to consider updated data, nor any fraudulent concealment by GFCL. As such, the Court should reject Daikin's claim that the deficiency notice provision does not apply. *See Shelter Forest Int'l Acquisition, Inc. v. United States, No. 2021-2281*, 2022 WL 2155965, at *6 (Fed. Cir. June 15, 2022) (explaining that the "fraudulent nature of the respondent's previous submission formed the underlying rationale for our decision {in *Papierfabrik*} that § 1677m(d) did not apply).

Accordingly, the Court should sustain Commerce's determination to grant GFCL the CEP offset.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant

Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

/s/ Daniel F. Roland
LESLIE M. LEWIS                        Trial Attorney
Attorney                               Civil Division
Office of the Chief Counsel            U.S. Department of Justice
   for Trade Enforcement &      P.O. Box 480
   Compliance                   Ben Franklin Station
U.S. Department of Commerce            Washington, DC 20044
                                       Tel: (202) 305-0514
                                       Fax: (202) 305-7644
                                       Email: daniel.f.roland@usdoj.gov

December 9, 2022                       *Attorneys for Defendant*

62

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules and the Court's July 21, 2022, Order (ECF No. 21). According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 11,627 words.

<u>/s/ Daniel F. Roland</u>

December 9, 2022