UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

---

|  |  |  |
|---|---|---|
| DAIKIN AMERICA, INC., | ) | |
|  | ) | PUBLIC VERSION |
| *Plaintiff,* | ) | |
|  | ) | |
| v. | ) | Case No. 22-122 |
|  | ) | |
| UNITED STATES, | ) | |
|  | ) | |
| *Defendant,* | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| GUJARAT FLUOROCHEMICALS LIMITED, | ) | |
|  | ) | |
| *Defendant-Intervenor.* | ) | |

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin
America, Inc.*

Dated: February 13, 2023

PUBLIC VERSION

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY OF TERMS ...........................................................................iv

I.   Commerce Erred in Failing to Apply AFA to GFCL Based on the Company's Failure to Report Movement Expenses on a Transaction-Specific Basis ................................................................................2

   A.  It Was Feasible for GFCL to Report Transaction-Specific U.S. Movement Expenses .....................................................................3

   B.  GFCL's Allocation Methodology Was Distortive ............................11

   C.  Commerce's Failure to Apply AFA Is Based on a Finding that Is Unsupported by the Record Evidence ...........................................15

II.  Commerce Should Have – at a Minimum – Reallocated GFL's Movement Expenses on an Overall Average Basis ..........................17

III. Commerce Erred in Granting GFCL a CEP Offset ...........................21

   A.  GFCL's Evidence Was Not "Sufficient" ...........................................21

   B.  Commerce Arbitrarily Departed from Its Practice .........................24

     1.  The Difference Between the Preliminary Phase and Final Phase Is Not a Valid Explanation.............................................25

     2.  Commerce Did Notify GFCL of Deficiencies in Its Response...26

     3.  The Burden Was on GFCL to Establish Its Entitlement to a CEP Offset.................................................................................27

   C.  19 U.S.C. § 1677m(d) Is Inapplicable ...........................................35

IV. CONCLUSION.................................................................................36

CERTIFICATE OF COMPLIANCE

PUBLIC VERSION

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 533, 616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ........................................ 29

*Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ........................................................................................ 18

*Corus Eng'g Steels Ltd. v. United States*, 27 C.I.T. 1286 (Ct. Int'l Trade 2003) ............................................................................................. 32

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ........................................................................................................ 14

*Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) .................................................................... 29, 30, 31, 34

*Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294 (Ct. Int'l Trade 2019) ........................................................................................ 29

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001) ......................................................................................... 32, 33

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .... 16

*NSK Ltd. v. U.S.*, 481 F.3d 1355 (Fed. Cir. 2007) .................................. 14

*Sucocitrico Cutrale Ltda. v. United States*, Slip-Op. 12-71, 2012 WL 2317764 (Ct. Int'l Trade June 1, 2012) ................................................ 29

**Statutes**

19 U.S.C. § 1677b(a)(7)(A) ....................................................................... 28

19 U.S.C. § 1677e(a)(2) ............................................................................. 15

19 U.S.C. § 1677m(d) ............................................................ 30, 34, 35, 36

PUBLIC VERSION

## Other Authorities

*Carbon and Alloy Steel Wire Rod From Korea*, 87 Fed. Reg. 5792 (Dep't Commerce Feb. 2, 2022) (final results)................................................32

*Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 76,918 (Dep't Commerce Dec. 23,2004) (final determ.).......32

*Certain Oil Country Tubular Goods from Korea,* 87 Fed. Reg. 20,817 (Dep't Commerce Apr. 8, 2022) ............................................................24

*Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (Dep't Commerce June 29, 2020) ........................................................24

*Oil Country Tubular Goods From Ukraine,* 87 Fed. Reg. 57,176 (Dep't Commerce Sept. 19, 2022) (prelim. results) .........................................33

*Polyethylene Terephthalate Sheet from the Republic of Korea*, 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020)......................................24

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H. R. Doc. No. 103–826(I), at 829-830, reprinted in 1994 U.S.C.C.A.N. 4040, 4167-68 ........................................................29

*Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Dep't Commerce Feb. 14, 2020) ...................................................................25

PUBLIC VERSION

# GLOSSARY OF TERMS

| | |
|---|---|
| **AFA** | Adverse Facts Available |
| **CEP** | Constructed Export Price |
| **Commerce** | U.S. Department of Commerce |
| **Daikin** | Daikin America, Inc. |
| **Daikin Opening Br.** | Daikin Memorandum in Support of Motion for Judgment on the Agency Record (Sept. 19, 2022) (ECF 22) |
| **GFCL** | Gujarat Fluorochemicals Limited |
| **GFCL Br.** | GFCL's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgement on the Agency Record (Jan. 13, 2023) (ECF 29) |
| **Gov't Br.** | Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgement on the Agency Record (Dec. 9, 2022) (ECF 27) |
| **Gujarat Americas** | Gujarat Americas LLC |
| **IDM** | Issues and Decision Memorandum |
| **GFCL Br.** | GFCL Rebuttal Brief (Nov. 19, 2021) |
| **LOT** | Level of Trade |
| **PTFE** | Polytetrafluorethylene |

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DAIKIN AMERICA, INC., ) | |
| ) | PUBLIC VERSION |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 22-122 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| GUJARAT FLUOROCHEMICALS ) | |
| LIMITED, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daikin hereby submits the following reply brief in support of its motion for judgment on the agency record in the above-captioned action. For the foregoing reasons, Commerce's final determination in the investigation of granular PTFE from India should be remanded with instructions to correct the agency's erroneous calculation of GFCL's movement expenses and the granting of a CEP offset.

PUBLIC VERSION

## I.      Commerce Erred in Failing to Apply AFA to GFCL Based on the Company's Failure to Report Movement Expenses on a Transaction-Specific Basis

As Daikin demonstrated in its opening brief, Commerce's failure to apply AFA to GFCL's U.S. movement expenses was not supported by substantial evidence and was not in accordance with the law. *See* Daikin Opening Br. at 17-28. GFCL could have reported transaction-specific U.S. movement expenses as required by Commerce in its regulations and original AD questionnaire. *Id.* at 17-24. GFCL failed to cooperate to the best of its ability to report its movement expenses on a transaction-specific basis. *Id.* Instead, it allocated the expenses by product type in a manner that was inaccurate and distortive. *Id.* Moreover, in its final determination, Commerce failed to require that GFCL prove that its allocation method did not cause distortions and unlawfully ignored evidence that shows the existence of such distortions. *Id.* at 24-39. As discussed below, neither the government nor GFCL raise any arguments in their response briefs that detract from this conclusion.

PUBLIC VERSION

### A. It Was Feasible for GFCL to Report Transaction-Specific U.S. Movement Expenses

The record evidence shows that GFCL could have reported its U.S. movement expenses on a transaction-specific. *See* Daikin Opening Br. 17-24. In particular, GFCL could have used its sales documents to track merchandise by batch number [

], link these batch numbers to specific shipments, and then calculate the cost to ship [                                    ]. *Id.* Daikin showed this was feasible by calculating transaction-specific ocean freight for one [      ] where GFCL had placed the relevant documents on the record. *Id.* at 22.

According to the government and GFCL, it was not feasible for GFCL to report movement expenses on a transaction-specific basis because sales by the affiliate in the United States, GFL Americas, involved multiple purchases from GFCL in India, which were then stored in the U.S. warehouse before being shipped to the customer from inventory. *See* Gov't Br. at 23; GFCL Br. at 7-8. While plausible on its face, Commerce blindly accepted this excuse without grappling with record evidence to the contrary. This failure warrants a remand. *See, e.g., Commc'ns Workers of Am. Loc. 4123 on behalf of AT&T Servs., Inc.*

PUBLIC VERSION

*v. U.S. Sec'y of Lab.*, 518 F. Supp. 3d 1342, 1356 (Ct. Int'l Trade 2021) (remanding determination as unsupported by substantial evidence because the agency "failed to grapple with the union's evidence from which conflicting inferences might be fairly drawn."); *Nucor Corp. v. United States*, 33 C.I.T. 207, 265 (2009) (remanding case to Commerce where its determination showed no effort to grapple with the evidence in support of a party's position).

One piece of evidence that Commerce failed to grapple with is the Export Customer Complaint Register. GFCL sold the subject merchandise to customers in [                    ], and the record shows that GFCL traced the movement of [              ] merchandise to the U.S. customer. *See* Daikin Opening Br. at 19-24. In fact, the Export Customer Complaint Register maintained by GFCL shows that GFCL routinely performs this tracking. *See GFCL Supp. A. Resp.* (May 24, 2021) at Exhibit SA-3(a), Appx03913. When GFCL receives complaints from its customers, GFCL could determine [

]. *Id.* at 19-20.

In fact, the record shows that GFCL had to track its batches of subject merchandise for each sale on a routine basis. According to GFCL, granular PTFE products are used in critical applications in the automotive and chemical processing industries and also for "some of the most sophisticated defense and aerospace applications." Petition at Exhibit I-31, Apppx01495; GFCL Sec. A Resp. at Exhibit A-16.1, Appx02540. It is thus vital that manufacturers such as GFCL track specific shipments of merchandise to specific customers so that, in the case of any problem with the product, they can determine the root cause of the problem and take corrective measures as necessary. Moreover, the Export Customer Complaint Register is direct evidence that GFCL did routinely track specific shipments of merchandise and that it was, therefore, feasible to report movement expenses on a transaction-specific basis.

Commerce also failed to grapple with other evidence on the record. For example, GFCL's ability to track its merchandise through the warehousing process was so important that its warehousing agreement

5

stated that the warehouse must [



]. GFCL Sec. C Resp. at Exhibit C-30,

Appx03677. [




]. *Id.*

Although Daikin did not have access to all of GFCL's documents,

such as the [                                            ], it

was still feasible for Daikin to calculate transaction-specific movement

expenses using the scant documents that were on the record. Indeed, in

its opening brief, Daikin calculated a transaction-specific international

freight cost of [                    ] for [

] for [                              ] involving batch number

[            ] that were [    ] sold to the U.S. customer [

]. Daikin Opening Br.

at 22. Daikin could also use the [

6

]. *Id.* at 22-23. Significantly, neither the government nor GFCL dispute the accuracy of Daikin's calculations based on GFL's own sales documentation. Their silence speaks volumes.

The government concedes that GFCL "identified particular batch numbers for certain merchandise in response to post-sale complaints made by customers" – *i.e.*, that GFCL could trace merchandise from GFCL to GFL Americas and then finally to the U.S. customer. Gov't Brief at 27. However, the government contends that this ability does not matter because there is no evidence that GFCL "'routinely' tracks merchandise batch numbers." *Id.* It states that "Daikin effectively criticizes GFCL for not making new records by piecing together data from various sales and shipping documents." *Id.* at 30. The government's contention has no merit. First of all, documents on the record such as the Export Customer Complaint Register [

] show that it does routinely track merchandise batch numbers. Second, the key inquiry is whether a respondent records the *information* necessary to *calculate* transaction-specific expenses in the ordinary course, not whether it was already performing

7

that calculation prior to Commerce's requests. *See NSK Ltd. v. U.S.*, 346 F. Supp. 2d 1312, 1342 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (rejecting respondent's argument that "its records do not allocate expenses based on weight" because respondent's "product brochure lists weight for all of its {products}."). Here, GFCL simply refused to expend the same efforts for Commerce that it routinely expends for its own customers when they [

].[1]

The government also points to Commerce's finding that "the record does not indicate how … batch numbers are associated with specific shipments." Gov't Brief at 27 (citing IDM at 7 (Appx01061)). In fact, the record does indicate how batch numbers are associated with specific shipments. For example, [

---

[1] GFCL was required to calculate and report other data points to Commerce, even though it does not routinely perform the calculations necessary to report such data. *See, e.g.,* GFCL Sec. C. Resp. at C-17, Appx03529 (discussing a worksheet prepared by GFCL to calculate the weighted-average payment date of total collection); *id.* at C-37, Appx03549 (discussing formula used by GFCL to calculate its reported imputed credit expenses); *id.* (discussing calculation of the weighted average interest rate on short-term borrowings).

PUBLIC VERSION

]. GFCL Supp. A Resp. (May 24, 2021) at Exhibit

SA-4 (Appx03920-04008). The record shows that [


], it was feasible for GFL Americas to link its shipments

to the U.S. customer to shipments from India by GFCL. The

government states that there is no evidence indicating that the [



]. *See* Gov't Brief at 28.  But this is exactly

what [

]. It seems that neither Commerce nor the government ever

bothered to scrutinize these documents for themselves.

For its part, GFCL does not seriously contest that it was incapable

of reporting movement expenses on a batch-specific basis. *See* GFCL Br.

at 19. Instead, it asserts that such reporting would "introduce a

distorted batch-number specific allocation inconsistent with GFCL's

record-keeping practices." *Id.* (citing GFCL Rebuttal Brief (Nov. 19,

2021) at 7 (emphasis added), Appx08689. This argument appears

different from what GFCL argued below. Moreover, there is zero

PUBLIC VERSION

evidence that reporting movement expenses on a more transaction-specific basis would introduce any distortions.

The government cites the prior investigation of *Polytetrafluoroethylene Resin from India* as support for the final determination. Gov't Brief at 10 (citing *Polytetrafluoroethylene Resin from India*, 83 Fed. Reg. 48,594 (Dep't Commerce Sept. 26, 2018) (final determ.) ("*PTFE Resin from India*") and accompanying IDM at Comment 2). That proceeding actually supports Daikin's challenge. In that prior proceeding, "GFCL reported its U.S. warehousing expenses on a transaction-specific basis." IDM in *PTFE Resin from India* at Comment 2. However, when it ran into trouble supporting its calculations at verification, GFCL suggested that it could instead calculate a warehouse expense ratio that Commerce could use to adjust U.S. price for the relevant sales. In its final determination, Commerce found that because it was unable to verify the U.S. warehousing expenses reported in GFCL's sales data, the use of AFA was warranted.

There are two important takeaways from *PTFE Resin from India*. First, it undermines GFCL's statement that it cannot track movement expenses on a transaction-specific basis as the products are mixed up in

inventory in its U.S. warehouses. In *PTFE Resin from India*, GFCL could and did report transaction-specific expenses for merchandise that had been shipped to and warehoused in the United States. The fact that GFCL failed to maintain documents to recreate its calculations at verification does not detract from the fact that it could perform those calculations in the first place. The second takeaway is that, when faced with similar circumstances to those present in this case, Commerce applied AFA based on a finding that it was feasible for GFCL to report transaction-specific movement expenses but had failed to cooperate to the best of its ability to do so. That is what Commerce should have done in the investigation in this case. Its failure to do so is totally arbitrary.

The bottom line is that the record shows that GFCL could have reported its movement expenses on a transaction-specific basis. It simply failed to do so.

## B. GFCL's Allocation Methodology Was Distortive

Daikin established in its opening brief that GFCL's allocation of movement expenses by product type was distortive and that Commerce's rationale for accepting GFCL's allocation was unsupported by record evidence. *See* Daikin Opening Brief at 30-36. First, GFCL's

11

reported movement expenses showed [      ] variation between different

product types [                                                    ]. *Id.* at 31-

33. One product type had a per-unit movement expense of [      ] while

a second product type had a reported expense of [      ] – with no

plausible explanation as to why the second product cost [

] the first product to ship. *Id.* Second, GFCL's movement

expenses included both [                                        ] for

reasons that were never explained. *Id.* at 33. Third, GFCL's allocation

method resulted in numerous anomalies, including [      ] U.S. sales

with [     ] movement expenses and [

]. *Id.* at 33-34. How can an allocation that results in

[      ] movement expenses not be distortive?

Significantly, it is undisputed that GFCL never explained why

allocating movement expenses based on product type was appropriate.

In the original investigation, Commerce instructed GFCL that "if you

believe it is not feasible to report these movement expenses on a

transaction-specific basis, explain why it is not feasible to do so, and

*why your reported allocation based on product type is appropriate*."

Supp. Sec. C Quest. (June 11, 2021) at ¶ 9, Appx04102 (emphasis

added). In its response, while it provided "an" explanation for why it was not feasible to report movement expenses on a transaction-specific basis, GFCL provided zero explanation as to why it was appropriate to allocate expenses based on product type. GFL Supp. Sec. C. Resp. (July 9, 2021) at 7-8, Appx05087-88.

Nowhere in their response briefs do the government or GFCL dispute this fact. Instead, the government cooks up its own explanation as to why allocating expenses based on product type is appropriate, stating that the "allocation methodology is not distortive because it used GFCL's total shipping expenses and total quantity for each grade of product sold during the POI based on GFCL's records maintained in the ordinary course of business." Gov't Br. at 33. This explanation still dodges the fundamental question of why *product type* was the appropriate allocation methodology. Some of GFCL's products were shipped by ocean and some were shipped by air freight. GFCL Sec. C. Resp. at C-29, Appx03541. GFCL's allocation methodology obscured the different expenses associated with each method of freight. In addition, as the government acknowledges, the cost of movement expenses may fluctuate over time in different months. See Gov't Br. at 32 ("pricing

fluctuations from a shipper … can impact the actual movement costs incurred for a particular shipment of a given product"). GFCL's allocation of movement expenses over the entire POI obscures these fluctuations in prices over time. GFCL could have allocated its movement expenses based on freight type or month of shipment – *i.e.*, factors that were known to impact the cost of the movement expenses. Instead, it allocated its movement expenses by product type – *i.e.*, a factor with zero impact on the cost of movement expenses, since all product types were [                    ]. This was plainly distortive.

Commerce's refusal to consider evidence of distortions falls short of its obligation to make determinations based on substantial evidence. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Furthermore, Commerce's acceptance of an allocation methodology that was distortive was arbitrary and capricious because it was contrary to the agency's own regulations and practice. *NSK Ltd. v. U.S.*, 481 F.3d 1355 (Fed. Cir. 2007) (upholding Commerce's rejection of respondent's proposed allocation because "{i}nstead of setting forth a full explanation of why {the allocation} is non-distortive, NTN relied on

14

PUBLIC VERSION

a brief conclusory assertion to that effect"). Commerce's decision should, therefore, be overturned.

### C. Commerce's Failure to Apply AFA Is Based on a Finding that Is Unsupported by the Record Evidence

In its opening brief, Daikin established that Commerce acted arbitrarily and in a manner that was unsupported by substantial evidence when it declined to apply AFA to calculate GFCL's movement expenses. *See* Daikin Opening Br. at 23-24. The arguments to the contrary in the government's and GFCL's response briefs are devoid of merit and should be rejected.

The government and GFCL first argue that there is no deficiency or information lacking in the record for movement expenses. Gov't Br. at 37; GFL Br. at 17. Commerce is required by statute to apply facts available when a respondent, among other things: withholds information that has been requested by Commerce; fails to provide information in the form and manner requested; or significantly impedes a proceeding. *See* 19 U.S.C. § 1677e(a)(2). Here, Commerce instructed GFCL to report its movement expenses on a transaction-specific basis. GFCL withheld this information, failed to provide information in the form and manner requested, and significantly impeded the proceeding

PUBLIC VERSION

by instead allocating its movement expenses in a manner that was distortive and inaccurate. Thus, this statutory requirement was met.

The government also argues that AFA was not warranted because Commerce found that GFCL cooperated to the best of its ability. Gov't Br. at 37. This argument gets to the heart of the issue because, for all the reasons discussed above, this finding is not supported by substantial evidence. The record shows that GFCL routinely tracked particular shipments of merchandise so that it could respond to customer complaints and that the documents it maintained in the ordinary course of trade contained all information needed to calculate transaction-specific movement expenses. GFCL simply failed to expend for Commerce the same efforts it expends for its customers. This was not cooperating to the best of its ability. *See, e.g., Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (interpreting "{t}o the best of its ability" to mean "one's maximum effort" and specifying that it is not enough for a respondent to simply submit whatever information requires the least effort to Commerce; rather the information provided must represent the "maximum it is able to do" and must be "complete and accurate").

PUBLIC VERSION

The government also argues that AFA was not warranted because "the question is not whether GFCL *could have* possibly reported on a transaction-specific basis" but rather "whether it is *feasible* for GFCL to have done so based on its existing records." Gov't Br. at 39. This is a distinction without a difference. The term "feasible" is defined by Merriam-Webster as "capable of being done or carried out." *See* Merriam-Webster: feasible. As discussed exhaustively above and in Daikin's opening brief, GFCL was capable of reporting its movement expenses on a transaction-specific basis. Using its maximum efforts as required by the statute, it certainly was also feasible for it do so.

In sum, the underlying basis for Commerce's decision not to apply AFA is a factual finding that is not supported by substantial evidence. The decision should therefore be reversed and remanded.

## II. Commerce Should Have – at a Minimum – Reallocated GFCL's Movement Expenses on an Overall Average Basis

In its opening brief, Daikin argued that, even assuming for the sake of argument that Commerce lawfully declined to calculate GFCL's movement expenses using AFA, it should have at least reallocated the expenses to be on an overall-average basis to remove the distortions from allocating the expenses by product type. *See* Daikin Opening Brief

at 39-42. As demonstrated below, the government's and GFCL's response briefs fail to address these arguments in a meaningful way.

The government first resorts to the well-worn argument that Daikin is inviting the Court to "reweigh" the evidence and arrive at a different conclusion from Commerce. Gov't Brief at 41. But there is a difference between reweighing the evidence and actually grappling with the evidence in the first place – which Commerce failed to do. *See, e.g.*, *Comm'ns Workers*, 518 F. Supp. 3d at 1356; *Nucor Corp.*, 33 C.I.T. at 265. Indeed, "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the … determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000) (collecting cases).

The government next argues that Daikin does not show how its proposed reallocation using an overall average would eliminate the distortions it has identified. Gov't Brief at 42. The explanation is simple. GFCL's allocation methodology was distortive because it resulted in [      ] variations in movement costs by product type despite GFCL's practice of [

]. *See* Daikin Opening Br. at 31-32. Because GFCL's sales

documents show that [

] clearly distorted the movement expenses

that were actually incurred and, as a result, distorted the net U.S. price

used to calculate GFCL's dumping margin. For example, GFCL's sales

documents showed that for one sale, [

]. GFCL Supp. A

Resp. (May 24, 2021) at Exhibit SA-4, Appx03953. However, in its U.S.

sales database, GFCL allocated a per-unit freight cost of [        ] for

[                ] and a per-unit freight cost of [        ] for [

]). *See* GFCL C Resp. (May 18, 2021) at Exhibit C-14, Appx03619.

Using an overall average to allocate the movement expenses would

eliminate these types of distortions. The [

].

GFCL's allocation methodology was also distorted because it included the movement costs of [                                        ]. An allocation methodology based on the total movement expenses for subject merchandise divided by the total volume of subject merchandise sold would avoid this distortion.

Finally, GFCL's allocation methodology was distorted because it included [                                        ]. An allocation methodology based on an overall average would ensure that movement expenses are assigned to all sales and products. There is simply no explanation for allocating [                    ] movement expenses to some products.

For its part, GFCL insists that it "demonstrated that reporting on an aggregate basis would be unnecessarily distortive." GFCL Br. at 13. Other than this one sentence, however, GFCL fails to provide any explanation or citation to the record as to why reporting on an aggregate basis would create distortions. Instead, GFCL cites to the prior investigation in *PTFE Resin from India* as support for its position. *Id.* This case supports Daikin's position. In *PTFE Resin from India*, GFL itself admitted that, if an allocation of movement expenses was required, the most accurate method of allocation was on an overall

average basis. In particular, GFCL stated that if Commerce did not accept its warehousing expenses as reported on a transaction-specific basis, then "Commerce should calculate a warehouse expense ratio that divides the total warehousing cost by the total volume of merchandise that was stored in the warehouse during the POI." IDM in *PTFE Resin from India* at Comment 2. In other words, Commerce should use the same overall-average methodology that Daikin is proposing in this investigation.[2]

## III.   Commerce Erred in Granting GFCL a CEP Offset

Daikin demonstrated in its opening brief that GFCL failed to provide a quantitative analysis to support its claim for a CEP offset and that, in nonetheless granting a CEP offset, Commerce arbitrarily departed from its established practice of requiring this evidence before granting the offset. Daikin Opening Brief at 42-57.

### A. GFCL's Evidence Was Not "Sufficient"

The government argues that Commerce accepted the information that GFCL provided as "*sufficient* to show that there were differences

---

[2]   GFCL also calculated its U.S. warehousing expenses on an overall average basis in this investigation rather than allocating its U.S. warehousing expenses by product type. *See* GFCL Sec. C. Resp. at C-32, Appx03544.

between its home market and U.S. selling activities, such that an offset to achieve a fair comparison was appropriate." Gov't Br. at 43 (emphasis added). GFCL similarly argues that there was "substantial evidence" supporting the granting of a CEP offset. GFL Br. at 21. But this is directly contrary to what Commerce actually found when the agency stated that "the quantitative analysis provided by GFCL was *inadequate*." Final IDM at 9, Appx01063 (emphasis added). The term "inadequate" is an antonym of "sufficient." *See* Merriam-Webster Thesaurus: sufficient. It is thus impossible for evidence to be both "inadequate" and "sufficient."

GFCL similarly maintains that it "built a record demonstrating a CEP offset is appropriate." GFL Br. at 24 (internal quotation and citation omitted). GFCL tries to relitigate the issue of the adequacy of its reporting by discussing various *qualitative* differences between its sales in the home market and its CEP sales in the U.S. market. GFCL Br. at 26-28. For example, GFCL states that "{f}or sales support and training services, activities were performed at a much higher intensity of home market sales compared with CEP sales." *Id.* at 27. However, without the quantitative analysis required by Commerce, there is no

way to determine whether the resources expended for sales support such as training services are materially different between the two markets and, even if they are different, whether the differences impacted prices in the two markets. *See id.*

Commerce itself has explained the important policy reasons for requiring a quantitative analysis, namely, to avoid the potential for manipulation and to ground a CEP offset on objective data:

> {R}eliance on purely qualitative information may create the potential for manipulation (or inaccurate reporting) by permitting respondents to create a narrative that is not linked in any way to its verifiable financial data. Requiring quantitative evidence enhances our LOT analysis because such information allows us to determine whether differences in prices among various customer categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to some other unrelated factor such as relative sales volumes. Quantitative information, such as the selling expense information requested by Commerce in this investigation, permits Commerce to examine whether a respondent's narrative explanations and qualitative evidence are supported by its books and records maintained in the ordinary course of business. Additionally, the requirement that respondents provide quantitative support for their claimed LOTs reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that results from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations.

*Polyethylene Terephthalate Sheet from the Republic of Korea*, 85 Fed. Reg. 44,276 (Dep't Commerce July 22, 2020) ("*PET Sheet from Korea*") and accompanying IDM at Comment 4. As Commerce correctly found in the final determination, GFCL's reliance on the *qualitative* analysis in its selling functions chart was inadequate because it did not include the required *quantitative* analysis.

### B. Commerce Arbitrarily Departed from Its Practice

The government next argues that its decision was in accordance with law because "neither the statute nor Commerce's regulations require that the respondent submit a quantitative analysis to demonstrate it is entitled to a CEP offset." Gov't Brief at 46. However, Commerce's well-established practice is to require the respondent to submit a quantitative analysis before granting a CEP offset. Daikin Opening Br. at 44. *See also PET Sheet from Korea* and accompanying IDM at Comment 4. *Certain Oil Country Tubular Goods from Korea,* 87 Fed. Reg. 20,817 (Dep't Commerce Apr. 8, 2022) and accompanying IDM at Comment 16; *Emulsion Styrene-Butadiene Rubber from Brazil*, 85 Fed. Reg. 38,847 (Dep't Commerce June 29, 2020) and accompanying IDM Comment 1; *Utility Scale Wind Towers from Canada*, 85 Fed. Reg.

8,562 (Dep't Commerce Feb. 14, 2020), IDM at 15-16, *unchanged in final*, 85 Fed. Reg. 40,239 (July 6, 2020).

An agency's decision is arbitrary when it deviates from an established practice followed in similar circumstances and does not provide a reasonable explanation for the deviation. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003); *see also SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Here, the government points to two differences between this case and prior cases where it has denied respondents CEP offsets for failing to provide the required quantitative analysis. Gov't Br. at 55. Neither of these two differences constitutes a reasonable explanation for Commerce's deviation from established practice.

### 1. *The Difference Between the Preliminary Phase and Final Phase Is Not a Valid Explanation*

First, the government states that in prior cases where it denied the CEP offset, Commerce had already denied the CEP offset at the preliminary phase, whereas in this case, Commerce had already granted the CEP offset in the preliminary phase. Gov't Br. at 55. This is a truly arbitrary reason. Preliminary determinations, "are 'preliminary' precisely because they are subject to change." *NTN Bearing Corp. v.*

25

PUBLIC VERSION

*United States*, 74 F.3d 1204, 1208 (Fed.Cir.1995). Thus, Commerce "need not reach the same result" in the final determination as it did in the preliminary determination since "{t}he purpose of publishing preliminary results is to discover inaccuracies and correct them before coming to a final decision." *Nat'l Candle Ass'n v. United States*, 29 C.I.T. 365, 372 (2005) (quoting *Pulton Chain Co. v. United States*, 17 C.I.T. 1136, 1140 (1993)). The fact that Commerce erroneously decided to grant a CEP offset in the preliminary determination in this case does not provide a rational explanation for why it granted a CEP offset in the final determination.

### 2. *Commerce Did Notify GFCL of Deficiencies in Its Response*

The government's second reason for deviating from its established practice is that Commerce found that it had not informed GFCL that it required more information. Gov't Br. at 55 (citing IDM at 10 (Appx01064). GFCL similarly argues that "Commerce did not notify GFCL of any quantitative deficiencies on the record." GFL Br. at 21. As an initial matter, as Daikin established in its opening brief, Commerce did inform GFCL that its quantitative analysis was deficient. *See* Daikin Opening Brief at 50-53. Specifically, Commerce instructed GFCL

26

PUBLIC VERSION

in a supplemental questionnaire to "{p}rovide documentation supporting GFCL's methodology (*i.e.*, the quantitative analysis) used to report the levels of intensity…provided by GFCL." *GFCL A Supp. Resp.* (May 24, 2021) at 1, Appx03880. This instruction placed GFCL on notice that Commerce lacked sufficient quantitative evidence in support of GFCL's LOT claims. In its supplemental response, rather than provide the requested quantitative analysis, GFCL continued to rely on the subjective "levels of intensity" of its selling activities that GFCL had already reported in its initial questionnaire response. *Id.* at 2, Appx03881.

### 3. The Burden Was on GFCL to Establish Its Entitlement to a CEP Offset

More importantly, even assuming that Commerce did not notify GFCL of the deficiencies in its responses, as Daikin discussed in its opening brief, the burden is on the respondent to show entitlement to a CEP offset. *See* Daikin Opening Brief at 43 (collecting cases). Thus, any failure to notify GFCL of deficiencies cannot result in the automatic granting of a CEP offset. As discussed below, this is the inescapable conclusion that results from the statute, the legislative history, Commerce's practice, and the prior decisions of the courts.

The respondent's burden to show entitlement to a CEP offset is imbedded in the statute, which requires that any claimed differences in the prices of different LOTs must be "*shown* to be wholly or partly due to a difference in level of trade" that "involves the performance of different selling activities," and are "*demonstrated* to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade." 19 U.S.C. § 1677b(a)(7)(A) (emphasis added). The language in the statute reflects Congress' intent that:

> Commerce will carefully investigate whether a level of trade adjustment should be made to increase or decrease normal value. However, if a respondent claims an adjustment to decrease normal value, *as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment.*
>
> *Commerce will require evidence from the foreign producers* that the functions performed by the sellers at the same level of trade in the U.S. and foreign markets are similar, and that different selling activities are actually performed at the allegedly different levels of trade…. *Because level of trade adjustments may be susceptible to manipulation, Commerce will closely scrutinize claims for such adjustments…. .* Where it is established that there are different levels of trade based on the performance of different selling activities, but the data establish that there is a pattern of no price differences, the level of trade adjustment will be zero. No further adjustment is necessary.

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H. R. Doc. No. 103–826(I), at 829-830, reprinted in 1994 U.S.C.C.A.N. 4040, 4167-68 (emphasis added).

This Court has recognized that under this statutory regime, "{t}he party seeking a CEP offset bears the burden of establishing that the differences in selling functions performed in the home and US markets are 'substantial.'" *Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294, 1300 (Ct. Int'l Trade 2019) (citing *Sucocitrico Cutrale Ltda. v. United States*, Slip-Op. 12-71, 2012 WL 2317764, at *5 (Ct. Int'l Trade June 1, 2012) and 19 C.F.R. § 351.401(b)). Likewise, "{w}hile it is Commerce's responsibility to determine if a petitioner qualifies for a CEP offset, it is the responsibility of the respondent requesting the CEP offset to procure and present the relevant evidence to Commerce." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 533, 556, 616 F. Supp. 2d 1354, 1374 (Ct. Int'l Trade 2009). And "{t}he party seeking a CEP offset ultimately bears the burden of demonstrating substantial differences in selling activities across the LOTs." *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1345 (Ct. Int'l Trade 2020).Where the respondent has not met that burden as required, this

PUBLIC VERSION

Court has affirmed Commerce's decision to grant neither a LOT adjustment nor a CEP offset. *See id.*

In *Dong-A Steel*, the Court upheld Commerce's decision not to grant a CEP offset even the agency had not notified the respondent of deficiencies in its reporting. Specifically, the Court rejected the argument that Commerce could not decline to make a CEP adjustment even where "Commerce never requested any additional information or clarifications… in any supplemental questionnaire or otherwise indicated that any deficiency existed in the record regarding this issue." *Dong-A Steel*, 475 F. Supp. 3d at 1347 n.22 (quotation marks omitted). The Court explained that this is because "{t}he burden falls to the party seeking the CEP offset to provide the requisite evidence that would allow Commerce to determine that a CEP offset adjustment is warranted." *Id.* "That Commerce did not request any additional information beyond what was provided by {the respondent} does not discredit the validity of the conclusion drawn from that evidence." *Id.* The Court also held that "Commerce had no obligation under 19 U.S.C. § 1677m(d) to work with {the respondent} to correct for 'deficiencies' in

PUBLIC VERSION

the record, since as discussed above, it does not appear that deficiencies existed in the first place." *Id.*

The respondent in *Dong-A Steel*, like GFCL in this case, was given an opportunity to submit evidence to support its claim that its U.S. sales were made at a different LOT. That respondent, like GFCL in this case, submitted information on what sales activities it performed for its various sales which it "organized … by intensity (high, medium, or low)." *Id.*, 475 F. Supp. 3d at 1345. Commerce reviewed that evidence but found it was "insufficient" to establish entitlement to a CEP offset. *Id.*, 475 F. Supp. 3d at 1346-1247. The Court affirmed Commerce's determination and disagreed with the respondent that Commerce was required to work with the respondent to further fill out the record before finding the evidence insufficient to meet the respondent's burden. The insufficiency of the evidence was not a deficiency in the record. The burden was on the respondent to meet the standard of sufficiency, and it did not shift to Commerce to treat the respondent's failure as a deficiency.

Because "{t}he burden of proof is upon the claimant to prove entitlement" to a CEP offset, this Court has also explained "{i}t is not

automatic each time export price is constructed." *Corus Eng'g Steels Ltd. v. United States*, 27 C.I.T. 1286, 1290 (Ct. Int'l Trade 2003). That conclusion has also been reached by the Court of Appeals for the Federal Circuit: "the CEP offset will not be automatic." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1316 (Fed. Cir. 2001).

In practice, Commerce has likewise stated that "the respondent bears the burden of demonstrating that it is entitled to a CEP offset." *Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 76,918 (Dep't Commerce Dec. 23, 2004) (final determ.) and accompanying IDM at Comment 5 ("*Shrimp 2004 IDM*"). Commerce has rejected arguments that would result in a CEP offset being "automatically granted," quoting from the Federal Circuit in *Micron Technology* that "{t}he CEP offset will not be automatic." *Carbon and Alloy Steel Wire Rod From Korea*, 87 Fed. Reg. 5792 (Dep't Commerce Feb. 2, 2022) (final results), accompanying IDM at 16.

Commerce has also stated that a respondent is not entitled to a CEP offset simply because an offset was granted to another respondent, or in another proceeding altogether. The respondent must make a showing on the record presently before Commerce. *Shrimp 2004 IDM* at

PUBLIC VERSION

Comment 5. *See also Oil Country Tubular Goods From Ukraine,* 87 Fed. Reg. 57,176 (Dep't Commerce Sept. 19, 2022) (prelim. results) and accompanying IDM at 12 (citing to *Micron Technology* that a CEP offset is not automatic and "{t}hus, the decision to grant a CEP offset is a fact-specific inquiry that must be made based on the record. Commerce is not bound by its determinations in a prior segment of a proceeding because each segment has its own unique factual record. Commerce must examine each record on its own merits.").

In this case, Commerce departed from its practice and the authorities cited above and the directions of the statute, treating the CEP offset as automatic. Commerce expressly recognized that GFCL had failed to meet its burden:

> {W}e agree that the quantitative analysis provided by GFCL was inadequate in response to Commerce's initial questionnaire, which requires that the respondent provide a quantitative analysis showing how the expenses assigned to the POI sales made at different claimed levels of trade impact price comparability, as well as how the quantitative analysis supports the claimed levels of intensity for the selling activities reported in the selling functions chart.

*Final IDM* at 9, Appx01063. Thus, Commerce recognized that the record before it did not contain evidence establishing differences in

PUBLIC VERSION

LOTs or that those differences affected price comparability. The respondent's burden had unambiguously not been met.

But rather than declining to grant any offset as directed by the statute, its own regulations and practice, and in line with decisions of the Courts, Commerce relied on the fact that the agency had not informed GFCL of further "deficiencies" in its reporting, which Commerce reasoned it was required to do under 19 U.S.C. § 1677m(d). *Final IDM* at 10, Appx01064. But this Court has in the past specifically affirmed Commerce's consistent position that "Commerce had no obligation under 19 U.S.C. § 1677m(d) to work with {the respondent} to correct for 'deficiencies' in the record" regarding claimed differences in LOTs, because the burden is firmly on the respondent to support its claim for this beneficial adjustment. *Dong-A Steel*, 475 F. Supp. 3d at 1347 n.22.

Commerce failed to explain why it was deviating from established practice by relieving respondents of their burden. Nor did it explain how this decision was consistent with its regulations and the explicit directions of the statute that differences in LOTs must be "*shown*" and that, for a CEP offset to be granted, the different LOTS must be

34

"*demonstrated* to affect price comparability." 19 U.S.C. § 1677b(a)(7)(A) (emphasis added). Commerce granted the offset even after expressly finding that the record was inadequate. This result turns the statute, regulations, and Court-affirmed Commerce practice on its head.

### C. 19 U.S.C. § 1677m(d) Is Inapplicable

As mentioned, the government and GFCL argue that Commerce's grant of the offsets was required by 19 U.S.C. § 1677m(d) because Commerce did not notify GFCL of any deficiency in its claim for a CEP offset. Gov't Br. at 58; GFCL Br. at 29. However, these parties ignore the complete language of § 1677m(d), omitting the plain language that makes that section applicable, by its own terms, only when Commerce "disregard{s} all or part of the original and subsequent responses" and instead applies facts available. Here, Commerce did not disregard any information submitted by GFCL. It did not substitute adverse facts available, or even neutral facts available, in place of anything submitted by GFCL. Commerce *did* examine the evidence submitted by GFCL and found it to be "inadequate" – but not "deficient." Nothing in § 1677m(d) allows, much less directs, Commerce to ignore its obligation to make a determination that is supported by substantial evidence on

PUBLIC VERSION

the record, particularly when the agency has recognized that the evidence before it is inadequate.

If Commerce is not rejecting the information as deficient and not applying facts available, then § 1677m(d) remains irrelevant. Here, Commerce would not have resort to facts available or adverse facts available to deny GFCL a CEP offset. It would simply not apply the offset. Commerce's explanation that § 1677m(d) somehow required it to grant a CEP offset because it did not inform GFCL of a deficiency in its reporting is therefore contrary to law.

## IV.   CONCLUSION

For the foregoing reasons, Daikin respectfully requests that this Court reverse and remand Commerce's *Final Determination* with instructions to correct the agency's erroneous calculation of GFCL's movement expenses and the granting of a CEP offset.

\*       \*       \*

Respectfully submitted,

*/s/ Luke A. Meisner*
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin America, Inc.*

Dated: February 13, 2023

PUBLIC VERSION

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing response brief contains 6,988 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: February 13, 2022                    /s/ Luke A. Meisner
                                            Luke A. Meisner