A-533-899
Remand
Slip Op. 24-32
Court No. 22-00122
Investigation
**Public Version**
E&C/OVIII:  KJ

**_Daikin America, Inc. v. United States_,**
**Court No. 22-00122, Slip Op. 24-32 (CIT March 14, 2024)**
**Granular Polytetrafluoroethylene Resin from India**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court

or CIT) in _Daikin America, Inc. v. United States_, Court No. 22-00122.[1]  These final results of

redetermination concern the final determination in the less-than-fair-value investigation of

granular polytetrafluoroethylene from India.[2]

In the _Remand Order_, the Court instructed Commerce to reconsider:  (1) whether it was

feasible for respondent Gujarat Fluorochemicals Limited (GFCL) to report its domestic inland

freight, international freight, and domestic inland insurance expenses on a transaction-specific

basis based on the sales documentation on the record and, if not, whether the expenses were

calculated on as specific a basis as possible and whether the reporting of such expenses does not

---

[1] _See Daikin America, Inc. v. United States_, Court No. 22-00122, Slip Op. 24-32 (CIT March 14, 2024) (_Remand Opinion_); _see also Daikin America, Inc. v. United States_, Court No. 22-00122, ECF No. 42 (CIT March 14, 2024) (_Remand Order_).
[2] _See Granular Polytetrafluoroethylene Resin from India:  Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances_, 87 FR 3772 (January 25, 2022) (_Final Determination_), and accompanying Issues and Decision Memorandum (IDM); _see also Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Antidumping Duty Orders_, 87 FR 14514 (March 15, 2022).

cause inaccuracies or distortions; and (2) whether GFCL demonstrated its eligibility for a constructed export price (CEP) offset.[3]

Based on the Court's remand order, Commerce has provided further explanation for its decision to rely on GFCL's allocated movement expenses and reconsidered whether GFCL demonstrated eligibility for the CEP offset. Specifically, in light of the Court's opinion, on remand, Commerce has: (1) continued to rely on GFCL's allocated movement expenses, providing additional explanation to support Commerce's determinations that transaction-specific reporting was not feasible, that GFCL's allocation methodology is as specific as possible, and that the allocation causes neither distortion nor inaccuracies, and (2) found that, having failed to establish its eligibility for the CEP offset, GFCL is not entitled to a CEP offset.

## II. REMANDED ISSUES

### Issue 1:  U.S. Movement Expenses

*Background*

During the investigation, GFCL reported certain of its U.S. movement expenses (*i.e.*, domestic inland freight (DINLFTPU), international freight (INTNFRU), and U.S. inland freight expenses (INLFPWU)[4]) on an allocated basis, rather than on a transaction-specific basis as requested by Commerce.[5]  Under the regulation, Commerce may consider allocated expenses when transaction-specific reporting is not feasible, provided that Commerce is satisfied that the allocation method used does not cause inaccuracies or distortions.[6]  Further, in determining the feasibility of transaction-specific reporting or whether an allocation is calculated on as specific a

---

[3] *See Remand Order* at 1.
[4] INLFPWU has been inadvertently referred to as INSUREU in previous documents.  *See Final Determination* IDM at Comment 1.
[5] *See Final Determination* IDM at 6.
[6] *See* 19 CFR 351.401(g)(1).

basis as feasible, Commerce must take into account the records maintained by the party in question in the ordinary course of its business.[7]

According to GFCL, it could not report movement expenses on a transaction-specific basis because it was unable to establish a one-to-one match between purchases by its U.S. affiliate from GFCL and sales by its U.S. affiliate to U.S. customers based on its sales and inventory records.[8] GFCL explained that its U.S. affiliate, GFL Americas, stored inventory for U.S. sales in a warehouse and then sold merchandise from inventory to U.S. customers based on pending orders and availability of stock in the warehouse.[9] GFCL further explained that, because sales of merchandise by its U.S. subsidiary, GFCL Americas LLC (GFCL Americas), to U.S. customers involved multiple purchases from GFCL, it was not feasible to directly tie purchases from GFCL to sales to unaffiliated customers or to establish a one-to-one correlation between purchases and sales.[10] In addition, GFCL explained that merchandise shipped from its U.S. warehouses could consist of lots of various sizes and product types, shipped over different time periods.[11]

As a result, GFCL reported its movement expenses on an allocated basis by product grade, based on grade weight in kilograms (kg).[12] That is, GFCL calculated per-unit movement expenses for each product sold to the United States by aggregating the actual grade-specific freight costs for its sales to GFL Americas during the POI by product and then dividing the

[7] *See* 19 CFR 351.401(g)(3).
[8] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's First Supplemental Section C Questionnaire Response," dated July 9, 2021 (SCQR), at 7-8.
[9] *Id.* at 7; *see also Final Determination* IDM at 6.
[10] *See* SCQR at 7-8.
[11] *Id.*; and GFCL's Letter, "Gujarat Fluorochemicals Limited's Second Supplemental Sections A&C Questionnaire Response (PART II – Questions 1, 2, 4 and 7)," dated August 9, 2021, at 3.
[12] Grade is included in GFCL's material and commercial product codes as reflected in GFL America's QuickBooks accounting system for CEP sales and as reported in the database in fields PRODCOD1U and PRODCOD2U. *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Section C Questionnaire Response," dated May 17, 2021 (CQR), at C-8 and Exhibit C-5.

actual freight costs by the weight of the grade-specific sales to GFL Americas during the POI by product.[13]  GFCL submitted a spreadsheet for the calculation of movement expenses for [        ] grades of subject and non-subject merchandise.[14]  From these grades, GFCL determined which ones were sold to the United States during the POI.[15]  GFCL submitted sample shipping documents to confirm that it tracks the quantity and costs of shipping subject merchandise to a single warehouse in the United States on a per-grade basis.[16]

In the *Final Determination*, Commerce found that GFCL's reporting of certain U.S. movement expenses on an allocated basis was reasonable and that there is no record evidence that its allocation methodology causes inaccuracies or is distortive.[17]  As such, we found that the application of facts available (adverse or otherwise) was not warranted.[18]  Daikin, the petitioner, challenged Commerce's final determination.  Relevant here, Daikin alleged that GFCL could have reported its U.S. movement expenses on a transaction-specific basis because GFCL was able to associate product batch numbers with specific shipments, such as when managing [                                      ].[19]

In its opinion, the Court held that Commerce failed to address record evidence including the Export Customer Complaint Register and dismissed the petitioner's arguments regarding the distortive nature of GFCL's allocation methodology.[20]  The Court remanded for Commerce's reconsideration whether it was feasible for GFCL to report its domestic inland freight,

---

[13] *See* CQR at C-27, C-30, and Exhibit C-14; SCQR at Exhibit SC-8; and *Final Determination* IDM at 6-7.
[14] *See* CQR at Exhibit C-14; and SCQR at Exhibit SC-8.
[15] *Id.*; *see also* SCQR at Exhibit SC-5.
[16] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Section A Questionnaire Response," dated April 26, 2021 (AQR), at A-30 and Exhibits 13.3 and 13.4.
[17] *See Final Determination* IDM at Comment 1; *see also* GFCL's Letter, "GFCL's Verification Questionnaire Response," dated September 22, 2021 (VQR), at 3 and Exhibit VSQ-1(c).
[18]  *See Final Determination* IDM at Comment 1.
[19] *See Remand Opinion* at 6-7 (summarizing Daikin's allegation).
[20] *Id.* at 7-8.

international freight, and domestic inland insurance expenses on a transaction-specific basis based on sales documentation on the record, including the Export Customer Complaint Register, shipping documents, and other documents establishing the cost of freight for each individual shipment, and, if not feasible, whether GFCL's expenses were calculated on as specific a basis as feasible and whether GFCL's reporting of such expenses does not cause inaccuracies or distortions.[21]

*Analysis*

On remand, Commerce finds that it was not feasible for GFCL to report its domestic inland freight, international freight, and domestic inland insurance expenses on a transaction-specific basis as alleged by Daikin. As referenced by the Court, Daikin alleged that it was feasible for GFCL to report on a transaction-specific basis as it was able to routinely associate product batch numbers with specific shipments, such as dealing with [          ].[22] However, Commerce's feasibility determinations must account for the records maintained by the respondent in the ordinary course of business.[23] Although documents on the record contain product batch numbers, record information does not indicate that batch numbers are tracked and recorded by GFCL in the ordinary course of business such that it was feasible for GFCL to report its U.S. movement expenses on a transaction-specific basis nor how batch numbers are associated with the merchandise.[24] There is no record evidence indicating that the

[                                                                                    ].[25]

---

[21] *See Remand Order* at 1, 8; *see also* 19 CFR 351.401(g)(1).
[22] *See Remand Opinion* at 6-7.
[23] *See* 19 CFR 351.401(g)(3).
[24] *See* SCQR at Exhibit SC-35; and *e.g.*, GFCL's Letter, "Gujarat Fluorochemicals Limited's First Supplemental Section A Questionnaire Response," dated May 24, 2021 (SAQR), at Exhibits SA-4 and SA-5.
[25] *Id.*

First, Commerce considered the Export Customer Complaint Register, which is a register of post-sale complaints made by customers that includes [                              ].[26] Information is recorded in the register in the unique circumstance of a post-sale customer complaint.[27]  Notably, there is no indication that the [                    ], associated with the [                ], derives from GFCL.[28]  The purpose of the Export Customer Complaint Register is to track complaints made by customers.  In fact, GFCL submitted the register in support of GFCL's level of trade (LOT) analysis demonstrating that it provides technical support to its U.S. customers. [29]  As such, the Export Customer Complaint Register does not demonstrate that GFCL tracks merchandise by [       ] in the ordinary course of business such that transaction-specific reporting of U.S. movement expenses is feasible.

Next, Commerce considered shipping and sales documents on the record.  The Court held Commerce failed to address record evidence showing that GFCL tracks merchandise batch numbers [                    ].[30]  Upon additional review of the record, on remand, Commerce finds that although certain shipping and sales documents contain batch numbers [                ], there is no record indication of how the batch numbers are associated with specific shipments or sales of merchandise.[31]  The record contains a [

---

[26] *See* SAQR at Exhibit SA-3(a).
[27] *Id.*
[28] *Id.*
[29] *See* SAQR at SA-3.
[30] *See Remand Opinion* at 7 (adding that "[                                        ]").
[31] *See, e.g.*, AQR at Exhibits A-13.2, 13.3, and 13.4; and SAQR at Exhibits SA-4 and SA-5.

].[32]  Yet, nothing on the record indicates that the

[                                    ].  In fact, GFCL's sample sales documentation shows that one batch number

can cover multiple pallet numbers.  For example, on the packing list in Exhibit SA-4 of GFCL's

questionnaire response, [                              ][33] and on the packing list in GFCL's Exhibit

SA-5, [                         ].[34]

      That certain documents from the sales and shipment chain contain the same batch

numbers does not demonstrate that GFCL routinely tracks merchandise batch numbers

[          ] or that it would be feasible for GFCL to piece these various documents together to report

U.S. movement expenses for the merchandise on a transaction-specific basis. Commerce

considered record evidence containing [                              ][35] which can be

linked to [                                  ].[36]  Commerce also considered

record evidence linking the sale to [                                  ],[37] the

[                                        ],[38] and the

[                      ].[39]  However, only the packing list contained batch numbers.  In order to report

its movement

---

[32] *See* SAQR at Exhibit SA-4.
[33] *Id.*
[34] *Id.* at Exhibit SA-5.
[35] *Id.* at Exhibit SA-4, Part 1 at .pdf 59.
[36] *Id.* at pdf 49.
[37] *Id.* at pdf 54.
[38] *Id.* at pdf 56.
[39] *Id.* at Exhibit SA-4, Part 2 at .pdf 1.

expenses on a transaction- or even batch-specific basis, GFCL must be able to establish a one-to-one correlation between its U.S. affiliate's purchases from GFCL and sales to the U.S. customer. Absent record information on how batch numbers are associated with the merchandise in the sales and shipping documents, the mere ability to connect these documents is insufficient to show the feasibility of transaction-specific expense reporting.

The Court in *SNR Roulements* explained that with respect to the regulation governing deduction of movement expenses, "{n}othing suggests that companies are required to make wholesale changes to their record-keeping practices to comply with 19 CFR. 351.401(g)(1)."[40] Because of the way in which GFCL maintains its records, it was unable to establish a one-to-one relationship with respect to sales between GFCL and its U.S. affiliate and sales from the affiliate to U.S. customers. According to GFCL, the allocated movement expenses at issue are not incurred and recorded in GFCL's accounting system at the time the sale is made to unaffiliated U.S. customers.[41] GFCL's accounting records show inland freight expenses from the plant/warehouse to the customer as well as international freight expenses and list various freight providers and relevant expenses.[42] [                    ].[43] Upon review of the record, on remand, Commerce continues to find that there is no information suggesting that batch numbers are tracked and recorded in GFCL's normal books and records for GFCL to feasibly establish a one-to-one link between sales and shipping documents.

Moreover, the record evidence here shows that attempts to link a specific batch number to a particular invoice would be a burdensome exercise involving a manual review of shipping

---

[40] *See SNR Roulements v. United States*, 341 F. Supp. 2d 1334, 1351 (CIT 2004) (*SNR Roulements*).
[41] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Rebuttal Brief," dated November 19, 2021 (GFCL Rebuttal Brief), at 4.
[42] *See* SCQR at Exhibit SC-35.
[43] *Id.*

documents for GFCL's sales to GFL Americas, GFL America's sales to unaffiliated U.S. customers, as well as warehouse documentation. For example, the sample sales documentation for a sale made through Channel 3 (where GFCL ships from India to a U.S. warehouse for a sale to be made to an unaffiliated customer) includes [      ] pages of documents.[44] Considering that there are [      ] U.S. sales involving [      ] of unique invoices to [      ] different U.S. customers through [      ] different sales channels, GFCL would have to review and compile thousands of pages of records to link movement expenses to particular transactions. Indeed, in an administrative review of a different AD order, GFCL went to great lengths to attempt to link movement expenses to specific sales but was unable to duplicate the methodology at verification due to the complicated nature of the calculation.[45] Therefore, because GFCL has prior experience in participating in AD proceedings and on that basis reasonably reported the movement expenses at issue in the most accurate way that it could, on a product-specific basis, using shipping and warehouse records it keeps in the normal course of business.

Consequently, on remand, Commerce finds that it was not feasible for GFCL to report its domestic inland freight, international freight, and domestic inland insurance expenses on a transaction-specific basis.

In accordance with the Court's *Remand Order*, because we have found that transaction-specific reporting was not feasible, Commerce has also considered whether GFCL's expenses were calculated on as specific a basis as feasible.[46] According to the regulation, any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to

---

[44] *See* SAQR at SA-4.
[45] *See Polytetrafluoroethylene Resin from India: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 48594 (September 26, 2018) (*Polytetrafluoroethylene Resin from India*), and accompanying IDM at Comment 2.
[46] *See Remand Order* at 1.

Commerce's satisfaction that the allocation is calculated on as specific a basis as is feasible.[47] As the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has held, the "satisfaction" standard in 19 CFR 351.401(g)(2) provides Commerce with the discretion to decide whether to accept a proposed allocation.[48]  However, in making its determination, Commerce is required to take into account the records maintained by GFCL in the ordinary course of business.[49]

GFCL calculated per-unit movement expenses for each product sold to the United States by aggregating the actual grade-specific freight costs for its sales to GFL Americas during the POI by product and then dividing the actual freight costs by the weight of the grade-specific sales to GFL Americas during the POI by product.[50]  Although grade was not designated as a product characteristic in Commerce's questionnaire, it is included in GFCL's material and commercial product codes reflected in GFL America's QuickBooks accounting system for CEP sales and reported in the database in fields PRODCOD1U and PRODCOD2U.[51]  As such, notably, GFCL's allocation method is based on its records maintained in the ordinary course of business.  GFCL's sample shipping documents on the record indicate that GFCL is able to track the quantity and costs of shipping subject merchandise to a single U.S. warehouse on a per-grade basis.[52]  Because GFCL's allocation is calculated based on shipments of subject merchandise during the POI, on a per-grade basis, and is based on GFCL's records maintained in in ordinary course, on remand, Commerce is satisfied that GFCL's expenses were calculated on as specific a basis as feasible.

---

[47] *See* 19 CFR 351.401(g)(2).
[48] *See Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1292 (Fed. Cir. 2008) (*Koyo*).
[49] *See* 19 CFR 351.401(g)(3).
[50] *See* CQR at C-27, C-29-C-30, and Exhibit C-14; *see also* SCQR at Exhibit SC-8.
[51] *See* CQR at C-8 and Exhibit C-01.
[52] *See, e.g.*, AQR at Exhibit A-13.4; and VQR at Exhibit VSQ-1(c).

In accordance with the Court's order, because we have found that transaction-specific reporting was not feasible, Commerce also considered whether GFCL's allocation methodology does not cause inaccuracies or distortions.[53]  According to the regulation, a party seeking to report on an allocated basis must explain why the allocation methodology used does not cause inaccuracies or distortions.[54]  As stated above, the Federal Circuit has held that the "satisfaction" standard provides Commerce with the discretion to decide whether to accept a proposed allocation.[55]

To determine whether GFCL's allocation caused inaccuracies or distortions, Commerce considered record evidence with respect to product code [          ], submitted by GFCL as a set of sample sales documents in its Section A questionnaire response.  A review of the documentation from [                ] shows an ocean freight expense of between [        ] rupees (Rs)/kg to ship this product.[56]  Using its grade-specific allocation methodology, GFCL reported [      ] Rs/kg for product code [              ] – well within the range calculated from the documentation.[57]  This example shows that GFCL's calculation methodology allocating freight expenses by the grade of the product sold does not cause inaccuracies or distortions.

Rather than producing a more accurate transaction-specific cost, the record indicates that, even if feasible, requiring GFCL to trace movement expenses at the batch number level would introduce a distorted batch-number specific allocation inconsistent with GFCL's records because the accounting records maintained by GFCL for [

---

[53] *See Remand Order* at 1.
[54] *See* 19 CFR 351.401(g)(2).
[55] *See Koyo*, 551 F.3d at 1292.
[56] *See* AQR at Exhibit A-13.3, .pdf 253 and 260.
[57] *See* SCQR at Exhibit SC-01.

].[58]  In addition, Commerce acknowledges that there are a certain number of transactions included in the U.S. sales database with no reported domestic or international movement or insurance expenses.  The product code for these transactions does not appear in GFCL's calculation chart.[59]  However, GFCL explained in its supplemental questionnaire response that the product pertaining to these transactions was not sold from GFCL to its U.S. affiliate during the POI.[60]  As such, Commerce is satisfied that GFCL's allocation methodology does not cause inaccuracies or distortions.

Accordingly, on remand, Commerce continues to rely on GFCL's allocation methodology.

**Issue 2:  CEP Offset**

*Background*

To achieve a fair comparison between normal value (NV) and U.S. price, section 773(a)(7) of the Tariff Act of 1930, as amended (the Act), provides for additional adjustments, namely level of trade (LOT) and CEP offset adjustments.  Commerce grants a CEP offset to lower NV when a respondent's home market sales occur at a more advanced LOT than the respondent's U.S. sales.[61]  Commerce adjusts NV in the form of a CEP offset if the home market LOT is at a more advanced stage than the CEP LOT, and there is insufficient record information to determine the effect of this difference on price comparability.[62]  Commerce's regulations specify that the party in possession of the relevant information has the burden of establishing to Commerce's satisfaction "the amount and nature of a particular adjustment."[63]

---

[58] *See* SCQR at Exhibit SC-35 ([                    ]).
[59] *See* CQR at Exhibit C-14.
[60] *See* SCQR at 12.
[61] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001).
[62] *See* 19 CFR 351.412(f).
[63] *See* 19 CFR 351.401(b)(1); and *Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27370 (May 19, 1997).

Consistent with prior investigations and practice, Commerce requires that respondents provide both qualitative and quantitative analyses to evaluate whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different LOTs.[64]  Commerce requires a quantitative analysis to support any claimed differences in channel-specific selling functions and corresponding levels of intensity, demonstrating that differences in the expenses incurred in each sales channel impact price comparability.[65] Commerce examines quantitative information linked to each reported selling function, as well as how indirect selling expenses support the claimed differences in selling functions.[66]  The quantitative analysis supports a respondent's thorough descriptions of the various selling functions and the purported differences between claimed LOTs.

In its initial AD questionnaire, Commerce requested that GFCL provide a quantitative analysis showing how expenses assigned to POI sales made at different claimed LOTs impact price comparability, and that GFCL explain how the quantitative analysis supports the claimed levels of intensity for the selling activities reported in the selling functions chart.[67]  Specifically, Commerce requested GFCL's response to the following LOT analysis questions:

a.  Provide information requested below for each selling activity reported **in the selling functions chart at the end of this section**.  The information you provide should support your claims regarding the level of intensity at which you performed sales activities.

---

[64] *See, e.g., Polyethylene Terephthalate Sheet from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 85 FR 44276 (July 22, 2020) (*Polyethylene Terephthalate Sheet from Korea*), and accompanying IDM at Comment 4; and *Final Determination* IDM at 9.

[65] *See* Commerce's Letter, "Initial AD Questionnaire," dated March 26, 2021 (Initial AD Questionnaire), at A-8; *see also 4th Tier Cigarettes from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair al Negative Determination of Critical Circumstances*, 85 FR 79994 (December 11, 2020) (*Cigarettes from Korea*), and accompanying IDM at 34; *Large Diameter Welded Pipe from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 32729 (May 22, 2023) (*Welded Pipe from Korea Prelim*), and accompanying Preliminary Decision Memorandum (PDM) at 13, unchanged in *Large Diameter Welded Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 71826 (October 18, 2023).

[66] *See Emulsion Styrene-Butadiene Rubber from Brazil:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 38847 (June 29, 2020), and accompanying IDM at Comment 1.

[67] *See* Initial AD Questionnaire at A-7 – A-8.

    i.    List the specific activities performed for that sales activity category.

    ii.    Provide documentation demonstrating that you performed each of these activities during the POI/POR.  Explain how this documentation supports your claim that you performed each reported activity, and discuss how the reported activity is relevant to the LOT analysis.

    iii.    Indicate how often you performed each of the specific activities during the POI/POR.

    iv.    Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability.  Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales databases.  For example, if you arranged freight services for sales of subject merchandise, you may consider in that analysis the expenses incurred for arranging freight services in your level of trade analysis, but should not consider the per-unit inland freight expenses reported to Commerce in your sales databases.  Do not include selling activities performed by affiliated parties located in the United States in your analysis.

    v.    Demonstrate how indirect selling expenses vary by the different levels of trade claimed.

    vi.    Explain how the quantitative analysis provided in response to the requests for information above support the claimed levels of intensity for the selling activities reported in the selling functions chart.

    vii.    If you normally incur an expense for performing a selling activity but did not incur such an expense during the POI/POR, you may submit annual historical expense data reflecting average expenses incurred during a three-year period prior to the beginning of the POI/POR for Commerce's consideration.[68]

In response, GFCL provided a selling functions chart, which included the frequency and intensity with which the various selling activities were performed, as well as descriptions of the various sales channels and selling activities.[69]

---

[68] *Id*.
[69] *See* AQR at Exhibit A-11 (emphasis in original).

In a supplemental questionnaire, Commerce requested that GFCL "{p}rovide documentation supporting GFCL's methodology (*i.e.*, the quantitative analysis) used to report the levels of intensity … for each of the figures reported in {GFCL's selling functions chart}."[70] In response, GFCL discussed information in its selling functions chart and its descriptions of the selling functions included in its initial questionnaire response.[71] In addition, GFCL provided documentation supporting its provision of technical assistance and details regarding its inventory maintained in warehouses.[72]

Based on this record evidence, Commerce preliminarily granted GFCL a CEP offset.[73] That is, in the *Preliminary Determination*, Commerce found that the NV LOT was a more advanced stage of distribution than the CEP LOT and, unable to calculate a LOT adjustment given that there was only one LOT in the home market and no other appropriate basis for determining a LOT adjustment, Commerce granted the CEP offset adjustment.[74] Following the issuance of the *Preliminary Determination*, the petitioner, Daikin, raised issues with the information GFCL had provided in support of the CEP offset adjustment.[75]

In the *Final Determination*, Commerce continued to grant GFCL a CEP offset.[76] However, Commerce also acknowledged that the quantitative analysis GFCL provided was inadequate in response to Commerce's initial AD questionnaire, which required that the respondent provide a quantitative analysis showing how the expenses assigned to the POI sales

---

[70] *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated May 13, 2021 (SAQ), at 1.
[71] *See* SAQR at 2.
[72] *Id*. at 1-2 and Exhibit SA-3; and CQR at Exhibits C-30 – C-36.
[73] *See Granular Polytetrafluoroethylene Resin from India; Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 49299 (September 2, 2021), and accompanying PDM at 9-11.
[74] *Id*. at 10-11.
[75] *See Final Determination* IDM at 9-11.
[76] *Id.* at 9-10.

made at different claimed LOTs impact price comparability, and an explanation of how the quantitative analysis supports the claimed levels of intensity for the selling activities reported in the selling functions chart. Commerce explained that instead of providing such an analysis, GFCL had "referred generally to its reported selling expenses and provided additional qualitative support for its reported levels of intensity in its selling functions chart."[77] Nevertheless, Commerce acknowledged that it had not informed GFCL that it required more information, and therefore, "GFCL did not have an opportunity, pursuant to section 782(d) of the Act, to remedy any deficiency in its quantitative analysis by providing additional information in a supplemental questionnaire response."[78] Commerce explained its determination to grant the adjustment, that "we have in this instance accepted GFCL's information as sufficient for purposes of this segment of the proceeding and are granting a CEP offset to GFCL for this final determination."[79] Commerce also stated that in future administrative reviews, a more detailed and robust quantitative analysis of GFCL's selling functions would be required for Commerce to evaluate whether a CEP offset is warranted.[80]

In its *Remand Opinion*, the Court held that substantial record evidence did not support that GFCL qualified for the CEP offset.[81] With respect to Commerce's deficiency notice rationale, according to the Court, GFCL's response to the supplemental questionnaire "afforded it a chance to remedy the insufficiency insofar as {section 782(d) of the Act} required any such opportunity."[82] The Court concluded that Commerce had found that the respondent failed to demonstrate its eligibility for the adjustment; yet, gave it another chance, which GFCL declined

---

[77] *Id.*
[78] *Id.* at 10.
[79] *Id.*
[80] *Id.*
[81] *See Remand Opinion* at 10.
[82] *Id.*

to use.[83]  This, the Court held, is not substantial evidence demonstrating that GFCL qualified for

the offset.[84]  Accordingly, the Court remanded for Commerce's reconsideration.

  *Analysis*

As described above, to grant a CEP offset, Commerce requires a quantitative analysis to

support any claimed differences in channel-specific selling functions and corresponding levels of

intensity, demonstrating that differences in the expenses incurred in each sales channel impact

price comparability.[85]  In the initial AD questionnaire, Commerce requested that GFCL provide a

quantitative analysis showing how expenses assigned to POI sales made at different claimed

LOTs impact price comparability, and that GFCL explain how the quantitative analysis supports

the claimed levels of intensity for the selling activities reported in the selling functions chart.[86]

In response, GFCL provided a selling functions chart, which included the frequency and

intensity with which the various selling activities were performed, as well as descriptions of the

various sales channels and selling activities.[87]

In its supplemental questionnaire, Commerce asked GFCL to provide documentation

supporting its quantitative analysis.[88]  In response, GFCL discussed the levels of intensity in its

selling functions chart and reiterated that it described its selling functions in its original

questionnaire response.[89]  The only new information GFCL provided in its supplemental

questionnaire response was an Export Customer Complaint Register and copies of

---

[83] *Id.*
[84] *Id.*
[85] *See* Initial AD Questionnaire at A-8; *see also Cigarettes from Korea* IDM at 34; *Welded Pipe from Korea Prelim* PDM at 13, unchanged in *Large Diameter Welded Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 71826 (October 18, 2023).
[86] *See* Initial AD Questionnaire at A-7 – A-8.
[87] *See* AQR at Exhibit A-11.
[88] *See* SAQ at 1-2.
[89] *See* SAQR at 2.

correspondence with customers to show the technical support it provided to customers.[90]  GFCL did not demonstrate how indirect selling expenses vary by the different claimed LOTs, as required by the questionnaire.  Nor did it provide any selling expense data from its accounting records or trace expense data to specific sales activities.  That is, GFCL's response lacks an adequate quantitative analysis showing how the expenses assigned to the POI sales made at different claimed LOTs impact price comparability and an explanation of how that quantitative analysis supports the claimed levels of intensity for the selling activities reported in the selling functions chart.  Therefore, in light of the Court's opinion and order and in accordance with 19 CFR 351.401(b)(1), Commerce has determined that, by failing to provide the requested quantitative analysis and information, GFCL did not meet its burden of establishing eligibility for the CEP offset adjustment.  Accordingly, on remand, Commerce has not granted GFCL the CEP offset.

## III.    INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

On June 10, 2024, we released the Draft Remand Results to interested parties for comment.[91]  On June 17, 2024, we received comments from the petitioner, Daikin America, Inc. (Daikin or the petitioner) and GFCL.[92]  On June 25, 2024, we notified the petitioner that its comment submission contained new factual information which was not on the record of this remand proceeding, and therefore, we requested that the petitioner resubmit its comments with new factual information redacted.[93]  On July 3, 2024, the petitioner resubmitted its comments

---

[90] *Id.* at 2 and Exhibit SA-3.
[91] *See* Draft Results of Remand Redetermination, *Daikin America, Inc. v. United States*, Consolidated Court No. 22-00122, Slip Op. 24-32 (CIT March 14, 2024), dated June 10, 2024 (Draft Remand Results).
[92] *See* Petitioners' Letter, "Comments on Draft Remand Redetermination," dated June 17, 2024; and GFCL's Letter, "Gujarat Fluorochemicals Limited's Comments on the Draft Remand Redetermination in Court No. 22-00122 (Slip Op. 24-32)," dated June 17, 2024 (GFCL's Comments).
[93] *See* Commerce's Letter, "Rejection of New Factual Information in Comments on Draft Remand Redetermination," dated June 28, 2024.

redacting references containing new factual information in accordance with Commerce's request.[94]  As explained below, we continue to reach the same conclusions that we reached in the Draft Remand Results. Our discussion of interested party comments is below.

**Comment:  U.S. Movement Expenses**

*Petitioner's Comments*:

*The following is a verbatim summary of argument submitted by the petitioners.[95]  For further details, see Petitioner's Comments at 3-14.*

Commerce's draft remand redetermination wrongfully determined that it was not feasible for GFCL to report its movement expenses on a transaction-specific basis and wrongfully determined that GFCL's grade-based allocation was as specific as possible and did not cause inaccuracies and distortions. In fact, it was feasible for GFCL to report transaction-specific movement expenses and GFCL's allocation *did* cause inaccuracies and distortions. Commerce's findings were largely based on conjecture and did not address the bulk of the evidence that Daikin raised during the investigation and before the CIT.

- First, Daikin demonstrated, and the CIT found, that internal GFCL documents proved that the company was capable of "track{ing} merchandise" in a way that allowed it to report transaction-specific movement expenses.[96] This contradicted GFCL's claim that it could not calculate transaction-specific movement expenses because merchandise shipped from India "cannot be tracked or identified after the goods are stored in the U.S. warehouse{.}"[97] Commerce did not adopt the CIT's finding regarding these documents and instead implausibly speculated that they could reflect information derived from a party other than GFCL.[98] Commerce's speculation was not based on any evidence in the record.

- Second, Commerce found that "there is no record indication of how the batch numbers are associated with specific shipments or sales of merchandise," yet conceded that the record did in fact reflect GFCL's ability to associate movement expenses with specific shipments and sales.[99] Commerce's ultimate finding was not that linking batch numbers to specific shipments and sales was impossible, as GFCL claimed, but that it would merely be difficult.[100] However, this does not exempt GFCL from using information in its records to calculate transaction-specific movement expenses, as GFCL is required to

---

[94] *See* Petitioner's Letter, "Comments on Draft Remand Redetermination" dated June 17, 2024, re-filed on July 2, 2024 (Petitioner's Comments).
[95] *See* Petitioner's Comments at 2-3 (emphasis in original) (executive summary).
[96] *Id.* at 2 (citing *Remand Opinion* at 7).
[97] *Id*. (citing GFCL Rebuttal Brief at 3).
[98] *Id.* (citing Draft Remand Results at 6).
[99] *Id*. (citing Draft Remand Results at 8).
[100] *Id*. (citing Draft Remand Results at 8-9).

expend its "maximum effort" in complying with Commerce's request for transaction-specific data.[101]

- Third, Commerce concluded that GFCL's grade-based allocation methodology did not cause inaccuracies or distortions on the basis of its review of only a single GFCL product code. This ignored the evidence of distortions that Daikin raised during the investigation and before the CIT, such as variation in movement expenses for products with identical physical properties. Commerce also failed entirely to address Daikin's alternative proposal to allocate GFCL's movement expenses on an overall-average basis, which would address the distortive effect of a grade-based allocation. Allocation on the basis of grade is equivalent to allocating on the basis of product value, a method that the CIT has previously found to be distortive.[102]

*GFCL's Comments*:

*The following is a verbatim summary of argument submitted by GFCL. For further details, see GFCL's Comments. For further details, see GFCL's Comments at 3-5.*

On remand, the CIT instructed Commerce to reconsider two issues: (1) whether GFCL reasonably reported its domestic inland freight, international freight, and domestic inland insurance expenses on an allocation basis; and (2) whether GFCL was eligible for a CEP offset.[103]

With respect to the first issue, GFCL agrees with Commerce's determination that GFCL could not feasibly report movement expenses on a transaction-by-transaction basis and that the allocated movement expenses were as specific as possible without introducing any distortions or inaccuracies. Commerce's decision is based on substantial evidence on the record. GFCL provided ample evidence to demonstrate that reporting certain movement expenses, including domestic inland freight, international freight, and domestic inland insurance, was not feasible based on GFCL's business practices and normal books and records. Not only did GFCL provide such information, GFCL also presented Commerce a reasonable alternative by reporting on an allocation basis. This alternate reporting did not introduce any inaccuracies or distortions to GFCL's reporting or Commerce's dumping margin calculation. Indeed, reporting on an allocation basis avoided introducing distortions to the administrative record. In short, GFCL agrees with Commerce's reasoning and urges Commerce to maintain its position in the final remand results.

**Commerce's Position:**

We do not agree with the petitioner that Commerce incorrectly determined in the Draft

Remand Results that it was not feasible for GFCL to report its movement expenses on a

---

[101] *Id*. at 3 (citing *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382 (Fed. Cir. 2003)).

[102] *Id.* (citing *SKF USA Inc. v. United States*, 800 F. Supp. 2d 1316, 1324-25 (CIT 2011)).

[103] *See* GFCL's Comments at 2 (citing Draft Remand Results at 1-2; and *Remand Order* at 10).

transaction-specific basis and that GFCL's grade-based allocation was as specific as possible and did not cause inaccuracies and distortions.

As an initial matter, the petitioner states that GFCL's claim regarding the feasibility of reporting movement expenses on a transaction-specific basis is contradicted by the Export Customer Complaint Register which demonstrates, "in the words of the CIT, that GFCL 'tracks merchandise batch numbers [                    ].'"[104]  In fact, in its comments on the draft remand, the petitioner states that the Court "found" that GFCL documents "proved {} the company was capable of 'tracking merchandise'" and that "Commerce did not adopt the CIT's finding."[105]  However, it was the petitioner who argued that documents including the register show GFCL routinely tracks merchandise batch numbers [                    ].  The Court remanded Commerce's final determination in this proceeding with instructions to reconsider whether it was feasible for GFCL to report its shipping-related costs on a transaction-specific basis in light of certain record evidence which the Court held Commerce had not addressed; whether these expenses were calculated on a specific a basis as possible; and whether the reporting of such expenses did not cause inaccuracies or distortions.[106]  As such, we disagree with the petitioner that the Court made a finding of fact or interposed its own determination regarding record evidence for that of the agency's.[107]

Nevertheless, Commerce disagrees with the petitioner's assertion that the Export Customer Complaint Register tracked merchandise [

---

[104] *See* Petitioner's Comments at 4 (citing *Remand Opinion* at 7).
[105] *See* Petitioner's Comments at 2.
[106] *See* Remand Opinion at 8.
[107] *See Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003) (holding that the CIT abused its discretion in reversing an ITC finding and directing a particular finding, and instead was required to return the case to the ITC for further consideration); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the

].[108]  Nor does Commerce agree that the Export Customer Complaint Register contradicts GFCL's claim that transaction-specific reporting of shipping expenses was not feasible.[109]  As explained above, Commerce may consider allocated expenses when transaction-specific reporting is not feasible, provided that Commerce is satisfied that the allocation method used does not cause inaccuracies or distortions.[110]  Further, in determining the feasibility of transaction-specific reporting or whether an allocation is calculated on as specific a basis as feasible, Commerce must take into account the records maintained by the party in question in the ordinary course of its business.[111]  The Export Customer Complaint Register is a record of post-sale customer complaints.[112]  The Export Customer Complaint Register neither contains a full list of transactions nor is it maintained in relation to transactions which do not result in complaints. In fact, as GFCL points out, the register "is, instead, extraordinary and outside of GFCL's normal course of business, if a customer is making a complaint."[113]  As such, the record does not support the petitioner's argument that the Export Customer Complaint Register "tracked merchandise [                                      ]" or that it is feasible for GFCL to report shipping costs on a transaction-specific basis by using the Export Customer Complaint Register.

The petitioner argues that, in the draft remand results, Commerce's statement that there is no indication that the [                                    ] originates with GFCL is "plainly refuted on the face" of the document.[114]  However, Commerce's statement is correct –

---

record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").
[108] *See* Petitioner's Comments at 3-4.
[109] *Id.* at 4.
[110] *See* 19 CFR 351.401(g)(1).
[111] *See* 19 CFR 351.401(g)(3).
[112] *See* SAQR at Exhibit SA-3(a); *see also* GFCL's Comments at 4.
[113] *See* GFCL's Comments at 4-5.
[114] *Id.* (citing Draft Remand Results at 6 (citing SAQR at Exhibit SA-3(a)).

our point was not that the [          ] in the Export Customer Complaint Register are *prepared*

by someone else other than GFCL.  Our point was that the Export Customer Complaint Register

falls short of demonstrating that GFCL tracks merchandise by [          ] because, for

example, it is entirely possible that the customer provides the information, including

[          ], to GFCL from the shipment it has received when it contacts GFCL with a complaint and

that the customer's complaint is recorded in the register based on the information the customer

has provided.  The petitioner asserts that the Export Customer Complaint Register "features

[          ]."[115]  Given the designated purpose of the Export Customer Complaint Register as a

register of post-sale complaints made by customers, the information in the Export Customer

Complaint Register's

[          ] reflects

complaints from customers on shipments they have received versus information originating from

GFCL.  Again, the record indicates that the Export Customer Complaint Register tracks

complaints made by customers.  Although Commerce agrees that the register was maintained by

GFCL, the register does not demonstrate that GFCL tracks merchandise by [          ]

nor that GFCL uses the Export Customer Complaint Register to do so.

 As we have noted, it is unclear how the Export Customer Complaint Register can be used

to track the merchandise from the [          ] or to

report shipping costs on a transaction-specific basis.  Information is only recorded post-sale,

where there is a customer complaint.  The information in the register, *i.e.*, [   ] line items,

pertains to complaints received by GFCL during the POI.[116]  Thus, petitioner's position fails to

---

[115] *Id*.
[116] *See* SAQR at Exhibit SA-3(a).

account for the fact that it is entirely plausible that any or all of the sales listed in the register were made prior to the POI.  Accordingly, it defies reason that this particular document could be used to sufficiently track GFCL's sales of POI merchandise from the [                    ].  Even assuming *arguendo* that it could, the result would only potentially offer transaction-specific reporting for [    ] sales.

The petitioner also argues that the Export Customer Complaint Register shows that GFCL is capable of linking merchandise [                    ] which contradicts GFCL's justification for reporting shipping costs on an allocated basis, *i.e.*, that the linkage was impossible.[117]  The petitioner asserts that if GFCL did the maximum it is able to do, GFCL would calculate transaction-specific movement expenses for Commerce.[118]  The fact that something is *not impossible* is not the standard.  Again, Commerce may consider allocated expenses when transaction-specific reporting is *not feasible*, accounting for the records maintained by the respondent in the ordinary course of its business.[119]  As explained above, the record supports GFCL's explanation that transaction-specific reporting was not feasible due to its sales and inventory processes and in accordance the records maintained by GFCL in ordinary course.  For the reasons outlined above, neither the Export Customer Complaint Register nor the petitioner's claim that it is possible, by some method set forth by the petitioner, for GFCL to report on another basis detracts from GFCL's claim.

Next, the petitioner argues that batch numbers were associated with specific sales and shipments.[120]  The petitioner claims that Commerce's assertion that "there is no record indication of how the batch numbers are associated with specific shipments or sales" is contradicted by

---

[117] *See* Petitioner's Comments at 5 (citing Draft Remand Results at 6).
[118] *Id.*
[119] *See* 19 CFR 351.401(g)(1); 19 CFR 351.401(g)(3).
[120] *See* Petitioner's Comments at 5-7.

Commerce's statement that the record contained [                                ]."[121]

The petitioner also quotes language from [                                ].  The

petitioner concludes that "at minimum, Commerce's assertion that 'there is no record indication'

that batch numbers were associated with specific shipments or sales is false."[122]  Yet,

Commerce's concern was with *how* batch numbers are associated with specific shipments or

sales.  As Commerce explained, in order to report movement expenses on a transaction-specific

basis, the respondent must be able to establish a one-to-one correlation between its U.S.

affiliate's purchases from GFCL and sales to the U.S. customer.  Nothing on the record

indicates that the [                                ].  Absent

information as to *how* batch numbers are associated with the merchandise in the sales and

shipping documents, the mere ability to connect the documents is insufficient to demonstrate

feasibility.

In addition, the petitioner argues that it is not Commerce's job to save GFCL from a

burdensome exercise.[123]  Again, consistent with its regulations, Commerce may consider

allocated expenses when transaction-specific reporting is *not feasible*, accounting for the records

maintained by the respondent in the ordinary course of its business.[124]  The Court in *SNR*

*Roulements* explained that, "{n}othing suggests that companies are required to make wholesale

---

[121] *Id.*
[122] *Id.*
[123] See Petitioner's Comments at 7-8.
[124] *See* 19 CFR 351.401(g)(1); 19 CFR 351.401(g)(3).

changes to their record-keeping practices to comply with 19 CFR 351.401(g)(1)."[125]  In the draft remand results, with respect to feasibility, Commerce explained that the record shows that "attempts to link a specific batch number to a particular invoice would be a burdensome exercise involving a manual review of shipping documents for GFCL's sales to GFL Americas, GFL America's sales to unaffiliated U.S. customers, as well as warehouse documentation."

The petitioner also argues that in discussing the *Polytetrafluoroethylene from India* investigation, Commerce failed to mention the fact that in that proceeding Commerce used adverse facts available to calculate one of GFCL's movement expenses due to its inability to replicate its calculation at verification.[126]  The petitioner's argument is irrelevant to the issue of expense allocation.  In that investigation, the expense at issue *was* reported on a transaction-specific basis, however, because the expense could not be verified, we determined that the company had not acted to the best of its ability in responding to our request for information and applied an adverse inference under section 776(b) of the Act.[127]

It is certainly not uncommon for Commerce to accept a respondent's reporting of expenses based on an allocation methodology in accordance with 19 CFR 351.401(g)(1).  For example, in *OCTG from Korea*, respondent SeAH explained that its computer system does not contain the information that would allow the company to link each inventory sale with the corresponding import.[128]  SeAH also explained that while it could, in theory, identify the import corresponding to each sale through inventory, this would involve a manual tracing of information that would take a substantial amount of time.  Commerce found that SeAH adequately explained

---

[125] *See SNR Roulements v. United States*, 341 F. Supp. 2d 1334, 1351 (CIT 2004) (*SNR Roulements*).
[126] *See* Petitioner's Comments at 8.
[127] *See Polytetrafluoroethylene Resin from India* IDM at Comment 2.
[128] *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM at Comment 5.H.

why it could not report the eight adjustments at issue on a sale- or vessel-specific basis for

inventory sales and found the allocation methodology reasonable.[129]

The Federal Circuit has held that the "satisfaction" standard in 19 CFR 351.401(g)(2)

provides Commerce with the discretion to decide whether to accept a proposed allocation.[130]  In

making its determination, Commerce must consider the records maintained by GFCL in the

ordinary course of business.  As outlined above, the record supports GFCL's claim that it does

not maintain records in ordinary course to report certain movement expenses on a transaction-

specific basis and no evidence put forth by the petitioner contradicts GFCL's claim.  The

petitioner's arguments as to what specific information is available in GFCL's records and what is

feasible for GFCL to report amount to speculation.

The petitioner argues that GFCL's methodology for allocating movement expenses is

equivalent to allocating the expenses by product value, since the grades of PTFE are physically

identical but differ as to price.[131]  According to the petitioner, GFCL's methodology therefore is

"a distortive method that has been rejected by the courts."[132]  But, in the case cited to by the

petitioner, Commerce rejected the proposed allocation method that it found to be distortive based

on Commerce's analysis of the underlying record facts.[133]  In sustaining Commerce's

determination, the Court held that "Commerce reasonably determined that allocation based on

weight avoided the distortion that {Commerce} identified as occurring when value-based

allocation was applied."[134]  Here, Commerce has not made a similar finding.  The petitioner

further argues that Commerce failed entirely to address its alternative proposal to allocate

---

[129] *Id.*
[130] *See Koyo*, 551 F.3d at 1292.
[131] *See* Petitioner's Comments at 10.
[132] *Id.* (citing *SKF USA Inc., v. United States*, 800 F. Supp. 2d 1316, 1324-25 (CIT 2011) (*SKF USA*)).
[133] *See SKF USA*, 800 F. Supp. 2d at 1325.
[134] *Id.*

GFCL's movement expenses on an overall-average basis, which would address the allegedly distortive effect of a grade-based allocation. The overall average calculations provided by the petitioner in its case brief are based on the "Transfer cost allocation from GFL India to GFL Americas during POI."[135]

As discussed, GFCL based its movement expense calculations on the *actual expenses* incurred and tracked by grade, which is equivalent to product code in GFCL's reporting, in accordance with its normal books and records.[136] Thus, we disagree with the petitioner's contention that GFCL's product-specific allocation of movement expenses is necessarily distortive simply because it results in different per-unit amounts being calculated for different products. In fact, the petitioner's arguments are based on speculation rather than record evidence. The petitioner surmises that the results of GFCL's allocation methodology *suggest* that GFCL "pushed" expenses to non-subject merchandise in order to mask its actual level of dumping.[137] The petitioner points to no record evidence for this allegation because there is none. Next, the petitioner accuses Commerce of "cherry picking" its evidence by demonstrating for a sample product that the allocated amount does not greatly differ from the per-unit amount that can be calculated using the limited transaction-specific movement information on the record. As the petitioner well knows, Commerce did not select this particular product, but simply examined the sample sales documents submitted by GFCL in response to a standard question in the antidumping questionnaire.[138] Moreover, comparing an allocated per-unit amount to the per-unit

---

[135] *See* CQR at Exhibit C-14.
[136] *Id.* at Exhibit C-5.
[137] *See* Petitioner's Remand Comments at 12.
[138] *See* AQR at Exhibit A-13.3, .pdf 253 and 260.

expense derived from transaction-specific expense data is a method often used by Commerce to test the reasonableness of an allocation methodology.

Rather than accept a reasonable allocation methodology, the petitioner now suggests a completely results-oriented approach—an overall average combining all grades of merchandise, subject and non-subject[139]—that is the antithesis of the transaction-specific reporting the petitioner has advocated up to this point. Based on the forgoing, we maintain that GFCL's product-specific allocation methodology is preferable to overall average movement expenses.

**Comment:  CEP Offset**

*Petitioner's Comments*:

The petitioner did not comment on this issue.

*GFCL's Comments*:

*The following is a verbatim summary of argument submitted by GFCL.[140]  For further details, see GFCL's Comments at 5-10.*

> GFCL requests that Commerce reconsider its decision on remand to deny GFCL a CEP offset.  There is substantial evidence on the record demonstrating that GFCL provided qualitative and quantitative support that its home market and CEP sales are made at different levels of intensity such that "expenses assigned to the POI sales made at different" intensities "impact price comparability."[141] Thus, a CEP offset is warranted.

**Commerce's Position:**

We disagree with GFCL that there is substantial evidence on the record to support a CEP offset.[142]  As discussed above, Commerce requires that respondents requesting a CEP offset

---

[139] The petitioner calculated average freight expenses for international freight (INTNFRU), inland insurance (INSUREU), and inland freight – plant/warehouse to customer (INLFWCU).  We note that the petitioner continues to confuse the variables INFLPWU (U.S. inland freight from port to warehouse) with INSUREU (country of manufacture inland insurance).  Insurance expenses (based on premiums paid) are not typically calculated on a transaction-specific basis because they are not incurred as such.

[140] *See* GFCL's Comments at 3 (executive summary).

[141] *Id*. (citing Draft Remand Results at 18).

[142] *Id*. at 5.

adjustment provide both qualitative and quantitative analyses for Commerce to evaluate whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different LOTs.[143]  Ultimately, it is the respondent's burden to demonstrate its eligibility for a CEP offset by providing the requested information and analysis.[144]

Commerce's initial questionnaire requested that GFCL provide:  1) documentation demonstrating the performance of each selling activity during the POI; 2) an explanation of how the documentation supports a claim that each reported activity was performed; and 3) a discussion regarding how the activity is relevant to the LOT analysis.[145]  The questionnaire also asked GFCL to demonstrate how indirect selling expenses vary by the different LOTs claimed.[146]  Finally, the questionnaire asked for an explanation of how the quantitative analysis supported the claimed levels of intensity for the selling functions reported in the selling functions chart.[147]  These requests ask the respondent to provide Commerce with the necessary qualitative and quantitative information for Commerce to evaluate whether a CEP offset should be granted.

In its Section A questionnaire response, GFCL simply referred to its selling functions chart, which included the frequency and intensity with which the various selling activities were performed, as well as descriptions of the various sales channels and selling activities.[148]  However, no documentation was provided to demonstrate that each selling activity was performed during the POI.  Furthermore, GFCL did not provide a quantitative analysis to support the claimed levels of intensity for the selling activities reported in the selling functions chart.

---

[143] *See, e.g., Polyethylene Terephthalate Sheet from Korea* IDM at Comment 4; and *Final Determination* IDM at 9.
[144] *See QVD Food Co. v. United States*, 658 F.3d at 1324 ("The burden of creating an adequate record lies with interested parties."); 19 CFR 351.401(b)(1) ("The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment{.}").
[145] *See* Initial AD Questionnaire at A-7.
[146] *Id*. at A-8.
[147] *Id.* at A-8.
[148] *See* AQR at A-24.

GFCL referred to its selling functions chart and stated, "there is significant variation in the level of trade between U.S. sales and home market sales, which can be quantified when comparing the expenses assigned to sales associated with each level of trade."[149]  However, although GFCL was in the possession of such information, such expenses were not further explained nor was a comparison of expenses provided.  Further, in response to Commerce's questionnaire asking GFCL to demonstrate how indirect selling expenses vary by the different claimed LOTs, GFCL again referred to its selling functions chart and explained that indirect selling expenses will vary between the different channels of distribution because the overall expenses are uniquely impacted by the nature of the selling functions performed by GFCL and GFL US.[150]  GFCL did not show how indirect selling expenses vary by the different LOTs claimed -- no analysis was provided.  In response to Commerce's request that GFCL explain how the quantitative analysis supports the claimed levels of intensity for the selling functions reported in the selling functions chart, GFCL simply referred to its selling functions chart and previous responses.[151]

In a supplemental questionnaire, we requested that GFCL provide documentation supporting its methodology (*i.e.*, the quantitative analysis) used to report the levels of intensity for each of the figures reporting in the selling functions chart.[152]  In its response, GFCL discussed the levels of intensity in its selling functions chart and reiterated that it described its selling functions in its original questionnaire response.[153]  The only new information GFCL provided in its supplemental questionnaire response was an Export Customer Complaint Register and copies of correspondence with customers to show the technical support it provided to

---

[149] *Id*.
[150] *See* AQR at A-25.
[151] *Id*.
[152] *See* SAQ.
[153] *See* SAQR at 2.

customers as support of the level of intensity for technical assistance in the selling functions chart.[154]  With respect to inventory maintenance, GFCL submitted warehouse agreements, which GFCL stated provided details regarding the inventory it maintained in designated warehouses for further distribution to customers.[155]  The documentation provided in response to Commerce's supplemental questionnaire qualitatively supported the above two selling activities in GFCL's selling functions chart (technical assistance and inventory maintenance).[156]  However, there are 21 selling activities reported in the selling functions chart.[157]

> GFCL comments that Commerce's regulations provide that:
>
>> Commerce '*will* grant a constructed export price offset' when '{n}ormal value is compared to constructed export price;' '{n}ormal value is determined at a more advanced level of trade than the level of trade of the constructed export price; and{,}' for cooperating respondents, 'the data available do not provide an appropriate basis to determine' that a 'difference in level of trade affects price comparability.'[158]

The regulation quoted by GFCL pertains to the circumstances required for Commerce to grant a CEP offset:  "The Secretary will grant a {CEP} offset only where: (i) Normal value is compared to {CEP}; (ii) Normal value is determined at a more advanced level of trade than the level of trade of the {CEP}; and (iii) … the data available do not provide an appropriate basis to determine … whether the difference in level of trade affects price comparability."[159]

GFCL also claims that "{c}ontrary to Commerce's draft remand results, Commerce previously recognized, based on record evidence, that certain of GFCL's selling functions outweigh others."[160]  GFCL goes on to summarize Commerce's observations in the Preliminary

---

[154] *Id.* at 2 and Exhibit SA-3.
[155] *Id*.
[156] *Id.*
[157] *See* AQR at Exhibit A-11.
[158] *See* GFCL's Comments at 7 (emphasis in original) (citing 19 CFR 351.412(f)).
[159] *See* 19 CFR 351.412(f).
[160] *See* GFCL's Comments at 8 (citing Draft Remand Results at 18).

Decision Memorandum of the various selling functions that GFCL reportedly performed in each sales channel on a qualitative level. While we disagree with GFCL's claim that Commerce prioritized certain selling functions over others in the Preliminary Decision Memorandum, this line of argument is beside the point that GFCL did not support its qualitative reporting with quantitative data.

Thus, we also disagree with GFCL that "the record shows that GFCL provided the information it could to demonstrate" how expenses assigned to the POI sales made at different claimed LOTs impact price comparability and how its quantitative analysis supports the claimed levels of intensity for the reported selling activities.[161] GFCL did not provide the necessary quantitative analysis and information. In one example from the instances discussed above, GFCL claimed that the variation in the level of trade between U.S. sales and home market sales "can be quantified when comparing the expenses assigned to sales associated with each level of trade,"[162] but GFCL never provided further explanation or a comparison of such expenses even though it was in possession of the information. Therefore, the record belies GFCL's claim that it provided the "information it could."

Again, it is not Commerce's burden to demonstrate that a respondent is entitled to an adjustment; it is the respondent's burden. Commerce requires qualitative and quantitative information and analysis from the respondent to determine whether a CEP offset is warranted. GFCL only provided qualitative support documentation for two of the 21 reported selling activities and no documentation at all pertaining to a quantitative analysis. GFCL was in possession of such information but did not provide it to Commerce. Accordingly, GFCL did not

---

[161] *See* GFCL's Comments at 9.
[162] *Id*.

demonstrate the appropriateness of such adjustment and therefore we continue to decline to grant a CEP offset.

## FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, based on the analysis above, Commerce has continued to rely on GFCL's allocated movement expenses and found that GFCL was not entitled to the CEP offset. As such, Commerce has revised its dumping analysis to exclude the CEP offset adjustment for the sole mandatory respondent, GFCL. Based on the change, Commerce determines that the following estimated weighted-average dumping margins exist[163] for the period January 1, 2020, through December 31, 2020:

| Company | *Final Determination* Dumping Margin (percent)[164] | Remand Weighted-Average Dumping Margin (percent) |
|---|---|---|
| Gujarat Fluorochemicals Limited (GFCL) | 10.01 | 10.36 |
| All Others | 10.01 | 10.36 |

Should the Court affirm these final results of redetermination, Commerce will publish a notice of amended final determination in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

7/11/2024

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA
Abdelali Elouaradia,
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[163] *See* section 735(d)(5)(A) of the Act ("{T}he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776"); and *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1254 (CIT 2018) (holding that Commerce has an established practice of recalculating the all-others rate upon revision of a mandatory respondent's rate); *see also Final Determination*, 87 FR at 3773.
[164] Adjusted for subsidy offsets. *See Final Determination*, 87 FR at 3773.