Refiled As Corrected Sep. 17, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
)
DAIKIN AMERICA, INC., )
)       PUBLIC
*Plaintiff,* )       VERSION
)
v. )       Case No. 22-122
)
UNITED STATES, )
)
*Defendant,* )
)
and )
)
GUJART FLUOROCHEMICALS )
LIMITED, )
)
*Defendant-Intervenor.* )
_____)

## PLAINTIFF'S COMMENTS OPPOSING <u>REMAND REDETERMINATION IN PART</u>

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Nicholas C. Phillips, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Daikin America, Inc.*

Dated: September 9, 2024

# <u>TABLE OF CONTENTS</u>

I.     SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    COMMERCE WRONGFULLY DETERMINED THAT IT WAS
       NOT FEASIBLE FOR GFCL TO REPORT TRANSACTION-
       SPECIFIC MOVEMENT EXPENSES . . . . . . . . . . . . . . . . . . . . . . . 5

       A.    The Export Customer Complaint Register Tracked
             Merchandise [
                                      ] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       B.    Batch Numbers Were Associated with Specific Sales
             and Shipments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       C.    It Is Not Commerce's Job to Save GFCL from a
             "Burdensome Exercise" . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.   COMMERCE WRONGFULLY ACCEPTED GFCL'S
       DISTORTIVE ALLOCATION OF MOVEMENT EXPENSES . . 23

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## GLOSSARY OF TERMS

| | |
|---|---|
| Adverse Facts Available | **AFA** |
| Constructed Export Price | **CEP** |
| Court of International Trade | **CIT** |
| Daikin America, Inc. | **Daikin** |
| *Daikin America, Inc. v. United States*, Ct. No. 22-00122, ECF No. 42 (Ct. Int'l Trade Mar. 14, 2024) | **Remand Order** |
| Final Remand Redetermination (Dep't Commerce July 11, 2024) | **Remand Redetermination** |
| Gujarat Fluorochemicals Limited | **GFCL** |
| Polytetrafluoroethylene | **PTFE** |
| U.S. Department of Commerce | **Commerce** |

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DAIKIN AMERICA, INC., ) | |
| ) | PUBLIC |
| *Plaintiff,* ) | VERSION |
| ) | |
| v. ) | Case No. 22-122 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| GUJART FLUROCHEMICALS ) | |
| LIMITED, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |

## PLAINTIFF'S COMMENTS OPPOSING
## REMAND REDETERMINATION IN PART

On behalf of Daikin America, Inc. ("Daikin" or "Plaintiff"), we

hereby submit comments on the final remand redetermination issued by

the U.S. Department of Commerce ("Commerce") on July 11, 2024

("Remand Redetermination") pursuant to the order issued by the Court

of International Trade ("CIT") in *Daikin America, Inc. v. United States*,

Ct. No. 22-00122, Slip Op. 24-32 (Ct. Int'l Trade Mar. 14, 2024)

("*Daikin*"). *See Daikin America, Inc. v. United States*, Ct. No. 22-00122,

ECF No. 42 (Ct. Int'l Trade Mar. 14, 2024) ("Remand Order"). As discussed below, although Commerce correctly determined that Gujarat Fluorochemicals Limited ("GFCL" or "Defendant-Intervenor") failed to demonstrate its eligibility for a constructed export price ("CEP") offset, Commerce erred in continuing to excuse GFCL's failure to report transaction-specific movement expenses for its U.S. sales. This latter determination is unsupported by substantial evidence and should be remanded by the Court with instructions for Commerce to once again reconsider whether it was feasible for GFCL to report its domestic inland freight, international freight, and domestic inland insurance expenses on a transaction-specific basis and if not, whether Gujarat's expenses were calculated on as specific a basis as is feasible and whether its reporting of such expenses does not cause inaccuracies or distortions.

## I.    Summary

Commerce's remand redetermination wrongfully determined that it was not feasible for GFCL to report its movement expenses on a transaction-specific basis and wrongfully determined that GFCL's grade-based allocation was as specific as possible and did not cause

inaccuracies and distortions. In fact, it *was* feasible for GFCL to report transaction-specific movement expenses and GFCL's allocation *did* cause inaccuracies and distortions. Commerce's findings were largely based on conjecture and did not address the bulk of the evidence that Daikin raised during the investigation and which the Court instructed the agency to address on remand.

First, Daikin demonstrated, and the Court found, that record evidence – the Export Customer Complaint Register – "show{ed} that Gujarat tracks merchandise batch numbers [

].'" *Daikin* at 7. This contradicted GFCL's claim that it could not calculate transaction-specific movement expenses because merchandise shipped from India "cannot be tracked or identified after the goods are stored in the U.S. warehouses and entered into GFL Americas LLC's inventory." *GFCL Rebuttal Br.* at 3, Appx. 08685. Commerce ignored the Court's finding regarding the Export Customer Complaint Register and instead implausibly speculated that this document could reflect information derived from a party other than GFCL. *Remand Redetermination* at 6, Remand Appx. 08958. Commerce's speculation was not based on any evidence in the record.

Second, Commerce found that "there is no record indication of how the batch numbers are associated with specific shipments or sales of merchandise," yet conceded that the record did in fact reflect GFCL's ability to associate movement expenses with specific shipments and sales. *Id.* at 8, Remand Appx. 08960. Commerce's ultimate finding was not that linking batch numbers to specific shipments and sales was impossible, as GFCL claimed, but that it would merely be difficult. *See id.* at 8-9, Remand Appx. 08960-61. However, this does not exempt GFCL from using information in its records to calculate transaction-specific movement expenses, as GFCL is required to expend its "maximum effort" in complying with Commerce's request for transaction-specific data. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Third, Commerce concluded that GFCL's grade-based allocation methodology did not cause inaccuracies or distortions on the basis of its review of only a single GFCL product code. This ignored the evidence of distortions that Daikin raised during the investigation and before the Court, such as variation in movement expenses for products with identical physical properties and shipping methods. Commerce also

failed to reasonably address Daikin's alternative proposal to allocate GFCL's movement expenses on an overall-average basis, which would remedy the distortive effect of a grade-based allocation. Because grades of PTFE do not differ as to physical properties or shipping methods, allocating movement expenses on the basis of grade is equivalent to allocating on the basis of product value, a method that this Court has previously found to be distortive. *See SKF USA Inc. v. United States*, 800 F. Supp. 2d 1316, 1324-25 (Ct. Int'l Trade 2011).

## II.    Commerce Wrongfully Determined That It Was Not Feasible for GFCL to Report Transaction-Specific Movement Expenses

In *Daikin*, the Court found that Commerce "failed to address record evidence . . . showing that it was feasible for Gujarat to report its shipping-related costs on a transaction-specific basis." *Daikin* at 7. However, in its Remand Redetermination, Commerce continues to "find{} that it was not feasible for GFCL to report its domestic inland freight, international freight, and domestic inland insurance expenses on a transaction-specific basis." *Remand Redetermination* at 9, Remand Appx. 08961. Commerce's finding is bereft of support in the record and instead depends on conjecture and cherry-picked data points. This does

not constitute substantial evidence and does not conform to the Court's

remand order.

## A.    The Export Customer Complaint Register Tracked Merchandise [

]

During the investigation, GFCL claimed that it could not calculate

transaction-specific movement expenses because merchandise shipped

from India "cannot be tracked or identified after the goods are stored in

the U.S. warehouse{.}" *GFCL Rebuttal Br.* at 3, Appx. 08685. In

response, Daikin brought GFCL's Export Customer Complaint Register

to Commerce's attention. This document showed, in the words of the

Court, that GFCL "tracks merchandise batch numbers [

].″ *Daikin* at 7. This directly contradicted

GFCL's claim. Moreover, Commerce failed to address the Export

Customer Complaint Register in its original determination. *See id.*

Commerce does no better in its Remand Redetermination. After

acknowledging that the Export Customer Complaint Register "includes

[                                              ]" the U.S. customer, Commerce

posits that "there is no indication that the [

], associated with the [                                      ],

6

derives from GFCL." *Remand Redetermination* at 6, Remand Appx.

08958. Confronted with record evidence that GFCL used [

] to identify product sold in the U.S. with shipments made from

India, Commerce hypothesizes that perhaps GFCL internally tracked

its sales using [                    ] prepared by *someone else*. This

conjecture is plainly refuted on the face of the Export Customer

Complaint Register, which features [


]." *GFCL*

*Supplemental Section A Questionnaire Response* at Exhibit SA-3(a),

Appx. 03913. Commerce's assertion is not a reasonable reading of the

record. It is also flatly contradicted by GFCL's [                       ]

which, as discussed in greater detail below, show that GFCL [


]. *GFCL Section C Questionnaire Response*

at Exhibit C-32, Exhibit C-35, Appx. 03706, 03729.

 Commerce attempts to shore up its conjecture by arguing that

"{t}he purpose of the Export Customer Complaint Register is to track

complaints made by customers" and noting that "{i}n fact, GFCL

submitted the register in support of GFCL's level of trade (LOT) analysis demonstrating that it provides technical support to its U.S. customers." *Remand Redetermination* at 6, Remand Appx. 08958. However, GFCL's intent in preparing the Export Customer Complaint Register and providing it to Commerce is irrelevant. Regardless of GFCL's intent, the document shows that GFCL is capable of linking merchandise [

]. *See Daikin* at 7. That squarely contradicts GFCL's stated justification for declining to calculate transaction-specific movement expenses – namely, that such a linkage was impossible. *See GFCL Supplemental Section C Questionnaire Response* at 8, Appx. 05088. It necessarily follows that if GFCL did "the maximum it is able to do," as is required to avoid the application of facts otherwise available with an adverse inference ("AFA"), it would expend the same effort for Commerce as it does for its customers and calculate transaction-specific movement expenses. *Nippon*, 337 F.3d at 1382.

In its response to interested party comments on its draft redetermination, which were included in the Remand Redetermination, Commerce continues to advance inapposite and unreasonable

arguments concerning the Export Customer Complaint Register.
Commerce first notes that the Export Customer Complaint Register
does not, by itself, represent a comprehensive tracking of [

]. *See Remand Redetermination*
at 22, Remand Appx. 08974 ("The Export Customer Complaint Register
neither contains a full list of transactions nor is it maintained in
relation to transactions which do not result in complaints."). This too is
irrelevant. As Daikin has argued from the start, the Export Customer
Complaint Register shows that GFCL had the *ability* to make this
linkage when called upon to do so, based on records that it kept in the
ordinary course of its business.

Indeed, Commerce appears to misunderstand Daikin's argument,
characterizing it as a claim that the Export Customer Complaint
Register could, on its own, be used as an independent source of
information to [                                      ]. *See id.* at 23-24,
Remand Appx. 08975-76 ("{I}t defies reason that *this particular
document* could be used to sufficiently track GFCL's sales of POI
merchandise from the [                                              ].

Even assuming *arguendo* that it could, the result would only potentially offer transaction-specific reporting for [    ] sales.") (emphasis added). This, of course, is not Daikin's claim. Rather, Daikin maintains the simple proposition that if GFCL is capable of linking [

] with [

] for the [    ] sales included in the Export Customer Complaint Register, it is capable of doing so for its U.S. sales in general. It is Commerce's failure to see the document as a reflection of such a capability that "defies reason."

In that vein, Commerce doubles down on its dubious claim that "there is no indication that the [

], associated with the [                    ], derives from GFCL." *Id.* at 6, Remand Appx. 08958. Commerce constructs an elaborate hypothetical to justify this position:

> Our point was that the Export Customer Complaint register falls short of demonstrating that GFCL tracks merchandise by [                                        ] because, for example, it is entirely possible that the customer provides the information, including [            ], to GFCL from the shipment it has received when it contacts GFCL with a complaint and that the customer's complaint is recorded in the register based on the information the customer has provided.

*Id.* at 23, Remand Appx. 08975. Commerce goes so far as to speculate that *all* of the information in the Export Customer Complaint Register may originate with customers and that GFCL merely "maintained" the document. *See id.*

Commerce's speculation – and its view that there is "no indication" that data recorded in a GFCL document about GFCL merchandise "derives from GFCL" – are unreasonable. *See id.* at 6. The Export Customer Complaint Register plainly reflects the feasibility of linking [

                ]. If GFCL could not do so, then it would be useless for customers to supply GFCL with [                    ] at all – assuming Commerce's unlikely scenario. For example, in the "[                ]" column of the Export Customer Complaint Register, GFCL records that it performed "[                    ]" for one U.S. sale revealing that "[



                                        ]."

*GFCL Supplemental Section A Questionnaire Response* at Exhibit SA-

11

3(a), Appx. 03913. In the "[                                    ], GFCL

recorded that [                                    ]. *Id.*

These statements clearly refer to actions undertaken by GFCL,

not the customer. That is, even if Commerce was correct that the sale's

[                ] was supplied by the customer, GFCL could not possibly

undertake the "[                    ]" and "[                    ]"

described unless it could connect the [

                                    ].

Ultimately, the Export Customer Complaint Register reflects GFCL's

practice of linking [

                                    ] when it had a need to

do so. Commerce cannot be allowed to avoid conclusions that are

evident on the face of the document in favor of speculative possibilities

for which there is no record evidence. The agency "is not free to

prescribe what inferences from the evidence it will accept and reject,

but must draw all those inferences that the evidence fairly demands."

*Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 378-

79 (1998). And this Court routinely reverses Commerce's findings of fact

when they are based on improper speculation or conjecture. *See, e.g.,*

*Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (reversing determination because it was based on "speculation" and "mere assumptions, which find no apparent support in record evidence"); *China Nat'l Arts & Crafts Import & Export Corp. v. United States*, 15 C.I.T. 417, 421 (1991) (reversing selection of Hong Kong as a surrogate country because Commerce had assumed that Hong Kong was a significant producer of shop towels without any "concrete evidence on the record").

### B.    Batch Numbers Were Associated with Specific Sales and Shipments

Commerce next finds in the Remand Redetermination that "although certain shipping and sales documents contain batch numbers [                                                    ], there is no record indication of how the batch numbers are associated with specific shipments or sales of merchandise." *Remand Redetermination* at 6, Remand Appx. 08958. Commerce contradicts its own statement in the very next sentence, conceding that the record contained [


].” *Id.* at 6-7, Remand Appx. 08958-59. Thus,

Commerce's assertion that "there is *no* record indication" that batch numbers were associated with specific shipments or sales is false. Commerce then again resorts to more conjecture, stating that "nothing on the record indicates that the [

]{.}" *Id.* at 7, Remand Appx. 08959. In fact, that is precisely what the Export Customer Complaint Register indicates, as it would be impossible for problems with merchandise sold in the U.S. to be identified by [                    ] if such [                    ] were not unique. It is also supported by [

]. *GFCL Section C Questionnaire Response* at Exhibit C-30, Appx. 03676-77.

Instead of pointing to any record evidence that [                    ] are not unique because, for example, they are repeated across different shipments of merchandise, Commerce supports its conjecture with inapposite points, noting that "GFCL's sample sales documentation shows that one batch number can cover multiple pallet numbers" and

that "on the packing list in GFCL's Exhibit SA-5, [

].￼" *Remand Redetermination* at 7,

Remand Appx. 08959. However, the fact that each batch consisted of

multiple pallet numbers does not imply that any batch numbers or

pallet numbers were duplicated. Commerce's argument therefore does

nothing to address Daikin's claim. If anything, GFCL's ability to track

each pallet number shipped in a given batch points to the granularity of

GFCL's shipment tracking data. Notably, Commerce fails to point to a

single instance on the record where the same batch number appears

across different shipments from India to the United States. Thus, not

only are batch numbers irrefutably unique, but the record shows that

they can be used to calculate movement expenses that are unique (*i.e.*,

transaction-specific) for GFCL's sales of subject merchandise.

Commerce claims that, although GFCL could link sales invoices

between GFCL, its U.S. affiliate, and the unaffiliated U.S. customer

with packing lists containing batch numbers for shipments from GFCL

to its U.S. affiliate, "{a}bsent record information on how batch numbers

are associated with the merchandise in the sales and shipping

documents, the mere ability to connect these documents is insufficient

to show the feasibility of transaction-specific expense reporting." *Id.* at 8, Remand Appx. 08960. This explanation is illogical. If sales invoices between GFCL, its U.S. affiliate, and the unaffiliated U.S. customer are associated with shipping documents containing batch numbers, then GFCL is indeed capable of linking the merchandise shipped from India with the merchandise sold in the U.S. by batch number. Further, the record does, in fact, contain "information on how batch numbers are associated with the merchandise in the sales and shipping documents." *Id.*  GFCL's U.S. affiliate tracks the merchandise by [                    ] after it has entered the United States and as it moves to the unaffiliated customer. This is demonstrated by the [

                    ] that GFCL provided Commerce during the investigation, which state that "[

                                        ]" and that the "[

                                            ]." *GFCL Section C Questionnaire Response* at Exhibit C-35, Exhibit C-32, Appx. 03729, 03706.

Commerce's only answer to the [                              ] requirement of [

] is to speculate, again, that these [                    ] may not

be unique. *See Remand Redetermination* at 25. As stated above, there is

no record evidence whatsoever to support this proposition, which GFCL

has never argued, despite having a strong incentive to do so. Rather,

the [                          ] on the record directly contradict GFCL's

claim that transaction-specific movement expenses were impossible to

calculate because merchandise shipped from India "cannot be tracked or

identified after the goods are stored in the U.S. warehouse{.}" *GFCL*

*Rebuttal Br.* at 3, Appx. 08685. In fact, they could be, and were.

Commerce's finding that "there is no record indication of how the batch

numbers are associated with specific shipments or sales of

merchandise" amounts to taking GFCL at its word in the face of

extensive contrary evidence on the record. This gets the regulatory

standard backward, as 19 C.F.R. 351.401(g)(2) makes clear that it is

GFCL's burden to demonstrate why transaction-specific reporting is

infeasible. *See Koyo Seiko Co., Ltd. v. United States*, 516 F. Supp. 2d

1323, 1340 (Ct. Int'l Trade 2007), *aff'd*, 551 F.3d 1286 (Fed. Cir. 2008)

("{T}he burden is on the requesting party to establish that its

alternative is reasonable and will not create distortions.").

## C.   It Is Not Commerce's Job to Save GFCL from a "Burdensome Exercise"

Commerce ultimately excuses GFCL from reporting transaction-specific movement costs not because doing so would be impossible, as GFCL claimed, but because doing so would require more work. Commerce wrote that linking "a specific batch number to a particular invoice would be a burdensome exercise involving a manual review of shipping documents for GFCL's sales to GFL Americas, GFL America's sales to unaffiliated U.S. customers, as well as warehouse documentation." *Remand Redetermination* at 8-9, Remand Appx. 08960-61. However, there is no "burdensome exercise" exception to 19 C.F.R. 351.401(g)(1), which requires transaction-specific reporting so long as it is "feasible" to do so. This was clearly the case, as the record shows that GFCL maintained [

]. *GFCL Section C Questionnaire Response* at Exhibit C-30, Appx. 03677.

Commerce attempts to support its finding that a transaction-specific calculation would be too burdensome by recounting GFCL's failure, in another antidumping proceeding, to "duplicate the

{transaction-specific} methodology at verification due to the complicated nature of the calculation." *Remand Redetermination* at 9, Remand Appx. 08961. What Commerce omits from its recounting is that in that antidumping proceeding, *Polytetrafluoroethylene Resin from India*, Commerce found that GFCL's botched verification constituted a failure "to act to the best of its ability in responding to our request for information and, therefore, an adverse inference is warranted{.}" *Polytetrafluoroethylene Resin from India: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,594 (Sept. 26, 2018), and accompanying Issues and Decision Memorandum at Comment 2. This reflects that Commerce had previously found that GFCL could report movement expenses on a transaction-specific basis and was required to expend its "maximum effort" in complying with Commerce's request for transaction-specific data. *Nippon*, 337 F.3d at 1382. However, in the current proceeding, Commerce has unexplainedly replaced the "maximum effort" standard with a "burdensome exercise" exception that is nowhere in the law. Commerce's approach would reward respondents that perform calculations incorrectly or otherwise fail to respond to Commerce's requests, despite the antidumping law's

overriding concern for calculating the most accurate dumping margin possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce's attempt to rebut this point merely reinforces it. Commerce writes that its determination in *Polytetrafluoroethylene Resin from India* "is irrelevant to the issue of expense allocation" because "{i}n that investigation, the expense at issue *was* reported on a transaction-specific basis, however, because the expense could not be verified, we determined that the company had not acted to the best of its ability in responding to our request for information and applied an adverse inference under section 776(b) of the Act." *Remand Redetermination* at 26, Remand Appx. 08978. Precisely. This prior proceeding underscores (1) that GFCL is capable of reporting movement expenses on a transaction-specific basis and (2) the appropriate response when a respondent fails to put forth its maximum effort when calculating these expenses, prior to or during verification, is to apply an adverse inference rather than absolve them of the burden.

Commerce's concern with GFCL's burden may originate with a flawed interpretation of 19 C.F.R. 351.401(g)(3), which requires

Commerce, when assessing the feasibility of transaction-specific

reporting, to "take into account the records maintained by the party in

question in the ordinary course of its business{.}" In its Remand

Redetermination, Commerce found that "there is no information

suggesting that batch numbers are tracked and recorded in GFCL's

normal books and records for GFCL to feasibly establish a one-to-one

link between sales and shipping documents." *Remand Redetermination*

at 8, Remand Appx. 08960. As an initial matter, GFCL *does* routinely

track and record [                    ] to link sales and shipments, as the

Export Customer Complaint Register and the [                              ]

demonstrate. But more substantively, this standard does not require

that GFCL actually link sales and shipments in the ordinary course of

business in order to be obligated to calculate transaction-specific

movement expenses. Rather, it is only necessary that GFCL possess the

*information* in its records necessary to make the calculation. When

Commerce requested that GFCL provide transaction-specific movement

expenses during the original investigation, GFCL was required to

conduct a "careful and comprehensive investigation of *all relevant*

*records* that refer or relate to the imports in question *to the full extent of*

*the importers' ability to do so.*" *Nippon*, 337 F.3d at 1382 (emphasis added). Accordingly, the courts have rejected respondent-plaintiffs' arguments in favor of reporting expenses as recorded in the ordinary course of business in lieu of more accurate reporting that used new calculations based on available records as contemplated by the regulation. *See NSK Ltd. v. U.S.*, 346 F.Supp.2d 1312, 1342 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (rejecting respondent's argument that "its records do not allocate expenses based on weight" because respondent's "product brochure lists weight for all of its {products}."); *LG Chem, Ltd. v. United States*, 534 F.Supp.3d 1386, 1402 (Ct. Int'l Trade 2021) (upholding Commerce's rejection of respondent's division-specific method of allocating expenses as less accurate than a company-wide method, even though the respondent tracked the expenses by division in the ordinary course of its business). Because GFCL recorded the information necessary to calculate transaction-specific movement expenses in the ordinary course of its business, it was obligated to do so before Commerce.

## III. Commerce Wrongfully Accepted GFCL's Distortive Allocation of Movement Expenses

Instead of reporting transaction-specific movement expenses, GFCL reported movement expenses by "aggregating the actual grade-specific freight costs for its sales . . . and then dividing the actual freight costs by the weight of the grade-specific sales{.}" *Remand Redetermination* at 10, Remand Appx. 08962.[1] Daikin repeatedly raised to both Commerce and the Court that because grades of PTFE are physically identical but differ as to price, GFCL's methodology is equivalent to allocating movement expenses by product value, a distortive method that has been rejected by the courts. *See SKF USA Inc.,* 800 F. Supp. 2d at 1324-25. The methodology was distortive because, first of all, GFCL's reported movement expenses showed [      ] variation between different product types [

]. *See Daikin Case Br.* at 6, Appx. 08608. One product type had a per-unit movement expense of [         ] while a second product type had a reported expense of [         ] – with no plausible explanation as to why the second product cost [

---

[1] "Grade" refers to product type of PTFE and is equivalent to product code (PRODCODU) in GFCL's reporting.

] the first product to ship. *Id.* Second, GFCL's movement

expenses included both [                                        ] for

reasons that were never explained. *Id.* at 7, Appx. 08609. Third, GFCL's

allocation method resulted in numerous anomalies, including [          ]

U.S. sales with [      ] movement expenses and [

                            ]. *Id.* at 5-6, Appx. 08607-08.

Accordingly, the Court's remand order required that Commerce must

reconsider "whether its reporting of those expenses does not cause

inaccuracies or distortions." *Daikin* at 8. However, on remand,

Commerce continues to find that GFCL's allocation "does not cause

inaccuracies or distortions." *Remand Redetermination* at 11-12, Remand

Appx. 08963-64. Commerce's basis for its finding is profoundly flawed

and fails to address the distortions that Daikin had repeatedly

identified and brought to the agency's attention.

Commerce's method for determining whether GFCL's allocation

caused inaccuracies or distortions did not involve confronting the

distortions discussed above. Instead, Commerce selected a single

product code from among at least [    ] such codes covering GFCL's

subject merchandise[2] and examined whether this single product code

was distorted:

> To determine whether GFCL's allocation caused inaccuracies
> or distortions, Commerce considered record evidence with
> respect to product code [      ] . . . A review of the
> documentation from [
>
>                                                    ] shows an ocean
> freight expense of between [                    ] rupees (Rs)/kg
> to ship this product. Using its grade-specific allocation
> methodology, GFCL reported [      ] Rs/kg for product code
> [      ] – well within the range calculated from the
> documentation. This example shows that GFCL's calculation
> methodology allocating freight expenses by the grade of the
> product sold does not cause inaccuracies or distortions.

*Remand Redetermination* at 11, Remand Appx. 08963. Commerce's use

of a single product code to support a blanket conclusion that GFCL's

allocation did not cause inaccuracies or distortions is patently

unreasonable. Commerce cherry-picked its preferred evidence and

ignored contrary evidence raised by Daikin that demonstrated

inaccuracies and distortions. As discussed above, Daikin demonstrated

that (1) GFCL's allocation produced [

                                                                        ],[3] [

---

[2] *See* GFCL Section C Questionnaire Response at Exhibit C-14, Appx. 03617-18. The
"Grade" column contains the product codes.
[3] *See e.g. id.*, Appx. 03617 (reporting a per-KG expense of [

                                                                        ]).

];[4] and (2) [

],

suggesting that GFCL "pushed" movement expenses away from subject

sales to non-subject sales in order to mask its actual level of dumping.[5]

*See Daikin Case Br.* at 7, Exhibit 1, Appx. 08609 (comparing reported

movement expenses between subject and non-subject merchandise).

Commerce did not substantively address these distortions and merely

insisted that GFCL "based its movement expense calculations on the

*actual expenses* incurred and tracked by grade," ignoring that an

allocation method may be both based on a respondent's actual records

*and* distortive. *Remand Redetermination* at 28, Remand Appx. 08980

---

[4] *Compare* GFCL Supp. Section A Questionnaire Response at Exhibit SA-4, Appx. 03920, 03953 (showing that [

] *with*
GFCL Section C Questionnaire Response at Exhibit C-14, Appx. 03617 (showing that GFCL reported a per-KG freight expense of [                        ] and a per-KG freight expense of [                ]).
[5] Commerce responds that Daikin "points to no record evidence for this allegation because there is none." *Remand Redetermination* at 28, Remand Appx. 08980. Commerce misses the forest for the trees – Daikin's allegation is based on the fact that GFCL's preferred allocation method [

]. In the absence of any alternative explanation for why [

], Daikin's inference is reasonable, and Commerce's rebuttal is non-responsive.

(emphasis in original); *see, e.g., Navigator Company, S.A. v. United States*, 415 F. Supp. 3d 1278, 1290 (Ct. Int'l Trade 2019) (rejecting allocation methodology for brokerage expenses that was based on respondent's own records but that "included adjustments related to non-POR sales and, therefore, caused inaccuracies or distortions.").

Commerce dismissed Daikin's concerns by examining limited sales documents for a single product and then declaring the movement expenses to be accurate. Commerce notes in defense of its method that it did not pick this product on purpose but "simply examined the sample sales documents submitted by GFCL," a method it notes is "often used by Commerce{.}" *Remand Redetermination* at 28-29, Remand Appx. 08980-81. That may well be the case, but it still does not address the evidence that Daikin raised regarding the product codes that *were* distorted. Commerce's methodology is akin to a doctor checking a single vital sign while willfully ignoring other evidence of disease and then declaring a patient to be healthy. Commerce's method does not conform to the substantial evidence standard, which requires Commerce to consider "record evidence which, on its face, provides significant support for an alternative conclusion{.}" *Allegheny Ludlum Corp. v. United*

*States,* 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) (collecting

cases). Commerce did not do that here.

Daikin additionally identified [

]. *See Daikin Case Br.* at 5-6, Appx.

08607-08. In its Remand Redetermination, Commerce "acknowledge{d}

that there are a certain number of transactions included in the U.S.

sales database with no reported domestic or international movement or

insurance expenses." *Remand Redetermination* at 12, Remand Appx.

08964. However, "GFCL explained in its supplemental questionnaire

response that the product pertaining to these transactions was not sold

from GFCL to its U.S. affiliate during the {period of investigation}," and

on that basis, Commerce was "satisfied that GFCL's allocation

methodology does not cause inaccuracies or distortions." *Id.* Commerce

ignores the fact that sales of subject merchandise in the U.S. during the

period of investigation and reported in GFCL's U.S. sales database *did*

incur movement expenses when they were shipped from India, and any

methodology that fails to accurately capture such expenses is – by

definition – an inaccurate and distortive methodology. *See Navigator*

415 F. Supp. 3d at 1291 (holding that Commerce properly concluded that a respondent's allocation was distortive on the basis of "the many observations involving negative expenses").

During the investigation and before the Court, Daikin argued that, at a minimum, Commerce should require GFCL to allocate its movement expenses on an overall average basis instead of using a grade-based allocation. Calculating movement expenses on an overall average basis would address the distortions that Daikin identified, such as [      ] disparities in movement expenses between PTFE grades with identical physical properties and [                ] and the sales observations with no reported expenses whatsoever. Using an overall average method, GFCL would simply divide, for example, its total international freight expenses of [            ] by its total product weight of [                ], yielding a per-unit international freight expense of [          ], and repeat the same calculation for domestic inland freight. *See* GFCL Section C Questionnaire Response at Exhibit C-14, Appx. 03616. This simple method is impossible to distort or manipulate. Commerce characterizes this reasonable alternative as "a completely results-oriented approach . . . that is the antithesis of the

PUBLIC VERSION

transaction-specific reporting the petitioner has advocated up to this point." *Remand Redetermination* at 29, Remand Appx. 08981. However, the only result Daikin has been seeking is accuracy. Daikin would indeed prefer an allocation method that is non-distortive to an allocation method that is distortive. Commerce's grade-based allocation has the distinction of being the worst of all worlds: neither transaction-specific nor distortion-free.

## IV.   Conclusion

Commerce's Remand Redetermination findings that it was not feasible for GFCL to report its movement expenses on a transaction-specific basis and that its grade-based allocation method does not cause inaccuracies or distortions are unreasonable and are not based on substantial evidence. The Court should reject this aspect of Commerce's Remand Redetermination and order it to try again.

Respectfully submitted,

/s/  Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner
Nicholas C. Phillips*
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel to Daikin America, Inc.*

*Admitted only in New York. Practice
limited to matters before federal
courts and agencies.

Dated: September 9, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response brief contains 5,784 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set for in the Court's Chamber's Procedures.

Dated: September 9, 2024                    <u>*/s/*   Luke A. Meisner   </u>
                                                                      Luke A. Meisner