Slip Op. 25-22

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

### Court No. 22-00122

DAIKIN AMERICA, INC.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

GUJARAT FLUOROCHEMICALS LIMITED,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

## OPINION

[The court sustains Commerce's redetermination.]

Dated: March 7, 2025

*Roger B. Schagrin*, *Luke A. Meisner*, and *Nicholas C. Phillips*, Schagrin Associates, Washington, DC, on the comments for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Claudia Burke*, Deputy Director; and *Collin T. Mathias*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on

the comments for Defendant. Of counsel on the comments was *Leslie M. Lewis*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Jessica R. DiPietro*, *Matthew M. Nolan*, and *John M. Gurley*, ArentFox Schiff LLP, Washington, DC, on the comments for Defendant-Intervenor.

*Baker*, Judge: This case involving a challenge to the Department of Commerce's calculation of the dumping rate assigned to a chemical imported from India returns after remand. *See Daikin Am., Inc. v. United States*, Slip Op. 24-32, 2024 WL 1171736 (CIT Mar. 14, 2024). Both domestic producer Daikin America, Inc., and Indian manufacturer Gujarat Fluorochemicals Limited are unhappy with the agency's redetermination, although for different reasons. This time, the court concludes that the Department got it right.

I

First, a quick refresher on the relevant (and somewhat abstruse) background principles. Generally, Commerce determines a respondent's dumping margin by comparing the relevant merchandise's export price or constructed export price in the United States with its normal value. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 (CIT 2020) (citing 19 U.S.C. § 1673). Normal value is the "home market" price. *Id*. at 1334 n.6.

"The 'export price' is the price the producer or exporter charges to an *unaffiliated* customer either within, or for exportation to, the United States, while the 'constructed export price' is the price the *affiliated* purchaser charges within the United States to a purchaser not affiliated with the producer or exporter." *Id.* at 1353 n.34 (CIT 2020) (emphasis in original) (citing *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1298–99 (CIT 2017)); *see also* 19 U.S.C. § 1677a(a) (defining "export price"), (b) (defining "constructed export price").

"Commerce makes certain statutory adjustments to the price of goods to reflect various costs involved in preparing the goods for sale in the United States, and the adjustments to 'constructed export price' are more extensive than the adjustments to 'export price.'" *Hung Vuong*, 483 F. Supp. 3d at 1353 n.34 (citing 19 U.S.C. § 1677a(c), (d)). One of the adjustments relevant here, which the Department makes to both prices, is the cost of transporting the products to the place of delivery in the United States. *See* 19 U.S.C. § 1677a(c)(2)(A).

The relevant regulation directs that respondents report such expenses on a "transaction-specific" basis. *See* 19 C.F.R. § 351.401(g)(1). If such reporting is "not feasible," Commerce may "consider allocated

expenses[1] . . . , provided [it] is satisfied that the allo-
cation method used does not cause inaccuracies or dis-
tortions." 19 C.F.R. § 351.401(g)(1); *see also id*.
§ 351.401(g)(2) ("Any party seeking to report an ex-
pense or a price adjustment on an allocated basis must
demonstrate to the Secretary's satisfaction that the al-
location is calculated on as specific a basis as is feasi-
ble" and that "the allocation methodology used does
not cause inaccuracies or distortions."). In making
these determinations, the Department "will take into
account the records maintained by the party . . . in the
ordinary course of its business," *id*. § 351.401(g)(3), as
well as certain other factors, *id*.

Along with adjusting the U.S. price, Commerce
must sometimes also adjust the home-market price.
This is because the statute directs the agency to deter-
mine the latter "to the extent practicable" by looking
to sales "at the same level of trade as" the former.
19 U.S.C. § 1677b(a)(1)(B)(i). Although neither the

---

1 "Transaction-specific" reporting means providing the De-
partment with the shipping costs linked to each sale. "Al-
located" disclosure of such spending means some method-
ology that apportions gross outlays among sales. That is
why Commerce prefers "transaction-specific" figures—they
represent the actual amounts, while "allocated expenses"
inherently involve estimates. *Cf. Shikoku Chems. Corp. v.
United States*, 795 F. Supp. 417, 420 (CIT 1992) (referring
to "the standard Commerce practice of preferring actual ex-
penses over allocated expenses").

statute nor the SAA[2] defines "same level of trade," *see Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001), binding precedent holds it "to mean comparable marketing stages in the home and United States markets, *e.g.*, a comparison of wholesale sales in [the home market] to wholesale sales in the United States," *id*. (citing 19 C.F.R. § 351.412(c)(2)). This "ensures . . . that a [home-market] *wholesale* price will not be compared to a United States . . . *retail* price." *Id*. (emphasis added).

But the Department may be "unable to find sales in the foreign market at the same level of trade as the sales in the United States." *Id*. In those cases, it "compare[s] sales in the United States and foreign markets at a different level of trade." *Id*. Based on that comparison, it must

> increase or decrease the [home-market price] to account for the difference in the level of trade, if that difference:
>
> > (i) involves the performance of different selling activities; and

---

[2] *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103–316, vol. 1, 1994 U.S.C.C.A.N. 4040. The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

*Id.* (quoting 19 U.S.C. § 1677b(a)(7)(A)). This is what the statute refers to as a "level of trade" adjustment.

There's yet another layer to this onion that we must peel back. When (1) the home-market price is based on a level of trade that "constitutes a more advanced state of distribution than the level of trade of the constructed export price," *and* (2) data are unavailable to carry out a level-of-trade adjustment, as discussed above, Commerce must reduce the home-market price. 19 U.S.C. § 1677b(a)(7)(B). It does so by the "amount of indirect selling expenses" in that country. *Id.* "[T]he apparent theory" is "that such costs would not have been incurred if the sale had been made on a less advanced level of trade." *Micron*, 243 F.3d at 1305. The statute calls this reduction a "constructed export price offset." 19 U.S.C. § 1677b(a)(7)(B).[3]

Reflecting these principles, the relevant regulation states that the Department will grant a constructed export price offset only where (i) normal value is

---

[3] This offset "may not exceed" the amount deducted for such expenses from the constructed export price under 19 U.S.C. § 1677a(d)(1)(D). *Micron*, 243 F.3d at 1305 (citing 19 U.S.C. § 1677b(a)(7)(B)).

compared to the constructed export price; (ii) normal value is determined at a more advanced level of trade than that of the constructed export price; and (iii) despite full cooperation from the party requesting the offset, the data available do not allow Commerce to determine under its standard methodology whether the difference affects price comparability. *See* 19 C.F.R. § 351.412(f)(1). An interested party seeking an offset has the burden of satisfying the agency that these requirements are met. *See id.* § 351.401(b)(1).

## II

### A

Daikin makes granular polytetrafluorethylene resin. It requested, and the Department opened, an antidumping investigation into imports of that chemical. Slip Op. 24-32, at 2, 2024 WL 1171736, at *1. Commerce selected Gujarat, which produces the same compound, as a mandatory respondent. *Id.* at 2–3, 2024 WL 1171736, at *1. After Commerce imposed duties, Daikin brought this suit arguing they were too low. The U.S. company challenged the agency's acceptance of allocated movement expenses and its grant of a constructed export price offset to the Indian producer.

This court remanded for reconsideration. In accepting allocated movement expenses, the agency "failed to address record evidence" tending to undermine its conclusion that transaction-specific reporting of those expenses was not feasible. Slip Op. 24-32, at 7, 2024

WL 1171736, at *2. And even if the latter method were not feasible, it needed to address whether Gujarat's reported expenses were calculated "on as specific a basis as possible" and did not cause inaccuracies or distortions. *Id.* at 8, 2024 WL 1171736, at *3.

As to a constructed export price offset, the agency found the supporting evidence insufficient. *Id.* at 8–9, 2024 WL 1171736, at *3. Even so, it granted the offset, reasoning that it would be unfair to hold the Indian producer responsible for holes in its evidence since it had no opportunity "to remedy the deficiency." *Id.*; *see also* 19 U.S.C. § 1677m(d). Assuming, but not deciding, that § 1677m(d) applied here, the court found that Gujarat had an opportunity to cure the deficiency in its supplemental questionnaire response. Slip Op. 24-32, at 9–10, 2024 WL 1171736, at *3. And it was undisputed that the company had the burden "of demonstrating eligibility" for the offset. *Id.* at 10, 2024 WL 1171736, at *3; *see also* 19 C.F.R. § 351.401(b)(1). The court thus held that letting the Indian producer "off with a mere warning" was "not substantial evidence" that the latter carried its burden, and remanded for reconsideration on that issue, too. Slip Op. 24-32, at 10, 2024 WL 1171736, at *3.

## B

### 1

On remand, Commerce reviewed the evidence[4] Daikin cited to show that Gujarat could feasibly have reported transaction-specific movement expenses. First, consistent with this court's prior opinion, *see* Slip Op. 24-32, at 7–8, 2024 WL 1171736, at **2–3, the Department considered batch numbers in the Export Customer Complaint Register, Appx08958, Appx08973–08976. It observed that the Register covers a very small number of transactions in the unique situation of a post-sale customer complaint. Appx08975. The agency also noted that, while the Register contains comments from Gujarat's employees describing actions taken in response to a complaint, there is no indication in the record that the batch numbers derived from the company or its affiliates. *Id.* Given the lack of

---

[4] The court declines to redact confidential record material that it finds does not qualify as "business proprietary information" under the applicable Commerce regulation, 19 C.F.R. § 351.105(c). *See* 19 U.S.C. § 1516a(b)(2)(B) (providing that the court "shall . . . preserve[] in any action under this section" the "confidential or privileged status accorded to any documents, comments, or information," except that it "may disclose such material under such terms and conditions as it may order"); *cf. In re Violation of Rule 28(d)*, 635 F.3d 1352, 1356 (Fed. Cir. 2011) (recognizing the "strong presumption in favor of a common law right of public access to court proceedings").

evidence, the Department concluded the end customers may have submitted those data. *Id.*

Daikin argued before the agency that the complaint register shows that Gujarat can link merchandise from the factory floor to the end customer, which contradicts its justification for reporting shipping costs on an allocated basis (that such linkage is impossible). Appx08976. The Department retorted that "[t]he fact that something is *not impossible* is not the standard." *Id.* (emphasis in original). Rather, "Commerce may consider allocated expenses when transaction-specific reporting is not feasible, accounting for the records maintained by the respondent in the ordinary course of its business." *Id.* (citing 19 C.F.R. § 351.401(g)(1), (3)). And the Department explained at length why such reporting was not practicable, *see* Appx08960–08961, including that the Indian company "would have to review and compile thousands of pages of records to link movement expenses to particular transactions," Appx08961.

Commerce also considered other evidence that Daikin contended shows that Gujarat can make a one-to-one correlation using batch numbers from sales and shipping paperwork. Appx08958. The agency noted that "although certain shipping and sales documents" on the record contain batch numbers, "there is no record indication of how" those "numbers are associated with specific shipments or sales of merchandise." *Id.* It pointed to an email "relating to a sale that appears to

reference the same batch and pallet numbers as those on a packing list for a shipment from India in April 2020." Appx08958–08959. Nothing showed that the "batch and pallet numbers referenced in the shipping documents . . . are unique, such that a one-to-one linkage between the sale and shipping documentation could be made." Appx08959. Indeed, the Indian producer's "sample sales documentation show[ed] that one batch number can cover multiple pallet numbers." *Id*.

As the record did not show "how batch numbers are associated with the merchandise in the sales and shipping documents, the mere ability to connect [those] documents" was "insufficient to show the feasibility of transaction-specific expense reporting." Appx08960. Commerce thus found that Gujarat's normal record-keeping did not allow the latter "to feasibly establish a one-to-one link between sales and shipping documents." *Id*. And so "it was not feasible" for the company to report its movement expenses "on a transaction-specific basis." Appx08961.

Having so concluded, the Department next considered whether Gujarat's movement expense reporting methodology was calculated on as specific a basis as feasible and was not distortive. Appx08961–08962; *see also* 19 C.F.R. § 351.401(g)(2). As to the first question, the former found that the latter's per-grade allocation method is based on the company's records maintained in the ordinary course of business, Appx08962—that

is, the allocated expenses were based on "the *actual expenses* incurred and tracked by grade," Appx08980 (emphasis in original). This is because the Indian producer's records "track the quantity and costs of shipping subject merchandise" to each U.S. warehouse "on a per-grade basis." Appx08962 (citing Appx02223–02245) (all shipping and sales documentation, including grade information, for one invoice). As the company's allocation is "calculated based on shipments of subject merchandise during the [period of investigation], on a per-grade basis, and is based on [its] records maintained in the ordinary course," *id.*, the Department was "satisfied that [the former's] expenses were calculated on as specific a basis as feasible," *id*.

As for whether this reporting was distortive, Commerce tested Gujarat's allocations against the sales and shipping documents submitted to the record. The former reviewed evidence for one product code, comparing the company's allocated expense for that product to standard ocean freight expense ranges also on the record. Appx08963. The allocated expense was "well within the range calculated" for that grade. *Id.* The Department did note that some reported transactions showed no "domestic or international movement or insurance expenses." Appx08964. But the Indian producer explained in a supplemental questionnaire that this discrepancy exists because it did not sell the "product pertaining to these transactions" to its U.S. affiliate during the period of investigation. *Id.* Accepting this explanation, the agency was "satisfied" that

the per-grade allocation "does not cause inaccuracies or distortions." *Id.*

2

With respect to Gujarat's request for a constructed export price offset, Commerce observed that it reduces the home-market price if the sales in that market "occur at a more advanced [level of trade] than" those in the U.S. market, Appx08964 (citing *Micron*, 243 F.3d at 1305), "and there is insufficient record information to determine the effect of this difference on price comparability," *id.* (citing 19 C.F.R. § 351.412(f)). Moreover, an interested party in possession of the relevant information has the burden of proving its eligibility. *Id.* (citing 19 C.F.R. § 351.401(b)(1)). To that end, the Department required the Indian company to "provide both qualitative and quantitative analyses to evaluate whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different" levels of trade. Appx08965.

Gujarat, however, "only provided qualitative support documentation for two of the 21 reported selling activities and no documentation at all pertaining to a quantitative analysis." Appx08985. Commerce thus declined to grant the requested offset. Appx08985–08986.

### III

Daikin now objects to the agency's acceptance of Gujarat's allocated movement expenses. *See* ECF 62. The Indian producer, for its part, challenges the Department's decision not to grant it a constructed export price offset. *See* ECF 57. The government defends both its flanks, *see* ECF 68, with the private parties' roles reversed, *see* ECF 70 (Gujarat defending the allocation finding); ECF 69 (Daikin defending the offset denial).

### A

Daikin challenges Commerce's finding that it was infeasible for Gujarat to report movement expenses on a transaction-specific basis. ECF 62, at 5–22. The American company's quarrel with the Department on this question goes to both the law and the facts.

As to the law, Daikin and the agency do battle over the legal standard. Recall that the relevant regulation requires that respondents report movement expenses on a transaction-specific basis insofar as it is "feasible." 19 C.F.R. § 351.401(g)(1). In assessing feasibility, Commerce must "take into account the records maintained by the party . . . in the ordinary course of its business, as well as such factors as the normal accounting practices in the country and industry in question and the number of sales made by the party during the period of investigation or review." *Id.* § 351.401(g)(3).

Ct. No. 22-00122                                              Page 15

According to Daikin, under this standard "it is only necessary that [a respondent] possess the *information in its records necessary*" to report movement expenses on a transaction-specific basis. ECF 62, at 21 (emphasis in original). The company invokes the familiar (to the trade bar, at least) refrain that escaping an adverse inference requires an importer to respond to agency data requests "to the full extent of [its] ability to do so." ECF 62, at 21–22 (emphasis removed) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).[5] In essence, it contends that so long as the importer *can* provide transaction-specific movement expenses, it must do so, no matter how onerous the undertaking. *Fiat justitia ruat caelum* ("Let justice be done though the heavens may fall."). And the government does not dispute that with enough time, toil, tears, and sweat—if not blood, which no doubt Daikin would also demand—Gujarat could do that. *See* ECF 68, at 32–33.

Daikin's argument has considerable force. In various contexts, federal courts have struggled with the

---

[5] For background on when Commerce may apply an adverse inference in calculating dumping margins, see *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336–39 (CIT 2020).

definition of "feasible." Does it mean what is *possible*, or rather what is *practicable*?[6]

The Supreme Court has twice indicated that it means the former. In *Citizens to Preserve Overton Park, Inc. v. Volpe*, the relevant statutes directed an agency not to "'approve any [highway] program or project' that requires the use of any public parkland 'unless . . . there is no feasible and prudent alternative to the use of such land . . . .'" 401 U.S. 402, 411 (1971) (quoting 23 U.S.C. § 138, 49 U.S.C. § 1653). The Court held that "the requirement that there be no 'feasible' alternative route admits of little administrative discretion." *Id*. If it were possible "as a matter of sound engineering . . . to build the highway along any other route," the agency had to do so. *Id*.

In *American Textile Manufacturers Institute, Inc. v. Donovan*, the Court considered the meaning of "feasible" in Section 6(b)(5) of the Occupational Safety and Health Act, 29 U.S.C. § 655(b)(5). 452 U.S. 490 (1981). Rejecting the contention that this term allows a cost-benefit analysis, the Court held that it means

---

[6] Dictionary definitions unhelpfully use both (very different) meanings. *See, e.g.*, *Feasible*, Oxford English Dictionary (2d ed. 1989) ("Capable of being done, accomplished[,] or carried out; possible, practicable."); *cf*. Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 419 (1989) (observing that sometimes "statutory words have more than one dictionary definition . . . . It is not clear, for example, whether the term 'feasible' contemplates a cost-benefit analysis . . . .").

"'capable of being done, executed, or effected.'" *Id.* at 508–09 (quoting Webster's Third New International Dictionary of the English Language 831 (1976)).

Although *Overton Park* and *Donovan* support Daikin's reading of "feasible" in 19 C.F.R. § 351.401(g)(1) standing alone, the government correctly argues that provision does not exist in isolation. *See* ECF 68, at 32. In assessing feasibility, Commerce must "take into account the records maintained by the party in question in the *ordinary course* of its business, *as well as such factors*" as normal accounting practices and the company's sales. 19 C.F.R. § 351.401(g)(3) (emphasis added). The common denominator of these enumerated (but non-exclusive) factors is that they bear on practicability. *Cf. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (distinguishing the statute at issue in *Donovan*—where "no other language . . . modified the phrase at issue: 'to the extent feasible'"—from the statute before it, which stated that "'maximum feasible' standards are to be determined in light of" certain specified criteria). Unlike the statute in *Overton Park*, *see* 401 U.S. at 411, the regulation here invests the Department with considerable "administrative discretion" to determine what is feasible. In making that determination, the lodestar is the practicable, not the physically possible regardless of time and expense.

This reading of the regulation thus defeats Daikin's reliance on *Nippon Steel* and the adverse-inference

statute, which applies when an interested party "fail[s] to cooperate by not acting to the best of its ability to *comply* with a request for information from" Commerce. 19 U.S.C. § 1677e(b)(1) (emphasis added). The Department did not ask Gujarat to move mountains to report its movement expenses on a transaction-specific basis. Instead, it only asked for such information insofar as it was "feasible." Appx04140. And if the importer contended it was not "feasible," the agency asked for an explanation with supporting "accounting and sales documentation." *Id.* The former having provided such an explanation, and the latter having been satisfied with those reasons, there was no failure to cooperate.

Daikin alternatively argues that, even accepting Commerce's reading of the regulation, substantial evidence does not support the latter's factual finding that it was infeasible for Gujarat to report its movement expenses on a transaction-specific basis. The American company first points to batch numbers in its competitor's Export Customer Complaint Register. It argues that they show Gujarat "link[ed] . . . merchandise packed in India with merchandise sold to unaffiliated U.S. customers when it had a need to do so." ECF 61, at 12. That's certainly a reasonable inference.

But it's not the *only* reasonable inference one can draw from this evidence. As the Department explained, that batch numbers are included in the Register does not *necessarily* mean Gujarat supplied that

information, much less that its records maintained in the ordinary course of its business can be connected using batch numbers to make a one-to-one comparison and calculate *per-transaction movement expenses*. Appx08974–08975. Rather, the Department noted, such a comparison would entail a "manual review" of "thousands of pages of records." Appx08960–08961. Although physically possible, such an undertaking "was not feasible due to [Gujarat's] sales and inventory processes and . . . records maintained" in the ordinary course. Appx08976.

It suffices here that the inference Commerce has drawn is reasonable. "Where two different, inconsistent conclusions may reasonably be drawn from the evidence in [the] record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (brackets omitted) (quoting *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)).

Daikin next points to language in contracts with various warehouses requiring them to maintain a digital inventory of goods stored for Gujarat or its American affiliate. *See* ECF 61, at 14; *see also* Appx03676–03677. Some of these agreements required the warehouses to track and ship goods by batch and pallet numbers. *See* ECF 61, at 16; Appx03706, Appx03729. Daikin argues that this shows how batch numbers are linked to merchandise in sales and shipping

documents, meaning Gujarat can make the one-to-one connection necessary to calculate transaction-specific movement expenses. ECF 62, at 15–16.

Commerce explained, however, that the limited examples of sales and shipping documentation with batch numbers are not enough to support the broader conclusion that these numbers are unique or can link sales and shipping documentation together to allow for a per-transaction calculation. Appx08977. And even if it did, the agreements only prove that the warehouse will track *inventory* by batch and pallet number, and that it will ship out orders on a by-batch basis. *See, e.g.*, Appx03706 ("Warehouse shall ship the products to customer on a by batch basis."), Appx03729 (Warehouse will track product "using GFL Americas LLC batch number and pallet number."). That is, the warehouses do not maintain records of which batches are part of which transactions. This tracks with Gujarat's questionnaire responses, which reported that one sale from its American affiliate can "involve multiple purchases from [Gujarat]." Appx05087–05088. The important question for the feasibility determination is not merely whether batch numbers are unique, but *how* batch numbers relate to individual shipments and purchases. *See* Appx08977. The agency's conclusion that the mere fact that "certain documents from the sales and shipment chain contain the same batch numbers" does not demonstrate that it would be feasible for Gujarat "to piece these various documents together" to report transaction-specific movement

expenses, Appx08959, is supported by substantial evidence.

B

Once the Department finds transaction-specific expense reporting to be infeasible, it may accept an expense reported by allocation if it is "satisfied that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1). As explained above, Commerce found that Gujarat's reporting had no such effects. Appx08964.

Daikin disagrees. It asserts that record evidence shows distortions and "suggest[s]" that the Indian producer manipulated the movement expense calculation "in order to mask its actual level of dumping." ECF 61, at 26. In the American producer's telling, Gujarat's per-grade allocation produces disparities in cost between "physically identical" grades, even when shipped together, *id.* at 25–26, creating "numerous anomalies," including sales with zero or negative movement expenses for "many product types," *id.* at 24. Thus, according to Daikin, the per-grade allocation method is the equivalent of allocating by product value, a methodology it claims this court rejected. *Id.* at 23 (citing *SKF USA Inc. v. United States*, 800 F. Supp. 2d 1316, 1324–25 (CIT 2011)). It claims Commerce ignored this evidence, instead choosing to "cherry-pick[]" a "single product code," which it contends cannot support the "blanket conclusion" that a

per-grade allocation does not cause distortions. *Id.* at 25.

But Daikin's argument proves too much. As the Department noted, it cherry-picked nothing; indeed, it *picked* nothing. The agency merely "examined the sample sales documents submitted by [Gujarat] in response to a standard question in the antidumping questionnaire." Appx08980. And the American producer's invocation of *SKF* fares similarly. There, Commerce permissibly determined that a "value-based allocation" method "caused unreasonable distortions." 800 F. Supp. 2d at 1324. The court thus sustained the Department's decision to use an alternative methodology. *Id.* Here, the agency made no such finding and rejected Daikin's proposed alternative allocation as more distortive because it would include non-subject products. Appx08979–08981.

Further, while the American producer contends that Commerce failed to "substantively address" evidence purportedly supporting a contrary determination, ECF 62, at 26, the record shows otherwise. The Department acknowledged "a certain number of transactions" with no reported movement expenses, and noted the product codes for those sales did not appear in Gujarat's calculation chart. Appx08964. The Indian producer explained that it did not sell any of those products to its U.S. affiliate during the period of investigation, so there were no actual movement expenses. *See, e.g.*, Appx05092 (explaining the discrepancy as to

packing expenses). Commerce was satisfied with that answer. Appx08964.

Finally, Daikin's contention that disparities in reported movement expenses between grades demands the conclusion that the methodology was intrinsically distortive is belied by Commerce's observation that, at least as to some grades, the calculated expense is within the normal range for that product. Appx08963. And the Department need not respond to the American producer's arguments in precisely the way that company prefers. As explained above, the agency "examine[d] the relevant" evidence, including that which arguably undermines its conclusion, and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Based on that evidence, it concluded that Gujarat's "product-specific allocation methodology is preferable to [the] overall average movement expenses" advocated by Daikin. Appx08981. The latter points to no other evidence to support what amounts to little more than speculation that the Indian producer's allocation method was distortive, or a suggestion that the company chose this method to hide its actual level of dumping. *See* ECF 61, at 25–26. For these reasons, Commerce's decision to accept Gujarat's movement expenses reported on a per-grade allocation is supported by substantial evidence.

## IV

Gujarat contests the Department's denial of its requested constructed export price offset. The former argues that it established by qualitative and quantitative analysis that its home-market and constructed export price sales are made at different levels of intensity such that the expenses assigned to the period of investigation sales made at different intensities impact price comparability. ECF 57, at 3. It asserts that it "provided the information it could," including documentation of relevant expenses and an "explanation of how the quantitative analysis . . . supported its claimed levels of intensity." *Id.* at 8–9.

Commerce explained, however, that the Indian producer provided no substantial quantitative analysis. The agency asked for a "quantitative analysis showing how the expenses assigned to . . . sales made at different claimed levels of trade impact price comparability." Appx01910. Instead, Gujarat merely referred to its descriptive, qualitative analysis accompanying the selling functions chart. *Id.* The Department then repeated the request. Appx03880. Again, the Indian producer only referred to its initial response even as it provided more evidence that certain sales activities were performed. Appx03881. Missing was any actual, quantitative analysis showing *how* it came up with the figures included in the selling functions chart.

Based on this failure, the Department found Gujarat's responses lacking. The Indian producer "did not

demonstrate how indirect selling expenses vary by the different [levels of trade] claimed," Appx08713; did not "provide any selling expense data," *id.*; and provided only "qualitative support documentation for two of the 21 reported selling activities and no documentation at all pertaining to a quantitative analysis," Appx08985.

The company's arguments to the contrary are unavailing. It is certainly correct to observe that "[n]ot all selling functions carry the same weight" and that requiring the same level of support for each selling function would be unreasonable. ECF 57, at 7. But the Department did not ask for the same level of support for each. It asked for *any documentation at all* of the quantitative analysis undertaken to summarize Gujarat's information in the selling functions chart. And the Indian producer's complaints that it "provided detailed descriptions, as well as ample supporting documentation including where the expenses are captured," *id.* at 8, similarly fall flat. The agency asked for the documentation of those expenses *and* the analysis supporting their summarization in the chart, not merely the raw data.

Gujarat does not point this court to any place in the record where it provided the requested information. It is simply not relevant that the Indian producer provided a "description of sales activities," *id.* at 9; "expenses relevant" to each market, *id.* at 10; and "evidence such as correspondence with customers, its different warehouse agreements . . . , and . . . sales docu-

ments for each channel of trade," *id.* at 11. What is relevant is that Commerce asked repeatedly for the quantitative analysis showing *how* Gujarat "distilled these [alleged] quantified differences as requested in its selling functions chart." *Id.* The company cannot now complain that the *agency* did not do that work.

The Indian producer also attacks Commerce's decision on the grounds that it "never clarified or specifically requested additional information relating to [Gujarat's]" questionnaire responses. *Id.* at 12. But again, even if that were true, *see* Appx08982–08984, it is just not relevant. "The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the [Department] the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1). Declaring that Gujarat "provided the information it believed to comprise a quantitative analysis," ECF 57, at 13, is not sufficient. And it is no more help to claim the agency "cannot now say that [Gujarat] provided no quantitative analysis." *Id.* It is well within Commerce's discretion to so find, as long as that determination is supported by substantial evidence, as it is here. The court thus sustains the agency's denial of the offset.

\*    \*    \*

**Ct. No. 22-00122**                                   **Page 27**

For these reasons, the court sustains the Department's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated:      March 7, 2025        <u>/s/ *M. Miller Baker*</u>
            New York, NY         Judge